# EXHIBIT 1

STATE OF VERMONT

SUPERIOR COURT                                          CIVIL DIVISION
CHITTENDEN UNIT                              DOCKET NO. 547-6-19 Cncv

**State of Vermont**

vs.

**3M Company,**
**E. I. du Pont de Nemours and Company,**
**The Chemours Company,**
**The Chemours Company FC, LLC,**
**Corteva, Inc., and**
**DuPont de Nemours, Inc.**

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff, the State of Vermont, as trustee of State natural resources, as owner of State

property, and in its *parens patriae* capacity on behalf of its citizens, makes the following

allegations against Defendants.

## I.    SUMMARY OF THE CASE

1.    The State of Vermont, by and through Attorney General Charity R. Clark, brings this

action to protect and restore State natural resources and State property from widespread

contamination and injury by per- and polyfluoroalkyl substances (PFAS).  Defendants are the

manufacturers of PFAS, including perfluorooctanesulfonic acid (PFOS), perfluorooctanoic acid

(PFOA), perfluorononanoic acid (PFNA), perfluorohexanesulfonic acid (PFHxS),

perfluoroheptanoic acid (PFHpA), perfluorobutane sulfonic acid and its potassium salt (PFBS),

and hexafluoropropylene oxide dimer acid and its ammonium salt (Gen-X). As used in this

Second Amended Complaint, the terms PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-

X include those chemicals themselves (including all of their salts, ionic states, and acid forms of the molecules) and the "precursor" chemicals that break down into these seven pollutants.

2.    PFAS are human-made, synthetic chemicals that do not exist naturally in the environment, are toxic at extremely low levels (in the parts per trillion (ppt)), and were widely used for decades in consumer, household, and other commercial products, as well as industrial uses.  The ubiquitous contamination caused by these chemicals in Vermont has only recently come to light.

3.    PFAS are known as the "forever" chemicals because they persist in the environment for an indefinite (and very long) period of time.  PFAS bioaccumulate in the human body and can bio-magnify in animals, particularly fish and "top of the food chain" mammals.  PFAS exposure is correlated with a wide array of harmful health effects, including kidney and testicular cancer, ulcerative colitis, and adverse effects on fetal development during pregnancy, the liver, the immune system, the thyroid, and cholesterol levels.

4.    Defendants are 3M Company and various DuPont-related entities—major chemical companies that manufactured PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X.

5.    Defendant 3M Company (3M) manufactured PFOA from approximately the 1940s until 2002, and was the exclusive manufacturer of PFOS from approximately the 1940s until 2002. 3M used PFOS in many of its consumer products, including those with Scotchgard.

6.    Defendant E. I. du Pont de Nemours and Company (Historical DuPont) manufactured PFOA from approximately 2002 until approximately 2013.  Historical DuPont used PFOA starting in the 1950s in many of its consumer products, including those with Teflon.  Historical DuPont manufactured PFOA until replacing it with the shorter-chain PFAS, "Gen-X."  Historical DuPont manufactured and used Gen-X until transferring its performance chemicals business and

some associated liabilities to defendant The Chemours Company in 2015. The remaining

Defendants are other DuPont affiliates that have manufactured PFAS chemicals and/or have

succeeded to DuPont PFAS liabilities. Historical DuPont, The Chemours Company and these

affiliates are collectively referred to in this Second Amended Complaint as "DuPont."

7.    3M and DuPont knew for decades that these chemicals were toxic and posed substantial

health and environmental risks, but they covered up this information and instead promoted these

chemical products as safe and appropriate for widespread use. For example, in 1999 a 3M

environmental scientist said that PFOS is "the most insidious pollutant" since polychlorinated

biphenyls (PCBs), and that PFOS is "probably more damaging than PCB because it does not

degrade," and is "more toxic to wildlife." The 3M scientist went on to decry 3M's "unethical"

decision to prioritize "markets, legal defensibility and image over environmental safety."

Around the same time, a DuPont lawyer said that PFAS's bio-persistence "will kill us," that "our

story is not a good one," and that he had urged the company to "act[] responsibly" to "reduce the

potential for punitives." Yet the lawyer was "unsuccessful in even engaging [DuPont] in any

meaningful discussion of the subject." Information on PFAS's dangerous properties was hidden

from the public for years, as Defendants continued to profit from PFAS sales.

8.    Products containing PFAS chemicals made by 3M and DuPont were sold into the State.

In addition, 3M and DuPont sold PFAS chemicals into Vermont for use in industrial processes.

By sending toxic chemicals into Vermont while misleading the public about their properties, the

Defendants have caused widespread contamination and injuries to State natural resources.

PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X have contaminated Vermont drinking

water, groundwater, surface water, wildlife, soil, and sediment.

9.    Since the discovery of PFOA contamination in Bennington in 2016, the State has launched a statewide investigation to identify sources of PFAS contamination throughout the State.  Over the last three years, the State has discovered that PFAS contamination appears to be nearly ubiquitous.  Following these discoveries, in May 2019, the Vermont Legislature enacted a law, Act 21 of the 2019 session, requiring (among other things) statewide sampling for PFAS contamination beginning no later than July 2019.  Pursuant to this new law, the State issued a PFAS Statewide Sampling Plan in June 2019.  As the State continues its ongoing investigation of PFAS contamination throughout the State  it continues to discover additional PFAS contamination, including in new locations.

10.    The State has the authority and responsibility to protect, conserve, and manage State natural resources for present and future generations of Vermonters.  The State seeks damages and other relief for PFAS contamination and injury in its capacity as trustee of State natural resources and in its *parens patriae* capacity on behalf of State citizens.  The State also acts to protect its own interests in property.

11.    The State alleges that Defendants are: liable for natural resource damages and restoration; liable for altering the quality of groundwater as prohibited by 10 V.S.A. § 1410; strictly liable for manufacturing and supplying defective products; strictly liable for failing to provide adequate warnings in connection with those products; liable for negligently causing damage to the State's natural resources and property; liable for creating a public nuisance; liable for creating a private nuisance; liable for trespass upon the State's natural resources and property; liable for violating Vermont's Uniform Fraudulent Transfer Act as in effect on July 1, 2015 and Vermont's Uniform Voidable Transactions Act as in effect starting on July 1, 2017 (E. I. du Pont de Nemours and Company, The Chemours Company, Corteva, Inc., and DuPont de Nemours, Inc. (f/k/a

DowDuPont Inc.) only); liable for addressing certain PFAS releases under 10 V.S.A. § 6615(a); and liable for all resulting damages, including punitive damages.

12.   Plaintiff brings this action to recover compensatory damages and natural resource damages, to ensure that Defendants bear such expense, rather than the State or its citizens and taxpayers.  These damages include restoration and loss-of-use damages, and costs to investigate, monitor, abate, contain, prevent, treat, and remove PFAS from the State's natural resources and property.  The State also seeks punitive damages to reflect Defendants' reprehensible conduct.

13.   This Second Amended Complaint alleges claims based on contamination and injury caused by the seven specific PFAS chemicals listed above (PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X), as well as their precursors, acids, salts, ionic forms, and byproducts. The State is not seeking to recover through this Second Amended Complaint any relief for contamination or injury related to Aqueous Film Forming Foam, a firefighting material that contains PFAS and which the State is addressing through a separate legal action.  The State also is not seeking to recover through this Second Amended Complaint any relief for personal injuries or diminution in private property values, or to obtain relief already obtained by the State in previous legal actions for PFAS contamination.  Finally, although this Second Amended Complaint alleges claims based on these seven specific PFAS chemicals, PFAS contamination is a rapidly developing issue, and additional information (potentially including information on other PFAS chemicals) is expected to come to light over the course of this litigation.

## II.     PLAINTIFF

14.   Plaintiff is the State of Vermont, as represented by and through the Attorney General of the State of Vermont, with its principal office at 109 State Street, Montpelier, Vermont 05609-1001.

15.   The State brings this action in its capacity as sovereign, as trustee of State natural resources and owner of property (or of substantial interests in property) contaminated and injured by Defendants, and pursuant to its *parens patriae* authority on behalf of the citizens of Vermont.

16.   The State also brings this action based upon its statutory authority to protect State natural resources and property, and its common law police power.  This power includes, but is not limited to, its power to prevent pollution of the State's natural resources and property, to prevent nuisances, and to prevent and abate hazards to public health, safety, welfare, and the environment.

17.   In this Second Amended Complaint, the term "State's natural resources and property" refers to all natural resources or property for which the State seeks damages, which may include fish, wildlife, biota, air, surface water, groundwater, wetlands, drinking water supplies, State-held public lands, and State-owned lands.

### III.    DEFENDANTS

18.   Defendants are manufacturers, marketers, distributors, sellers, and promoters of PFAS and PFAS-containing products.  The following Defendants, at times relevant to this action, manufactured, marketed, distributed and/or otherwise sold (directly or indirectly) PFAS that each such Defendant knew or should have known would be delivered into areas affecting the State's natural resources and property, or otherwise did business in the State.

19.   Defendant **3M Company** (3M) is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55144.  3M Company has been  served with process in this action through its registered agent, Corporate Service Company, 100 North Main Street, Suite 2, Barre, Vermont.

20.   Defendant **E. I. du Pont de Nemours and Company** (Historical DuPont and now known as EIDP, Inc.) is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.  Historical DuPont is currently a wholly-owned subsidiary of Defendant Corteva, defined below.  Historical DuPont has been served with process in this action through its registered agent, CT Corporation System, 17 G W Tatro Drive, Jeffersonville, Vermont, 05464-9919.

21.   Defendant **The Chemours Company** is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19899.  The Chemours Company has been served with process in this action through its registered agent, CT Corporation System, 17 G W Tatro Drive, Jeffersonville, Vermont, 05464-9919.

22.   The Chemours Company was incorporated as a subsidiary of Historical DuPont as of April 30, 2015.  From that time until July 1, 2015, The Chemours Company was a wholly-owned subsidiary of Historical DuPont.  On July 1, 2015, Historical DuPont spun off The Chemours Company and transferred to The Chemours Company its "performance chemicals" business line, which includes its fluoroproducts business.  Historical DuPont distributed shares of The Chemours Company stock to Historical DuPont stockholders, and The Chemours Company has since been an independent, publicly traded company.

23.   Defendant **The Chemours Company FC, LLC** is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware.  The Chemours Company FC, LLC has been served with process in this action through its registered agent, CT Corporation System, 17 G W Tatro Drive, Jeffersonville, Vermont, 05464-9919.  The Chemours Company FC, LLC is a wholly-owned subsidiary of The Chemours Company and manufactures fluoropolymer resins.

24.   The Chemours Company and The Chemours Company FC, LLC are collectively referred to throughout this Second Amended Complaint as "Chemours."

25.   Historical DuPont merged with The Dow Chemical Company on August 31, 2017 to create DowDuPont Inc. (DowDuPont) (the Merger).  In connection with the signing of the agreement and plan of merger for the Merger, Historical DuPont and The Dow Chemical Company announced their intention to pursue the separation of the combined company, DowDuPont, into three independent publicly traded companies, one for each of the combined company's agriculture, materials science, and specialty products businesses.  Historical DuPont and The Dow Chemical Company each merged with wholly-owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont.  Since that time, DowDuPont has effected a series of separation transactions to separate its businesses into three independent, publicly traded companies for each of its agriculture, materials science, and specialty products businesses.

26.   Defendant **Corteva, Inc.** (Corteva) is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware.  Corteva, Inc. has been served with process in this action through its registered agent CT Corporation System, 17 G W Tatro Drive, Jeffersonville, Vermont, 05464-9919.

27.   On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva, Inc.

28.   Corteva, Inc. was initially formed in February 2018.  From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

29.   On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva, Inc. common stock by way of a pro rata dividend.  Following that distribution, Corteva, Inc. is the direct parent of Historical DuPont (*i.e.*, E. I. du Pont de Nemours

and Company) and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses. On June 1, 2019, what remained of DowDuPont Inc. was renamed DuPont de Nemours, Inc.

30.    Defendant **DuPont de Nemours, Inc.** (f/k/a DowDuPont Inc.) (DowDuPont) is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. DuPont de Nemours, Inc. has been served with process in this action through its registered agent in Delaware, The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, DE 19801. On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva, Inc. and of another entity known as Dow Inc. (New Dow), changed its name to DuPont de Nemours, Inc., to be known as DowDuPont. DowDuPont retained assets in the specialty products business lines following the above described spin-offs, as well as the balance of the financial assets and liabilities of Historical DuPont not assumed by Corteva, Inc.

31.    Prior to taking its current corporate form on June 1, 2019, DowDuPont, through the businesses that it owned and operated, and those owned and operated by its subsidiaries, had a decades-long history as a performance chemicals company, among other things.

32.    Defendants E. I. du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Second Amended Complaint.

33.    3M Company; E. I. du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "Defendants." Defendants, among other things: (a) designed, manufactured, formulated, promoted, marketed, sold, and/or otherwise supplied (directly or indirectly) PFAS and/or products containing PFAS that were delivered into areas affecting the State's natural

resources and property, such that PFAS has contaminated, injured, and threatens the State's

natural resources and property; (b) acted with actual or constructive knowledge that PFAS and/or

products containing PFAS would be delivered into areas affecting the State's natural resources

and property; (c) are legally responsible for and committed each of the multiple tortious and

wrongful acts alleged in this Second Amended Complaint; and (d) promoted PFAS and/or

products containing PFAS, despite the availability of reasonable alternatives and their actual or

constructive knowledge that the pollution alleged in this Second Amended Complaint would be

the inevitable result of their conduct.

34.    To the extent any act or omission of any Defendant is alleged in this Second Amended

Complaint, the officers, directors, agents, employees, or representatives of each such Defendant

committed or authorized each such act or omission, or failed to adequately supervise or properly

control or direct their employees while engaged in the management, direction, operation, or

control of the affairs of such Defendants, and did so while acting within the scope of their duties,

employment, or agency.

35.    Any and all references to a Defendant or Defendants in this Second Amended Complaint

include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named

Defendants.

### IV.    JURISDICTION AND VENUE

36.    This Court has jurisdiction over the subject matter of this action pursuant to 4 V.S.A.

§ 31.  This Court may exercise jurisdiction over Defendants because they either are or at the

relevant time were: authorized to do business in Vermont, registered with the Vermont Secretary

of State, transacting sufficient business with sufficient minimum contacts in Vermont, or

otherwise intentionally availing themselves of the Vermont market through the manufacturing,

marketing, distribution, and/or sale of PFAS and PFAS-containing products in Vermont so as to satisfy minimum contacts and to render the exercise of jurisdiction over Defendants by the Vermont courts consistent with traditional notions of fair play and substantial justice.

37.    Venue is proper in this Court because the State is the plaintiff, and State natural resources and/or property have been contaminated, injured, and damaged by PFAS contamination in Chittenden County.

## V.    PFAS ARE TOXIC AND POSE SUBSTANTIAL HEALTH AND ENVIRONMENTAL RISKS

38.    PFAS are a family of chemical compounds containing fluorine and carbon atoms.

39.    PFAS have been used for decades in industrial processes and to produce consumer, household, and commercial products that Defendants promoted as being resistant to heat and stains, long-lasting, and that repel water and oil.

40.    PFAS are human-made, synthetic chemicals that do not exist naturally in the environment.

41.    PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X are persistent in the environment and do not readily break down or biodegrade.  PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X are stable in the environment and will persist for an indefinite (and very long) period of time.  Because of their persistence, unless PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X are actively cleaned up from contaminated State natural resources and property, these chemicals will remain and continue to contaminate State natural resources and property indefinitely.  While it is possible to clean up PFAS from certain State natural resources and property, it is difficult and expensive to do so.

42.    PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X are soluble in water, do not adsorb or stick to soil particles, are mobile in the environment, and migrate long distances through soil and groundwater.

43.    PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X are transported long distances through the air.

44.    The pernicious characteristics of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X mean that once these chemicals are released into the environment, they migrate into and cause extensive contamination and injury of State natural resources and property.

45.    PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X bioaccumulate and bio-magnify in humans and in wildlife such as fish.

46.    PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X are toxic to humans at extremely low levels.

47.    PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X are difficult and costly to treat and remove from State natural resources and property.

48.    Exposure to certain PFAS is associated with harmful and serious health effects in humans and animals, including but not limited to:

    a.   altered growth;

    b.   impacts to learning and behavior of infants and older children;

    c.   lowering a woman's chance of getting pregnant;

    d.   interference with the body's natural hormones;

    e.   increased cholesterol levels;

    f.   modulation of the immune system; and

    g.   increased risks of testicular and kidney cancers.

Some or all of these health effects are associated with PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X.

49.    PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X contamination is a serious threat to human health and State natural resources and property.

50.    Humans are exposed to PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X through ingestion of drinking water and contaminated food, inhalation, and dermal contact, among other pathways.

51.    Known pathways for PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X to enter the environment include releases to air, waters, and soil from industrial processes and sites, and from consumer, household, and commercial products containing PFAS during their normal and foreseeable use and disposal.

52.    PFOS, PFOA, PFNA, PFHxS, and PFHpA have been detected in sludge at wastewater treatment plants and/or in septage from septic systems.  Biosolids from sludge at wastewater treatment plants are often used as a soil additive at agricultural sites or in commercial products. Thus, PFAS contamination through these pathways has greatly expanded the area of PFAS contamination and injury in the State.

## VI.    VERMONT IS INVESTIGATING PFAS CONTAMINATION

53.    The State of Vermont has conducted a series of investigations and collected sampling data to identify, characterize, and address risks to public health and State natural resources as quickly as possible.  The State's investigation and response are ongoing given the scope of the

problem and that knowledge of the public health and environmental risks associated with PFAS is evolving.

54.    The Vermont Department of Health has developed a health advisory for five PFAS to protect public health, advising that the cumulative level of PFOS, PFOA, PFNA, PFHxS, and PFHpA in drinking water should not exceed 20 ppt.  The Vermont Agency of Natural Resources used this advisory to help establish a groundwater quality enforcement standard, as described below.  The United States Environmental Protection Agency (EPA) has similarly issued health advisories for PFOA, PFOS, PFBS, and Gen-X.

**A.  Statewide PFAS Investigations**

55.    In February 2016, the Vermont Department of Environmental Conservation (DEC) discovered PFAS contamination in Bennington associated with former Teflon coating facilities in Bennington and North Bennington.

56.    Since that first discovery, the Vermont Agency of Natural Resources (ANR) through the DEC has undertaken a broader investigation to identify PFAS contamination in Vermont and the most likely sources of PFAS contamination.  This investigation is ongoing.

57.    The State first identified areas of PFAS use associated with industrial activity, including wire coating facilities, semi-conductor facilities, battery manufacturing facilities, and landfills. The State then performed targeted sampling at public drinking water systems at several locations throughout the State.  The State continues to identify and sample other sources of PFAS contamination.

58.    In July 2018, the DEC issued its *Perfluoroalkyl Substances (PFAS) Contamination Status Report*, which provided an overview of the findings of DEC's investigations to date.  The Status Report summarized findings from a variety of sampling sites, which confirmed the presence of

PFAS contamination in over 400 drinking water wells in Bennington County, 300 of which had

contamination levels greater than the State's drinking water health advisory of 20

ppt. Alarmingly, the highest level of PFOA detected in private drinking well water was 4,600

ppt. The Status Report also described other sampling results in throughout Vermont near known

sources of PFAS, and found, for example, PFAS contamination above the drinking water health

advisory in a public water well and in 30 private drinking water wells in the Town of Pownal.

59. The Status Report also made recommendations on additional work needed in the future,

including additional sampling.

60. In June 2019, DEC published a *Perfluoroalkyl Substances (PFAS) Statewide Sampling*

*Plan*. The 2019 Plan was submitted pursuant to S. 49, a bill passed in 2019 by the Vermont

Legislature, which directs the ANR Secretary to publish a plan for a statewide investigation of

potential sources of PFAS contamination for public review and comment. The law requires the

Secretary of Natural Resources to begin implementing this statewide sampling plan by no later

than July 1, 2019.

**B. State and Federal PFAS Standards**

61. In 2016, the Vermont Department of Health (VDH) issued a drinking water health

advisory of 20 ppt applicable to the combined level of both PFOA and PFOS. In July 2018,

VDH issued a revised health advisory, which added three additional PFAS compounds—PFHxS,

PFHpA, and PFNA—to the 20 ppt standard (health advisory). Thus, the current health advisory

of 20 ppt is applicable to the sum of PFOA, PFOS, PFHxS, PFHpA, and PFNA. Information on

the health and environmental risks of PFAS is still being developed, and the federal government

and other states are continuing to lower health advisories and related standards for PFAS

chemicals as more information on the toxicity of these pernicious chemicals becomes known. Vermont's health advisory may be revised as additional data and information become available.

62.    Each of the five PFAS compounds subject to the State's health advisory poses significant human health risks.

63.    PFOA and PFOS target many organ systems, including but not limited to the liver, endocrine, and the immune system.

64.    The National Toxicology Program, a Division of the National Institute of Environmental Health Sciences, concludes that PFOA and PFOS are presumed to be immune hazards to humans, based on high levels of evidence in animals that PFOA and PFOS suppress the antibody response.

65.    Exposure to PFOA and PFOS is also associated with developmental toxicity, including neurodevelopmental effects and skeletal alterations.

66.    Toxicity studies indicate that exposure to PFHxS, PFHpA, and PFNA have similar impacts as exposure to PFOA and PFOS, including but not limited to immunotoxicity, disruption of the endocrine system, developmental toxicity, and liver toxicity.

67.    The combination of multiple PFAS also can pose a substantial risk to human health. PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together.  Further, some PFAS chemicals degrade into other PFAS chemicals.

68.    The DEC has also promulgated rules establishing the health advisory for PFAS as a groundwater quality enforcement standard, and listing PFOA, PFOS, PFHxS, PFHpA, and PFNA as hazardous materials.  These rules were put into effect on an emergency basis; permanent versions of the rules went into effect on July 6, 2019.

69.    EPA has recently promulgated health advisories for Gen-X and PFBS.  The EPA health advisories recommend that drinking water concentrations of PFBS and Gen-X not exceed certain levels.

70.    EPA has also issued human health toxicity assessments for PFBS and Gen-X.  These toxicity assessments show that PFBS is associated with health effects on the thyroid, reproductive organs and tissues, developing fetus, and kidneys and that Gen-X is associated with cancer and with health effects on the liver, kidneys, the immune system, and the development of offspring.

## VII.    DEFENDANTS HAVE CAUSED PFAS CONTAMINATION AND INJURY IN VERMONT

### A.    Defendants' Manufacturing and Use of PFAS.

71.    3M was the primary manufacturer of PFAS chemicals in the United States from the 1940s through the early 2000s.

72.    3M was the only known manufacturer of PFOS and PFHxS in the United States.

73.    3M was a major manufacturer of PFOA.

74.    3M manufactured PFOA, PFOS, and PFBS as raw chemical materials for use in 3M products and products made by third parties.

75.    3M manufactured PFAS by electrochemical fluorination beginning in the 1940s.

76.    The electrochemical fluorination process results in a product that contains and/or breaks down into compounds containing PFOS, PFOA, PFNA, PFHxS, PFBS, and/or PFHpA, among other PFAS.

77.    3M marketed and sold PFAS and products containing PFAS throughout the United States, including in Vermont.

- 17 -

78.    3M supplied PFAS to third parties for use in manufacturing, including but not limited to DuPont, and throughout the United States, including in Vermont.

79.    3M supplied PFAS to manufacturers in Vermont, including Chemfab Corporation.

80.    DuPont began purchasing PFOA from 3M in 1951 for use in manufacturing DuPont's brand-name Teflon products.  Teflon is commonly known for its use as a coating for non-stick cookware.

81.    DuPont has used PFAS in other brand-name products including Stainmaster.

82.    DuPont marketed and sold PFAS and products containing PFAS throughout the United States, including in Vermont.

83.    DuPont supplied PFAS to third parties for use in manufacturing, including in Vermont to the Chemfab Corporation.

84.    Although DuPont knew about the health and environmental risks of PFAS from its use of PFAS starting in 1951, DuPont began manufacturing its own PFAS chemicals in 2002 for use in manufacturing when 3M phased out production of PFOA.

85.    3M and DuPont were the only companies to manufacture PFOA in the United States. DuPont continued to manufacture, market, and sell PFOA until at least 2013.  After 2013, DuPont started using Gen-X in many of its products.  Chemours has continued to manufacture, market, and sell Gen-X after the 2015 spinoff from Historical DuPont.  DuPont is the only known company to manufacture Gen-X in the United States.

86.    3M introduced PFBS in 2003 in some products, such as Scotchgard.  3M publicly stated at the time that PFBS was "a sustainable alternative to PFOS-based surfactants," that it was "practically non-toxic," and that it was "not considered persistent, bioaccumulative and toxic."

87. Defendants knew, or should have known, that PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X would contaminate and injure the environment through their manufacturing, marketing, distribution, and sales of PFAS chemicals and consumer, household, and other commercial products and materials containing PFAS.

88. Defendants knew, or should have known, that their manufacturing, marketing, distribution, and sales of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X, and/or products containing PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X, including in Vermont, would result in contamination and injury of the State's natural resources and property.

**B.    3M Has Known for Decades of PFAS Health and Environmental Risks.**

89. 3M knew of the health hazards and environmental risks and impacts posed by PFAS for decades but continued to manufacture, market, distribute, and/or sell PFAS and products containing PFAS for decades.

90. Based on its own internal studies, 3M knew that PFOA and PFOS were harmful to humans and the environment as early as the 1950s.

91. In the 1950s, 3M knew that PFAS chemicals had the ability to move throughout groundwater. By 1960, 3M knew that PFOA and PFOS were capable of leaching into groundwater and contaminating the environment. For example, chemical wastes from its PFAS manufacturing were known to be able to leach from its waste dumps into groundwater and pollute underground basins. An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

92. By the early 1960s, 3M understood that some PFAS are stable and persist in the environment and that they do not degrade.

93. 3M failed to disclose the risks to regulators or to the public.

94.    3M began testing the physiological and toxicological properties of PFAS compounds as early as 1950.

95.    3M began testing for PFAS in well waters in the 1960s, and in 1960 confirmed the presence of surfactant pollution in the wells.

96.    A 1963 3M report described PFAS as being stable in the environment, "completely resistant to biological attack," and also confirmed that 3M knew the chemicals to be "toxic."

97.    In the 1970s, 3M researchers documented PFOA and PFOS chemicals in fish.

98.    At that time, 3M was aware that its PFAS products were hazardous to marine life. In fact, effects of toxicity testing of PFAS conducted in 1970 were (according to an outside researcher) "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

99.    In 1975, 3M scientists were informed that PFAS had been found within, and could build up in, the human body. The source of these chemicals was suspected by a researcher at the University of Florida investigating the matter to be Teflon cookware or "Scotchguarded" fabrics, but when questioned about these concerns, 3M researchers said that they "plead[ed] ignorance."

100.    In the 1970s, 3M began monitoring the blood of its employees for PFAS because 3M was concerned about the health effects of PFAS, and in 1976, confirmed that PFAS chemicals were in fact in its workers' blood. For example, 3M measured fluorochemicals in the blood of workers at its PFAS-manufacturing plant in Cottage Grove, Minnesota at "1,000 times normal."

101.    In 1975, 3M found PFOA to be "widespread in human plasma" according to samples taken from across the United States.

102. Since PFOA is not naturally occurring, these findings of blood in the human body reasonably should have alerted 3M that it was likely that its products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company.

103. These findings also should have alerted 3M that PFOA is mobile, persistent, bio-accumulative, and biomagnifying, as those characteristics would explain the presence of PFOA in blood from 3M's products.

104. In 1978, 3M studied, and independent experts confirmed, the risks of PFAS. A 3M internal report from 1978 warned that PFOS and PFOA "are likely to persist in the environment for extended periods." That same study found that one common PFAS compound was "found to be completely resistant to biodegradation."

105. Similarly, a 3M internal document from 1979 stated that PFOA and PFOS "are known to persist for a long time in the body and thereby give long term chronic exposure."

106. A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and PFAS bioaccumulating in fish tissue taken from the Tennessee River.

107. Results of a 90-day animal study conducted by 3M in 1978 indicated that PFAS "should be regarded as toxic," and that those aware of the results "urgently recommended that all reasonable steps be taken immediately to reduce exposure of employees to these compounds."

108. A 1979 report further discussing the study on PFOS and PFOA toxicity to animals stated that the compounds were "more toxic than anticipated," and further recommended that "lifetime rodent studies . . . be undertaken as soon as possible."

109. Despite these warnings and recommendations, 3M decided to not publish the findings of this investigation.

110.  A 1979 memo from M.T. Case, formerly within 3M's medical department in Corporate Toxicology and Regulatory Services, stated that he believed it "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long-term chronic exposure."

111.  At a meeting among 3M employees in June of 1979 discussing the "Fluorochemicals in Blood Program," an outside researcher named Dr. H.C. Hodge noted that "[r]eduction in exposure [to 3M employees to fluorochemicals] should have a top priority" and recommended that further testing be conducted.  According to Dr. Hodge, "[i]t should be determined if FC-807 [a PFAS chemical] or its metabolites are present in man, what level they are present, and the degree of persistence (half-life) of these materials."

112.  In 1981, 3M moved 25 female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure."  This was based on internal research showing that PFAS compounds were causing birth defects in rats.  Yet 3M did not alert the public or regulatory agencies of its concerns with effects of exposure to PFAS.

113.  In 1983, 3M scientists concluded that concerns about PFAS "give rise to concern for environmental safety," including "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

114.  Even then, 3M's practices were concerning even to its own employees.  In March 1999, 3M environmental scientist Rich Purdy wrote to 3M and expressed his "profound disappointment" with "3M's handling of the environmental risks associated with the manufacture and use of" PFOS.  Mr. Purdy described PFOS as "the most insidious pollutant since PCB," and that it is "probably more damaging than PCB because it does not degrade, where as PCB does; it is more

toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB." Mr. Purdy described his attempts to discuss the dangers of the chemical with the company, and 3M's refusal to act. Finally, Mr. Purdy stated that "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

115. Despite decades of research, 3M first shared its concerns with EPA in the late 1990s. In a May 1998 report submitted to EPA, "3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information" according to a former 3M employee.

116. In response to pressure from EPA, 3M began to phase out production of PFOS and PFOA products in 2000.

117. In connection with the phase out, 3M issued a press release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

118. The EPA press release regarding 3M's phase-out of PFOS and PFOA presented a different story, stating: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

119. 3M worked to control and distort the science on PFAS. For example, 3M provided millions of dollars in grants to a professor, John Giesy, who publicly presented himself as independent but behind the scenes worked for 3M. Giesy's goal, as expressed in a March 25, 2008 email, was to "keep 'bad' papers [regarding PFAS] out of the literature [because] otherwise in litigation situations they can be a large obstacle to refute."

120.  In 2006, EPA cited 3M for 244 violations of the Toxic Substances Control Act, accusing 3M of failing to notify the agency about new chemicals and of late reporting of "substantial risk information."  3M was fined $1.52 million for these violations.

121.  Despite the large body of research demonstrating the serious health risks posed by PFAS, much of which 3M has been aware of for decades, as recently as _November 2018_, 3M stated that "the vast body of scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current exposure levels, or even at the historically higher levels found in blood."

122.  When 3M introduced PFBS in 2003 in Scotchgard and other products and stated that PFBS was "a sustainable alternative to PFOS-based surfactants" and that PFBS was "not considered persistent, bioaccumulative and toxic," 3M knew or should have known that this characterization of PFBS was misleading and inaccurate.  Although 3M argued that PFBS clears the human body quickly, PFBS was detected in human blood samples 3M analyzed in 2005.  In 2008 and 2010, 3M submitted evidence to EPA that PFBS was found in the blood and livers of certain animals, and increased the liver weight of laboratory mice.

123.  In June 2022, EPA issued a health advisory that the level of PFBS in drinking water should not exceed certain levels.

124.  3M knew or should have known that, in their intended and/or common use, PFAS (including products containing PFAS and PFAS used in industrial processes) would injure and/or threaten public health and the environment in Vermont.

## C. DuPont Has Known for Decades of PFAS Health and Environmental Risks.

125. Like 3M, DuPont has known for decades of the health and environmental risks of PFAS but instead of warning the public, users, or consumers about such risks, covered up this information and promoted PFAS and PFAS-containing products as safe.

126. In approximately 1951, DuPont started using PFOA in making Teflon at its Washington Works manufacturing plant in Parkersburg, West Virginia. As early as 1954, employees at DuPont's Washington Works plant reported that C8 (another name for PFOA) might be toxic. DuPont was concerned enough about the complaints that it delayed marketing Teflon containing PFOA to the public. In 1961, seven years later, Teflon consumer products hit the marketplace.

127. By 1961, DuPont's researchers had concluded that PFOA was toxic and DuPont's chief toxicologist, Dorothy Hood, warned in a memo to executives that products containing PFOA should be "handled with extreme care." As early as the 1960s, DuPont knew that PFOA caused adverse liver reactions in dogs and rats.

128. As early as 1966, DuPont was aware that PFOA could leach into groundwater.

129. By 1976, DuPont knew about research showing detections of organic fluorine in blood bank samples in the United States, which the researchers thought could be a potential result of human exposure to PFOA.

130. In 1978, DuPont's Medical Director published an article in the *Bulletin of the New York Academy of Medicine* in which he acknowledged DuPont's duty to "to discover and reveal the unvarnished facts about health hazards," and that a company "should be candid, and lay all the facts on the table. This is the only responsible and ethical way to go."

131.  By 1979, DuPont had data indicating that its workers who were exposed to PFOA had a significantly higher frequency of health issues compared to unexposed workers but did not report this data to any government agency or any community where it used PFOA.

132.  By at least 1980, DuPont had internally confirmed that "continued exposure [to PFOA] is not tolerable," and that people accumulate PFOA in their bodies.

133.  By at least 1981, DuPont had obtained a 3M internal study that had documented birth defects in the eyes of unborn rats exposed to PFOA in utero and urged female workers who came into contact with PFOA to consult their doctors "prior to contemplating pregnancy."  Around this same time, a DuPont worker in the Teflon division of the Washington Works plant who was pregnant began moving PFOA waste into pits using a pump-like device as part of her job responsibilities.  Tragically, when the DuPont employee gave birth in January 1981, the baby had only half a nose and a ragged eyelid that gaped down to the middle of his cheek.  This was consistent with the 3M study and in March 1981, DuPont had a pathologist and a birth defects expert review the 3M study.  They concluded that "the study was valid" and that "the observed fetal eye defects were due to C8."  DuPont immediately removed all female workers from areas where they might come into contact with PFOA.

134.  In April 1981, DuPont began secretly monitoring 50 female employees who had been exposed to PFOA.  As DuPont's medical director Bruce Karrh explained in a memo, this monitoring was undertaken to "answer a single question—does C8 cause abnormal children?"  Initial data showed that two of the seven pregnant workers exposed to PFOA had babies with eye and nostril deformities, which the researchers concluded was "statistically significant."  DuPont abandoned the study rather than inform regulators or employees.

135.  In a confidential November 1982 memo, DuPont's medical director warned about employees being exposed to potentially dangerous levels of PFOA.  He recommended that all "available practical steps be taken to reduce this exposure."

136.  By at least the early 1980s, DuPont began considering the effects of PFOA beyond its Washington Works plant.  In 1984, DuPont sent employees to secretly fill jugs of water from gas stations and general stores around the plant.  Testing of the water revealed PFOA in Lubeck, West Virginia, and Little Hocking, Ohio.  But DuPont decided not to notify the public.

137.  In 1984, DuPont held a meeting at its corporate headquarters in Wilmington, Delaware to discuss health and environmental issues related to PFOA.  The corporate managers expressed concern about "C-8 exposures off plant as well as to our customers and the communities in which they operate."  The corporate managers admitted internally that "none of the options developed are … economically attractive and would essentially put the long-term viability of this business segment on the line."  The DuPont corporate managers predicted that the medical and legal departments "will likely take a position of total elimination," of PFOA but instead decided that "corporate image, and corporate liability" would drive decisions about PFOA.  And the corporate managers admitted that it was too late to address past liability: "Liability was further defined as the incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation."  DuPont did not disclose the information discussed at the 1984 meeting to EPA, the State, or the general public.  DuPont began manufacturing PFOA itself over 15 years later and continued to use PFOA for almost another 30 years.

138.  By the mid-1980s, DuPont was aware that PFOA is bio-persistent and bio-accumulative.

139.  In an October 20, 1986 memorandum, a DuPont employee stated that DuPont's management in Wilmington, Delaware was "concerned about the possible liability resulting from long-term C-8 exposure to our employees and to the population in the surrounding communities and those downriver from the [Washington Works] plant."

140.  In 1988, DuPont began treating PFOA internally as a possible human carcinogen.

141.  In 1999, DuPont received preliminary results from a monkey health study showing that C8 caused monkeys to lose weight and increased their liver size.  Even monkeys given the lowest doses suffered liver enlargement, and one was so ill it had to be euthanized.

142.  An internal DuPont memorandum regarding its litigation strategy shows that DuPont sought to "not create [the] impression that DuPont did harm to the environment" and wanted to "keep [the] issue out of the press as much as possible."

143.  In 2000, John R. Bowman, a DuPont in-house counsel for C8 issues, wrote an email to several colleagues: "I think we need to make more of an effort to get [DuPont] to look into what we can do to get the Lubeck community a clean source of water or filter the C-8 out of the water."  He continued:

> I think we are more vulnerable than the MTBE defendants [manufacturers of another notorious groundwater contaminant, MTBE] because many states have adopted a drinking water guideline for MTBE and it is not biopersistent.  My gut tells me the biopersistence issue will kill us because of an overwhelming public attitude that anything biopersistent is harmful.

> We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives.  [Bernard Reilly, another DuPont attorney] and I have been unsuccessful in even engaging the clients in any meaningful discussion of the subject.  Our story is not a good one, we continued to increase our emissions into the [Ohio] river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical.

144. In a 2001 e-mail, DuPont in-house lawyer Bernard Reilly described DuPont's response to the C-8 issue as "a debacle at best." Reflecting on a late 2001 meeting with EPA concerning PFAS contamination in Parkersburg, West Virginia, Reilly wrote of DuPont: "[T]he business did not want to deal with this issue in the 1990s, and now it is in their face, and some still are clueless. Very poor leadership, the worst I have seen in the face of a serious issue since I have been with DuPont."

145. Notwithstanding its internal knowledge of PFOA's health and environmental risks beginning as early as the 1950s, DuPont publicly stated in 2003 that "[w]e are confident that there are no health effects associated with C-8 exposure," and that "C-8 is not a human health issue."

146. DuPont's own Epidemiology Review Board (ERB) repeatedly raised concerns about DuPont's practice of stating publicly that there were no adverse health effects associated with human exposure to PFOA. In June 2005, DuPont reported to the press that "no human health effects are known to be caused by PFOA." An ERB member called that statement "[s]omewhere between misleading and disingenuous." In February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of DuPont's public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

147. In October 2006, contrary to ERB's advice, DuPont's chief medical officer issued a press release stating that "there are no health effects known to be caused by PFOA." An ERB member criticized the press release because it "appear[ed] written to leave the impression 'don't worry.'"

148. By December 2005, EPA uncovered evidence that DuPont had concealed the environmental and health effects of C8 for more than two decades. In response, EPA levied a

$16.5 million administrative penalty on DuPont, which at that time was the largest civil administrative penalty EPA had ever obtained under any federal environmental statute.

149.  At approximately the time this penalty was issued, DuPont was making approximately $1 billion a year in revenue from products containing C8.

150.  Facing increased scrutiny from EPA, DuPont began to gradually phase out PFOA production in 2006.  Shortly thereafter, DuPont notified EPA that it intended to produce Gen-X as a replacement for PFOA.

151.  In January 2009, EPA and DuPont agreed to a "premanufacture notice consent order" on Gen-X, issued under section 5(e) of the Toxic Substances Control Act, 15 U.S.C. § 2604(e).  The consent order stated that "EPA has concerns that [Gen-X] will persist in the environment, could bioaccumulate, and be toxic … to people, wild mammals, and birds."  The consent order went on to note that EPA expected Gen-X to be "highly persistent" and that EPA has "high concern for possible environmental effects over the long-term" because of Gen-X's similarity to its "analog" PFOA.  The consent order concluded that "uncontrolled manufacture, import, processing, distribution in commerce, use, and disposal of the [Gen-X] may present an unreasonable risk of injury to human health and the environment."  The consent order imposed restrictions on DuPont's manufacture of Gen-X, and required DuPont to submit additional testing results to EPA.  Notwithstanding these statements in the consent order, DuPont emphasized to others that Gen-X has a "favorable toxicological profile" compared to PFOA.

152.  Following the consent order, DuPont conducted additional studies of Gen-X.  These studies revealed that the biodegradation of Gen-X "was 0%," and that Gen-X was associated with (among other effects) tumors, enlargement of the liver and kidneys, and lower fetal weight

in laboratory animals.  DuPont downplayed these results, telling EPA that these effects were "not considered adverse."

153.  EPA determined that Gen-X poses serious health and environmental risks.  EPA's human health toxicity assessment concluded that Gen-X chemicals have "similar persistence in the environment as longer chain PFAS, such as PFOA and PFOS," that Gen-X chemicals are "more mobile" than PFOA and PFOS, and that studies of laboratory animals have shown "health effects including on the liver, kidneys, the immune system, development of offspring, and an association with cancer."  In June 2022, EPA issued a health advisory for Gen-X in drinking water, advising that the level of Gen-X in drinking water should not exceed certain levels.

154.  Historical DuPont manufactured Gen-X, a business Chemours continued after the 2015 spinoff.  Even after EPA's recent findings about Gen-X's threat to human health and the environment, Chemours has continued to describe Gen-X as a "suitable substitute" for PFOA.  In 2019 Chemours sponsored research that downplayed Gen-X's toxicity and the animal studies previously carried out by Historical DuPont.  After Gen-X was discovered in drinking water near a Chemours facility in North Carolina, Chemours managers publicly insisted that drinking the contaminated water was "safe" and comparable to risks from cooking and eating Brussels sprouts.  But a Chemours employee (who formerly worked at Historical DuPont) privately acknowledged to a colleague that the "spin" on this contamination would be that "Chemours poisoned people for years, and finally stepped up after they got caught."

**D.  Defendants Failed to Act on Their Knowledge of the Health and Environmental Risks of PFAS.**

155.  Despite their knowledge that PFAS posed environmental and human health risks, and despite the availability of reasonable alternatives, Defendants failed to warn customers, users, the public or the State, and failed to take any other appropriate precautionary measures to prevent or

mitigate such contamination. Instead, Defendants promoted PFAS, and products containing PFAS, as environmentally sound products appropriate for widespread use.

156. At all times relevant to this litigation, Defendants were or should have been aware that PFAS contamination and injury of State natural resources and property was inevitable. This was due to PFAS's solubility, recalcitrance to biodegradation and bioremediation, and the normal and foreseen use of PFAS in industrial processes, and in consumer, household, and commercial products, including in Vermont.

157. Defendants possess and have always possessed vastly superior knowledge, resources, experience, and other advantages, in comparison to anyone or any agency, concerning the manufacture, distribution, nature, and properties of PFAS and PFAS-containing products.

158. By virtue of their tremendous economic power and analytical resources, including the employment of scientists such as chemists, engineers, and toxicologists, Defendants have at all relevant times been in a position to know, identify, and confirm the threat PFAS posed and poses to State natural resources and property.

159. In addition, by virtue of this superior knowledge, and/or by virtue of Defendants' partial and incorrect statements regarding the nature and impacts of PFAS, Defendants had a duty to disclose the truth and to act in accordance with the truth about PFAS.

## VIII. Historical DuPont's Spinoff of The Chemours Company

### A. Historical DuPont Spins Off Chemours To Insulate Itself From Environmental Liabilities.

160. After Historical DuPont had been sued and faced the threat of further lawsuits regarding its manufacturing and releases of PFOA, Historical DuPont announced in October 2013 its intention to spin off its "performance chemicals" business, responsible for manufacturing and sales of PFAS and PFAS-containing products, including PFOA and Gen-X.

161. Historical DuPont intended to do so by spinning off its performance chemicals line of business, which includes the PFAS business, as a new, independently owned company named The Chemours Company (the Chemours Separation and Spin Transaction), and having The Chemours Company assume certain liabilities.

162. In February 2014, Historical DuPont formed The Chemours Company as a wholly-owned subsidiary. As a wholly-owned subsidiary, The Chemours Company had a separate board of directors, but that board was controlled by Historical DuPont employees.

**B.    Historical DuPont Dictated the Terms of the Chemours Separation and Spin Transaction.**

163. The Chemours Separation and Spin Transaction was not an arm's-length transaction. Chemours's Verified First Amended Complaint, C.A. No. 2019-0351-SG (Del. Ch.) (the Chemours Compl.), ¶ 25. There were no procedural protections for Chemours, and Historical DuPont dictated the terms of the Chemours Separation and Spin Transaction. *Id*.

164. Historical DuPont did not allow Chemours (or its prospective management team) to have independent counsel to represent Chemours's interests in structuring the Chemours Separation and Spin Transaction. *Id.* ¶ 26. Instead, Historical DuPont and its outside counsel unilaterally prepared all of the documents underlying and effectuating the Chemours Separation and Spin Transaction. *Id*.

165. From formation through consummation of the Chemours Separation and Spin Transaction, Historical DuPont controlled development of the Chemours Separation and Spin Transaction terms. *Id*. ¶ 27

166. The initial draft Chemours Separation Agreement did not include the schedules listing the assets and liabilities to Chemours, preventing Chemours's designated management team from evaluating central economic terms of the transaction. *Id*. ¶ 29. Historical DuPont did not

provide Chemours's designated management team the requested copies of these schedules during winter and spring 2015. *Id.*

**C.    Historical DuPont Dominated the Corporate Governance of Chemours in the Lead Up to the Chemours Separation and Spin Transaction.**

167.  On May 12, 2015, the Chemours Board, which then consisted of three Historical DuPont employees, Michael Heffernan, Nigel Pond, and Steven Zelac (the DuPont Employee Board Members), who were not going to be with Chemours following the Chemours Separation and Spin Transaction, authorized the Dividend. *Id.* ¶ 35(a).

168.  On June 5, 2015, the DuPont Board approved the Chemours Separation and Spin Transaction. *Id.* ¶ 70.

169.  On June 9, 2015, DuPont Employee Board Members, as the sole members of the Chemours' Board, held a DuPont Board "meeting" to "discuss" whether Chemours should approve the Chemours Separation and Spin Transaction and the Chemours Separation Agreement. *Id.* ¶ 35(c).  That meeting was also attended by other Historical DuPont employees and Historical DuPont's outside counsel. *Id.*  The meeting consisted of "presentations" by Historical DuPont's outside counsel and Historical DuPont. *Id.*  The DuPont Employee Board Members (1) took "notice" that "DuPont, as the sole stockholder of [Chemours], has communicated" that the DuPont Board had determined that the Chemours Separation and Spin Transaction "are in DuPont's best interests," and (2) "unanimously" adopted resolutions approving the Chemours Separation and Spin Transaction on Chemours's supposed behalf. *Id.*

170.  On June 26, 2015, Nigel Pond, Historical DuPont's M&A Counsel, formerly one of the DuPont Employee Board Members, and then designated a "Vice President" of Chemours (a temporary position he would resign immediately thereafter) executed the Chemours Separation Agreement on Chemours's behalf. *Id.* ¶ 35(d).

171. On July 1, 2015, Michael Heffernan, Nigel Pond, and Steven Zelac all resigned from the Chemours Board.

172. In connection with the Chemours Separation and Spin Transaction, Historical DuPont and Chemours executed a "Separation Agreement" (the Chemours Separation Agreement) dated as of June 26, 2015.

**D.    Chemours Incurred Significant Indebtedness In Connection With The Chemours Separation and Spin Transaction.**

173. On May 12, 2015, Chemours borrowed over $4 billion through Senior Secured Term Loans (the Term Loans), Notes, and related indentures.

174. The Term Loans were incurred pursuant to the terms of the Credit Agreement, dated May 12, 2015 by and among Chemours, certain Guarantors party thereto and JPMorgan Chase Bank, N.A., as administrative agent. *See* Chemours's Form 10, Amendment No. 3, Ex. 10.14, filed on May 13, 2015 (as amended) (the Credit Agreement).

175. The Information Statement for the Chemours Separation and Spin Transaction dated June 5, 2015 (the Info Statement), disclosed that a "Dividend" of over $3.9 billion would be paid to Historical DuPont.

**E.    The Chemours Separation and Spin Transaction Resulted in a Disproportionate Allocation of Assets, Debts, and Liabilities.**

176. As part of the Chemours Separation and Spin Transaction, Chemours received approximately 19% of Historical DuPont's business lines, while being saddled with approximately two-thirds of Historical DuPont's environmental liabilities and 90% of Historical DuPont's pending litigation by volume of cases.  Chemours Compl., ¶ 38.

177. These environmental liabilities included those related to over 80 Historical DuPont-associated sites, the majority of which were sites that Chemours would never operate. *Id.* ¶ 39.

178.  Historical DuPont even gave Chemours all liabilities related to Historical DuPont's historical explosives operations and asbestos and benzene exposures that had nothing to do with its performance chemicals business.

179.  As a result of the Chemours Separation and Spin Transaction, Chemours's capital structure carried a debt-to-EBITDA (earnings before interest, taxes, depreciation, and amortization) ratio of 7.3 to 1.0.  *Id.* ¶ 41.

180.  Under the Chemours Separation Agreement, The Chemours Company agreed to defend and indemnify Historical DuPont against, and assumed for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all liabilities relating," "primarily to, arising primarily out of or resulting primarily from, the operation of or conduct of the [Performance Chemicals] Business at any time."  This indemnification is uncapped and does not have a survival period.

181.  The Chemours Company agreed to indemnify Historical DuPont against and assume for itself the Performance Chemical Business's liabilities regardless of: (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Historical DuPont group or the Chemours group; and (v) which entity is named in any action associated with any liability.

182.  The Chemours Company agreed to indemnify Historical DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.  Such liabilities were deemed "primarily associated" if

Historical DuPont reasonably determined that 50.1% of the liabilities were attributable to the

Performance Chemicals Business.

183.  The Chemours Company also agreed to use its best efforts to be fully substituted for

Historical DuPont with respect to "any order, decree, judgment, agreement or [any litigation or

investigation] with respect to Chemours Assumed Environmental Liabilities " in effect at the

time of the Chemours Separation and Spin Transaction.  Chemours Separation Agreement at

§ 6.10(b).

184.  The schedules to the Chemours Separation Agreement, as referenced in the "Chemours

Assumed Environmental Liabilities" definition, have never been publicly filed.

## F. Historical DuPont's "High End (Maximum) Realistic Exposure" Figures Were Unrealistic and Designed to Mask Chemours's Insolvency.

185.  The Chemours Separation and Spin Transaction was predicated upon a determination that

Chemours would be solvent following the Chemours Separation and Spin Transaction.  *See id.*, §

4.5(e).  However, the solvency opinion was based upon faulty, and indeed fictitious, certified

"maximum" liability figures that were unrealistic and designed to mask Chemours's insolvency.

186.  Houlihan Lokey (Houlihan) was commissioned to provide a financial opinion regarding

Chemours's solvency on the spinoff date.  Chemours Compl., ¶¶ 49-50.  Houlihan's opinion,

however, was based on Historical DuPont's "High End (Maximum) Realistic Exposure"

estimates for dozens of sites that were given to it by Historical DuPont.  *Id.* ¶ 50.

187.  DuPont engineered the "High End Maximum Realistic Exposure" figures to massively

understate the real potential maximum exposure.  *Id.* ¶ 56.

188.  In May 2015, Historical DuPont demanded that Chemours's newly appointed chief

financial officer (Mark E. Newman) certify to the accuracy of the "High End (Maximum)

Realistic Exposure" numbers.  *Id*. ¶ 52.  Newman conditioned his certification upon Historical

DuPont's acknowledgement that it supplied the maximum liability numbers, which Historical DuPont did through "Backup Certificates" signed by its employees. *Id.*

189. Historical DuPont understated the real maximum liabilities.

190. For multiple categories of litigation (such as PFOA, benzene, and other PFAS), Historical DuPont does not appear to have undertaken any analysis. *Id.* ¶ 58. Rather, Historical DuPont's certification invoked a supposed "analysis" of the maximum liabilities done by Deloitte Transactions and Business Analytics LLP (Deloitte). *Id.*

191. Deloitte did not certify "maximums." *Id.*

**G.    Chemours's Management Raised Cash Flow Concerns Prior to the Chemours Separation and Spin Transaction.**

192. Prior to the closing of the Chemours Separation and Spin Transaction, Chemours's management complained to Historical DuPont's senior management that Chemours would lack appropriate cash reserves. *Id.* ¶ 51.

193. In June 2015, Historical DuPont summarily rejected the plea of Chemours's chief financial officer for an additional $200-300 million in cash reserves to function on day one. *Id.* ¶ 32.

194. Historical DuPont ignored the concerns of Chemours's management that paying quarterly stockholder dividends of $100 million would adversely affect Chemours's cash position. *Id.* ¶ 51. Chemours's management went on to cut future dividends to almost zero after the Chemours Separation and Spin Transaction. *Id.* ¶ 74.

**H.    Chemours's Financial Condition Was Deteriorating When the Chemours Separation and Spin Transaction Occurred, Leaving Chemours Insolvent.**

195.  Chemours's financial condition at the time of the Chemours Separation and Spin Transaction was rapidly deteriorating.  Chemours's business, as a stand-alone enterprise, was suffering from slumping EBITDA.

196.  In the midst of weakness in the global titanium dioxide market cycle and continued foreign currency impacts, Chemours had vastly overstated its own financial health.

197.  Chemours's financial condition was much worse at the time of the Chemours Separation and Spin Transaction than Chemours and Historical DuPont publicly disclosed.

198.  At the time of the Chemours Separation and Spin Transaction, Chemours's debt-to-EBITDA ratio was 7.3 to 1.0.  *Id.* ¶ 41.  This far exceeded the Credit Agreement's maximum "Total Net Leverage Ratio," barring Chemours from accessing $1 billion of revolving loans.  *See* Credit Agreement, § 6.13.

199.  Chemours suffered a liquidity shortage within months of the Chemours Separation and Spin Transaction.  Chemours Compl., ¶ 75.  As a result, Chemours laid off 1,000 employees, shut plants or production lines in Delaware and Tennessee, sold off business lines, undertook two corporate restructurings, and made multiple amendments to the Credit Agreement.  *Id.* ¶ 76.

200.  In November 2015, Chemours announced that it would sell to Dow its facility in Beaumont, Texas for approximately $140 million in cash.  *Id.* ¶ 77.

201.  In February 2016, Historical DuPont advanced Chemours $190 million for goods and services to be provided to Historical DuPont through mid-2017.  *Id.*

**I.    The Debt Trading Prices of Chemours's Funded Debt Reflects Chemours's Insolvency as of the Date the Chemours Separation and Spin Transaction and Spiraled Downhill in the Immediate Aftermath Thereof[1]**

---

[1] Chemours's share price, originally pegged by DuPont at $21 per share, declined to $11.48 within a month, and to $3.16 within six months.  *Id.* ¶ 65.

202. As of the last trading date before the Chemours Separation and Spin Transaction closed, the markets reflected Chemours's insolvency. As set forth in Chemours's publicly filed financial statements, the market believed that Chemours was insolvent by $77 million.

203. On August 6, 2015, Chemours filed its first Form 10-Q following the Chemours Separation and Spin Transaction, containing a deconsolidated balance sheet as of June 30, 2015, immediately prior to the Chemours Separation and Spin Transaction, reflecting Chemours's insolvency by at least $309 million.

204. Just three months after the Chemours Separation and Spin Transaction, Chemours was insolvent by $829 million based upon the value of its traded debt.

**J.    Historical DuPont Saddled Chemours with Liabilities Far in Excess of the Amounts Attributed to Such Liabilities at the Time of The Chemours Separation and Spin Transaction.**

205. In 2005, Historical DuPont settled a class action lawsuit filed on behalf of 70,000 residents of Ohio and West Virginia for $343 million. Under the terms of the 2005 class action settlement, Historical DuPont agreed to fund a panel of scientists to determine if any diseases were linked to PFOA exposure, to filter local water for as long as C-8 concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.

206. Also in 2005, Historical DuPont agreed to pay $16.5 million to resolve eight counts brought by the EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act concerning the toxicity of PFAS compounds.

207. The C8 Science Panel completed its research in 2013 and found several significant diseases, including cancer, with a probable link to PFOA. Thereafter, more than 3,500 personal

injury claims were filed in Ohio and West Virginia as part of the 2005 settlement that were consolidated into a multidistrict litigation court in Ohio (the Ohio MDL).

208.  At the time of the Chemours Separation and Spin Transaction, Historical DuPont certified to Houlihan a "maximum" liability figure for the 3,500 cancer and other bodily injury claims relating to PFOA of $128 million.  *Id.* ¶¶ 82, 84.

209.  In mid-2016, Historical DuPont lost the first three bellwether trials, the first having gone to trial just two months after the Chemours Separation and Spin Transaction.  Juries returned multi-million dollar verdicts against Historical DuPont, awarding compensatory damages and, in two cases, punitive damages to plaintiffs who claimed PFOA exposure caused their illnesses, in the total amount of $19.7 million.  *Id.* ¶ 85.

210.  On February 13, 2017, Historical DuPont and The Chemours Company reached a global settlement of the Parkersburg, West Virginia cases agreeing to pay $670.7 million to resolve the Ohio MDL.  *Id.* ¶¶ 89-90.

211.  At the time of the Chemours Separation and Spin Transaction, Historical DuPont certified Chemours's "maximum" exposure as $2.09 million with respect to Historical DuPont's Fayetteville Works operation in North Carolina.  *Id.* ¶ 93.  At the time of the Chemours Separation and Spin Transaction, Historical DuPont knew that the Fayetteville plant had been discharging PFAS for 30 years or more into the Cape Fear River, which serves as the source of drinking water for tens of thousands of people.  *Id*. ¶ 94.

212.  Beginning in September 2017, the State of North Carolina, public water authorities, well owners, and a consolidated putative class of North Carolina residents, among others, filed suit against Chemours and/or Historical DuPont.  *Id*. ¶ 97.

213.  In February 2019, Chemours entered into a judicially approved consent order with the State of North Carolina to resolve the State's claims arising from Historical DuPont's long-running discharges into the Cape Fear River and contamination of area groundwater.  *Id.* ¶ 99. That consent order requires Chemours to take steps to remediate Historical DuPont's historical contamination and to implement environmental protection measures at a cost of more than $200 million.  Additionally, a number of private lawsuits relating to Historical DuPont's activities in the region remain outstanding, including a class action.

214.  At the time of the Chemours Separation and Spin Transaction, Historical DuPont certified that the "maximum" Chemours could have to pay for total New Jersey environmental liabilities was $337 million, divided among different sites in New Jersey.  *Id.* ¶ 101.  In 2018, in connection with the DowDuPont spin-off, Historical DuPont revised its liability estimate upward to approximately $620 million.  *Id.*  The State of New Jersey has criticized even Historical DuPont's upward-revised estimates, claiming it "implausible" that these amounts could represent "good-faith estimates of [Historical DuPont's historical New Jersey] environmental obligations and liabilities."  *Id.*

215.  For benzene, Historical DuPont certified a "maximum" liability of $17 million, including defense costs, at the time of the Chemours Separation and Spin Transaction.  *Id.* ¶ 108.  In 2018, Historical DuPont provided Chemours with a more comprehensive study valuing the potential maximum costs at over $111 million.  *Id.*  Historical DuPont addressed PFAS litigation, if at all, as part of a catch-all "maximum" of $194 million covering "General Litigation . . . to Perpetuity," which apparently included everything from PFAS liabilities to commercial litigation.  *Id.* ¶ 110.

216. Significant additional environmental and other litigation arising from Historical DuPont's performance chemical business was likewise pending or threatened at the time of the Chemours Separation and Spin Transaction and additional lawsuits continue to be filed against Historical DuPont relating to its performance chemicals business.

217. In 2017, Chemours then also agreed, in an amendment to the Chemours Separation Agreement, to pay $25 million for future PFOA costs not covered by the Chemours Separation Agreement for each of the next five years (up to an additional $125 million). Historical DuPont also agreed to cover additional amounts up to $25 million for five years, with Chemours taking responsibility for any amounts greater than $50 million.

218. The effect of the spin-off of Chemours was to segregate a large portion of Historical DuPont's environmental (and other) liabilities, including liabilities related to its manufacturing, use, and disposal of PFAS compounds, and give them to an undercapitalized entity, thus attempting to limit the funds available to satisfy Historical DuPont's legacy liabilities.

219. Given that Chemours is purportedly responsible for all or substantially all of Historical DuPont's historic environmental liabilities, is saddled with debt, and has comparatively few assets, the separation and spin-off has been described by some market commentators as "a bankruptcy waiting to happen" and "complete securities fraud."

**L.    Following the Chemours Separation and Spin Transaction, Historical DuPont Turned Its Attention To The Next Steps In Its Multi-Step Scheme To Move Valuable Assets Away From PFAS Creditors.**

220. On December 11, 2015, Historical DuPont announced a merger with Dow Chemical Company, into the combined DowDuPont in what would become the Merger. DowDuPont would eventually, in 2019, split into three independent companies: an agriculture company, a materials science company, and specialty products company. These actions were all a

continuation of the fraudulent Chemours Separation and Spin Transaction, which was a necessary precondition to these later mergers and spins.

221.  The DowDuPont Merger closed on August 31, 2017, with each of Dow Chemical Company and DuPont becoming wholly owned subsidiaries of DowDuPont.

222.  During the two years following the Merger, DowDuPont engaged in a series of internal reorganizations to realign its businesses into three subgroups: agriculture, materials science, and specialty products.

223.  After the completion of the Merger, DowDuPont engaged in a number of internal transactions, realignments, and diversities, that resulted in the transfer, directly or indirectly, of a substantial portion of what had been Historical DuPont's assets from the combined DowDuPont.

224.  Pursuant to an April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the DowDuPont Separation Agreement), DowDuPont jettisoned away from Chemours' and Historical DuPont's creditors DowDuPont's agriculture chemical and seed business (which went with Corteva) and DowDuPont's materials science business (which went with New Dow) (the DowDuPont Separation).

225.  The spin-off of DowDuPont's materials science division into New Dow (the Dow Spin Off) occurred on April 1, 2019 and New Dow became an independent, publicly traded company on April 1, 2019.  New Dow was formed as a wholly-owned subsidiary of DowDuPont to serve as the holding company for the materials science business, and Corteva Inc. was formed as a wholly-owned subsidiary of DowDuPont to serve as the holding company for the agriculture business.  The Dow Spin Off was accomplished through a pro rata dividend in-kind of all of New Dow's then-issued and outstanding shares of common stock, to holders of DowDuPont's common stock as of the close of business on March 21, 2019 (the Dow Distribution).

226. The spin-off of DowDuPont's agriculture chemical and seed business to Corteva (a/k/a as Corteva Agriscience) (the Corteva Spin Off) occurred on June 1, 2019. The Corteva Spin Off was accomplished through a pro rata dividend in-kind of all of the then-issued and outstanding shares of Corteva's common stock, to holders of Historical DuPont's common stock as of the close of business on May 24, 2019 (the Corteva Distribution).

227. In connection with the Dow Distribution and the Corteva Distribution, DowDuPont entered into certain agreements that, among other things, effect the separations, provide for the allocation of assets, employees, liabilities, and obligations (including its investments, property and employee benefits and tax-related assets and liabilities) among DowDuPont, New Dow, and Corteva.

228. Pursuant to the DowDuPont Separation and Distribution Agreement as well as a June 1, 2019 "Letter Agreement," DowDuPont agreed to indemnify both New Dow and Corteva against certain litigation, environmental, workers' compensation, and other liabilities that arose prior to the distribution.

229. On or about June 1, 2019, DowDuPont changed its name to DuPont de Nemours, Inc., which now holds the former conglomerate's specialty products business.

230. The DowDuPont board of directors believed the completion of the post-Merger separations was, in DowDuPont's words, "the best available opportunity to unlock the value of DowDuPont's businesses." The practical effect of the post-Merger separations was to frustrate and hinder creditors of Historical DuPont and Chemours by moving valuable assets further away from Historical DuPont.

231. As a result of these transactions, the assets Historical DuPont had held following the Chemours Separation and Spin Transaction, including the Dividend and/or the proceeds or

products thereof, are now distributed across at least three independent companies, DowDuPont, New Dow, and Corteva, or their subsidiaries or affiliates.

232. Many details about these transactions are hidden from the public in confidential and/or non-public schedules and exhibits to the various agreements. As a result of the obfuscation of the specific details of these transactions, creditors' efforts to understand the final disposition of Historical DuPont's valuable assets and the adequacy of the consideration received in return has been hampered.

233. Pursuant to the DowDuPont Separation Agreement, DowDuPont and Corteva assumed direct financial liability of Historical DuPont, including liability that was *not* related to the Agriculture, Materials Science, or Specialty Products Businesses. More specifically, Corteva was allocated twenty-nine percent (29%) of all financial liabilities of Historical DuPont that are not related to the agriculture business, the materials science business, or the specialty products business. DowDuPont was allocated seventy-one percent (71%) of all financial liabilities of Historical DuPont that are not related to the agriculture business, the materials science business, or the specialty products business.

234. Liabilities related to businesses and operations of Historical DuPont that were previously discontinued or divested have been allocated between Corteva and DowDuPont as set forth in the non-public confidential schedules to the DowDuPont Separation Agreement. To the extent that liabilities related to businesses and operations of Historical DuPont that were previously discontinued or divested are not listed on the non-public confidential schedules to the DowDuPont Separation Agreement, each of DowDuPont and Corteva may be responsible for $200 million each in the aggregate, and once liability exceeds the aggregate cap, then excess liability will be allocated to the other. In the event such liabilities exceed $200 million in the

aggregate for each of DowDuPont and Corteva, liabilities are allocated 71% to DowDuPont and 29% to Corteva.

235.  The DowDuPont Separation Agreement allocates DowDuPont's assets between DowDuPont, New Dow, and Corteva.  Similarly, the DowDuPont Separation Agreement allocates DowDuPont's liabilities, including the liabilities of Historical DuPont.

236.  While the non-public nature of the schedules to the DowDuPont Separation Agreement obscures the liabilities retained by New Dow and those transferred to Corteva, it is fair to say that the DowDuPont Separation Agreement caused Corteva and DowDuPont to bear the brunt of liabilities for Historical DuPont, including Historical DuPont's legacy PFAS liabilities and the liabilities of its former Performance Chemicals Business.

237.  As a result of the Merger, DowDuPont was not a good-faith transferee of the proceeds of the Dividend because DowDuPont had sufficient knowledge about the Chemours Separation and Spin Transaction to induce it to inquire further about that transaction.

238.  In each of the Dow Spin Off and the Corteva Spin Off, neither the newly created New Dow nor Corteva were good-faith transferees of the proceeds of the Dividend, because each of New Dow and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Separation and Spin Transaction; and/or (iii) Chemours's insolvency.

239.  New Dow was not a good-faith transferee of Historical DuPont's and DowDuPont's assets received by New Dow in the Dow Spin Off.  This is because New Dow had sufficient knowledge about Historical DuPont's PFAS liabilities and other legacy environmental liabilities to induce New Dow to inquire further about those liabilities.

240. Likewise, Corteva was not a good-faith transferee of Historical DuPont's and DowDuPont's assets received by Corteva in the Corteva Spin Off. This is because Corteva had sufficient knowledge about Historical DuPont's PFAS liabilities and other legacy environmental liabilities to induce Corteva to inquire further about those liabilities.

241. Prior to the Dow Spin Off, The Dow Chemical Company's March 31, 2019 consolidated balance sheet reflected tangible assets of $49,153,000,000 and balance sheet liabilities of $51,591,000,000. Following the Dow Spin Off, New Dow's June 30, 2019 consolidated balance sheet reflected balance sheet tangible assets of $39,887,000,000 and balance sheet liabilities of $46,389,000,000. Thus, The Dow Chemical Company's and New Dow's balance sheets' liabilities *exceeded* their balance sheet tangible assets, for The Dow Chemical Company before the Dow Spin Off, and for New Dow after the Dow Spin Off.

242. Before the Corteva Spin Off, Historical DuPont's March 31, 2019 balance sheet reflected tangible assets of $31,327,000,000 and liabilities of $32,002,000,000. After the Corteva Spin Off, (i) Corteva's June 30, 2019 consolidated balance sheet, which includes Historical DuPont, reflected tangible assets of $19,064,000,000 and liabilities of $17,855,000,000 and (ii) Historical DuPont's June 30, 2019 balance sheet reflected tangible assets of $19,071,000,000 and liabilities of $21,928,000,000. Thus, Historical DuPont's balance sheet liabilities *exceeded* its balance sheet tangible assets both before *and* after the Corteva Spin Off. Additionally, after the Corteva Spin Transaction, Historical DuPont's liabilities included a $4.16 billion intercompany loan to Corteva.

243. Prior to the Dow Spin Off and the Corteva Spin Off, Historical DuPont's balance sheet reflected an aggregate total cash, cash equivalents, and marketable securities of $3,814,000,000.

After the Dow Spin Off and the Corteva Spin Off, DowDuPont's balance sheet reflected an aggregate total cash, cash equivalents and marketable securities of $2,083,000,000.

**M. The Chemours Separation and Spin Transaction, the Dow Spin Off, and the Corteva Spin Off were Coordinated Corporate Transactions to Siphon Valuable Assets away from PFAS Creditors.**

244.  The Chemours Separation and Spin Transaction, the Dow Spin Off, and the Corteva Spin Off (Spin Transactions), were a coordinated series of transactions through which Historical DuPont sought to spin-off (and separate) profitable and valuable assets, free and clear of billions of dollars of legacy environmental liabilities, including PFOA and PFAS liabilities.

245.  The Chemours Separation and Spin Transaction was part of a single integrated scheme that cumulated with the Dow Spin Off and the Corteva Spin Off.

## IX.    State Natural Resources and Property Injuries

246.  PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X have been found in and around State natural resources and property, including groundwater, surface waters, soil, sediments, and wildlife in locations throughout Vermont.

247.  Numerous locations in Vermont are contaminated and injured by PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X including but not limited to the following:

a.  There is widespread PFAS contamination and injury associated with former Chemfab Corporation Teflon fabric-coating facilities in North Bennington and Bennington.  More than 400 drinking water wells tested positive for PFOA contamination, including at levels up to 4,600 ppt.  There also is PFAS contamination and injury of other natural resources, including groundwater, surface water, fish, maple sap, and soils and sediments in the area.

b.  There is extensive PFAS contamination and injury associated with several former Warren Wire facilities in the Pownal area.  There also is PFAS contamination and injury associated with the Pownal Tannery.  PFAS has contaminated and injured groundwater, a public water supply well, over 40 private drinking water wells at levels up to 110 ppt, soil, and landfill leachate in these areas.  There is PFAS contamination and injury of groundwater associated with other wire coating facilities, including the Champlain Cable facility in Colchester, and the former Harbour Industries facilities in Shelburne.

c.  There is PFAS groundwater contamination and injury associated with the Eveready Battery manufacturing facility in St. Albans.

d.  There is PFAS groundwater contamination and injury at numerous landfills, including the Burgess Brothers construction and demolition debris landfill in Bennington, the Burgers Brothers Superfund site in Bennington, municipal solid waste landfills in Pownal, Sunderland, Shaftsbury, Dover, Bennington, Williston, Colchester, South Hero, and Halifax, the Windham Solid Waste Management District MSW landfill, the Boise Cascade landfill in Sheldon, and the Putney Paper sludge landfill in Putney.  There is PFAS contamination and injury of drinking water wells at the Shaftsbury landfill location.  At the former Kocher Drive Dump in Bennington, there is PFAS contamination and injury of groundwater and private drinking water wells.

e.  There is PFAS contamination of landfill leachate, including at the following landfills: New England Waste Services of Vermont in Coventry, Moretown landfill, the Chittenden Solid Waste District landfill, the City of South Burlington landfill,

the Rathe IV landfill, and the Town of Randolph landfill. These landfills received

PFAS-containing products including household, commercial, and industrial

products, along with sludge, for disposal.

    f.   There is PFAS contamination of sludge and biosolids at wastewater treatment

facilities, including in Bennington, Randolph, Barre, Burlington-Main, Newport,

and Montpelier. There also is PFAS contamination of influent and effluent at these

facilities.

    g.   There is PFAS contamination of septage from residential septic tanks, including in

Bennington.

    h.   There is PFAS contamination at schools due to the use of various floor cleaning

products and waxes containing PFAS.

248. PFAS contamination has injured State natural resources and/or adversely impacted their

beneficial public trust uses including those for drinking water, recreation, and fishing.

249. PFAS contamination and injury has substantially damaged the intrinsic value of these

State natural resources.

250. Vermont and its citizens have been deprived of the full use, enjoyment, and benefit of the

State's public trust resources, and the intrinsic values of such State natural resources have been

substantially harmed by PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X.

251. The State's natural resources and property have been contaminated and injured by PFOS,

PFOA, PFNA, PFHxS, PFHpA, PFBS, and Gen-X through foreseeable releases from, for

example, the following:

    a.   Solid waste facilities;

    b.   Industrial facilities;

    c.   Hazardous waste contaminated sites;

    d.   Wastewater disposal sites;

    e.   Wastewater treatment facilities;

    f.   Biosolid and sludge processing and application sites, and septage land spreading;

    g.   Car waxes at car washes;

    h.   Air deposition; and

    i.   Use and disposal of numerous consumer, household, and commercial products.

252.  Defendants' acts or omissions have caused and/or contributed to these PFAS releases.

253.  Defendants failed to disclose the environmental and health risks of PFAS that were known or should have been known to them, to the owners or operators of sites from which PFOS, PFOA, PFNA, PFHxS PFHpA, PFBS, and/or Gen-X have been released, to consumers, users, or to the State.  As a result, the risks associated with PFAS were unknown to the users of consumer, household, and commercial products containing PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X, were unknown to the State, and were generally unknown to those other than Defendants who could have reduced or limited the PFAS contamination and injury described above.  As manufacturers, marketers, and sellers of PFAS, Defendants were in the best position to reduce the risk of harm of their products.

254.  Each of the State's natural resources is precious, limited, and invaluable, as described in more detail below.

**A. Groundwater**

255.  Groundwater is a precious, limited, and invaluable State natural resource that is used for drinking water, irrigation, and other important purposes.

256.  Over 60% of Vermonters rely upon groundwater as a source for their drinking water.

257. State natural resources, including groundwater, are vital to the health, safety, and welfare of Vermont citizens, and to the State's economy and ecology.

258. Defendants' PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X have contaminated and injured the State's groundwater in locations throughout the State, including, for example, at the following locations:

    a.  Bennington (former Chemfab Corporation facility);

    b.  Bennington (Burgess Brothers construction and demolition debris landfill, and the Burgess Brothers Superfund site);

    c.  Bennington (solid waste landfill);

    d.  Chittenden Solid Waste District landfill in Williston;

    e.  North Bennington (former Chemfab Corporation facility);

    f.  Pownal Center;

    g.  Pownal Village;

    h.  North Pownal;

    i.  Rathe IV landfill in Colchester;

    j.  Shelburne (former Harbour Industries property);

    k.  South Hero landfill;

    l.  St. Albans (former Eveready facility);

    m.  Pownal (solid waste landfill);

    n.  Sunderland (solid waste landfill);

    o.  Shaftsbury (solid waste landfill);

    p.  Dover (solid waste landfill);

    q.  Halifax (solid waste landfill);

r.  Windham Solid Waste Management District MSW landfill;

s.  Putney (Putney Paper sludge landfill); and

t.  Sheldon (former Boise Cascade paper mill).

259.  Defendants' PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X have

contaminated and injured drinking water that is drawn from groundwater sources in  locations

throughout the State, including, for example, at the following locations:

a.  Bennington;

b.  Grafton School;

c.  North Bennington;

d.  Pownal Center;

e.  Pownal Village;

f.  North Pownal;

g.  Shaftsbury landfill; and

h.  Warren School.

260.  In the Bennington / North Bennington area, more than 400 drinking water wells tested

positive for PFOA, including at levels up to 4,600 ppt.  In the Pownal area, over 40 drinking

water wells tested positive for PFAS, including at levels up to 110 ppt.

261.  Ongoing additional testing continues to reveal further PFAS contamination and injury of

groundwater in locations throughout Vermont.

262.  It is virtually certain that additional testing will reveal further PFAS contamination and

injury of groundwater in locations throughout Vermont.

**B.     Surface Waters**

263.  Surface waters are precious, limited, and invaluable State natural resources that are used for drinking water, irrigation, recreation such as swimming and fishing, and ecological and other important purposes.

264.  Over 30% of Vermonters rely upon surface waters as sources for drinking water.

265.  The State's tourism and recreation industries are dependent upon clean water, including surface waters.

266.  Surface waters also are commercially, recreationally, aesthetically, and ecologically important to the State and its citizens, including by supporting aquatic ecosystems, and biota such as fish.

267.  Defendants' PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X have contaminated and injured the State's surface waters in locations throughout the State, including, for example, at the following locations:

      a.   Bennington College pond;

      b.   Paran Creek/Walloomsac River confluence;

      c.   Pownal Center; and

      d.   Hoosic River.

268.  PFOA contaminated and injured the Bennington College pond at levels up to 79.3 ppt, and the Paran Creek at levels up to 37.6 ppt.

269.  Ongoing additional testing continues to reveal further PFAS contamination and injury of surface waters in locations throughout Vermont.

270.  It is virtually certain that additional testing will reveal further PFAS contamination and injury of surface waters in locations throughout Vermont.

**C.    Wildlife, Soils, and Sediments**

271.  Wildlife is a precious, limited, and invaluable State natural resource.

272.  Soils and sediments are part of or interconnected with the health of State natural resources such as surface waters, groundwater, and wildlife, and provide numerous values and services.  For instance, sediments are important as habitat for wildlife including fish, among other important ecological uses; and soils may contain contaminants that migrate to groundwater. A healthy and functioning ecosystem depends upon the interplay between non-impaired soils, sediments, and wildlife.

273.  Defendants' PFOS, PFOA, PFNA, PFHxS, PFHpA PFBS, and/or Gen-X have contaminated and injured soils and sediments in locations throughout the State, including, for example, at the following locations:

      a.   Bennington;

      b.   North Bennington; and

      c.   Paran Creek/Walloomsac River confluence.

274.  There is widespread PFAS contamination and injury of soil throughout the State. Ongoing additional testing continues to reveal further PFAS contamination and injury of soils and sediments in locations throughout Vermont.

275.  Wildlife are critical ecological resources.

276.  Defendants' PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X have contaminated and injured fish, including in the Paran Creek/Walloomsac River confluence.

277.  Vermont's biodiversity is vital to its ecology, economy, and culture.

278.  Vermont's fish and other wildlife are used for food, recreational purposes, and provide a significant economic benefit to the State, including through tourism and recreation.

279. Injuries to wildlife affect not only individual wildlife, but the entire ecosystem of which they are part.

280. It is virtually certain that additional testing will reveal further PFAS contamination and injury of soils, sediments, and wildlife in locations throughout Vermont.

**D. New PFAS contamination continues to be discovered and existing contamination continues to injure State natural resources and property.**

281. PFAS has contaminated State natural resources and property throughout the State. This contamination has injured these resources, threatens State citizens' health, safety, and welfare, and interferes with the use of these precious resources.

282. Given PFAS's properties, including their resistance to biodegradation and their solubility, PFAS continues to move through groundwater, surface waters, and soils, and other natural resources, and cause initial contamination in new locations, adversely impacting State natural resources and property.

283. PFAS continues to move through the environment and contaminate and injure State natural resources and property at a number of locations throughout the State with known PFAS contamination.

284. Defendants' acts and omissions directly and proximately caused and continue to cause PFAS to intrude into and contaminate and injure these natural resources and property.

285. There are proven and preliminary remedial techniques for cleaning up PFAS in environmental media, and successfully treating drinking water.

286. Absent use of remediation and treatment methods, PFAS contamination will continue to spread through the State's natural resources and property. Although PFAS is persistent in the environment, PFAS can be successfully remediated in certain natural resources and/or successfully treated, but at significant expense.

287.  PFAS contamination levels in State natural resources including groundwater and drinking water typically fluctuate, *i.e.,* increase and decrease, over time as PFAS moves through groundwater and due to other factors, including changes in seasonal precipitation levels.  PFAS levels can fluctuate at a single PFAS contamination site over time.  For this reason, the only way to be certain that PFAS no longer exists in State natural resources such as groundwater or drinking water is to remediate or treat the PFAS.

288.  PFAS's presence and migration in Vermont's natural resources and property, absent large-scale and costly remediation and/or treatment, will continue indefinitely, and will continue to indefinitely threaten such natural resources and property.

289.  Because of the injury PFAS have caused and are causing to Vermont's natural resources, Vermont's natural resources require restoration, including compensation for interim and permanent losses.

## X.    FIRST CAUSE OF ACTION

### Civil Action for Natural Resource Damages and Restoration
### (All Defendants)

290.  The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

291.  Surface waters, groundwater, and wildlife are public trust resources in Vermont.

292.  The State in its role as trustee must manage public trust resources for the benefit of its citizens.

293.  The State, as trustee, may bring a cause of action to recover damages to and restoration of natural resources held in trust by the State.

294.  The State also may act in its *parens patriae* capacity to protect and restore the State's natural resources.

295. Defendants have unreasonably interfered with the use and enjoyment of public trust rights, and have injured the natural resources of the State of Vermont through the acts and omissions alleged in this Second Amended Complaint.

296. As a direct and proximate result of Defendants' acts and omissions as alleged in this Second Amended Complaint, PFAS has injured the State's natural resources by causing contamination of groundwater, drinking water supplies, public drinking water supply wells, private drinking water wells, surface waters, fish, and other natural resources of the State.

297. As a further direct and proximate result of the acts and omissions of Defendants, the State has sustained and will sustain substantial expenses and damages, for which Defendants are strictly, jointly, and severally liable.

298. Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources that are indivisible.

299. The Court's May 28, 2020 ruling on Defendants' motions to dismiss found that this claim does not state a separate substantive cause of action. The State pleads this claim here to preserve all rights with respect to this claim.

## XI.    SECOND CAUSE OF ACTION

### Groundwater Protection Act, 10 V.S.A. § 1410
### (All Defendants)

300. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

301. The State of Vermont is a "person" as defined by 10 V.S.A. § 1410(b)(3).

302. Defendants have altered the character and/or quality of the groundwater in the State by engaging in the acts and omissions alleged in this Second Amended Complaint. For example, as

discussed above, PFAS is associated with significant harmful health effects in humans and animals, including at low concentrations.

303. Defendants' alteration of the groundwater caused unreasonable harm by contaminating groundwater, drinking water supplies, public drinking water supply wells, private drinking water wells, and/or other natural resources and property of the State.

304. PFAS has profoundly and unreasonably affected groundwater in the State, compromising its use for household purposes including drinking, cooking, and bathing, and risking public health via exposure to PFAS. PFAS contamination poses an extraordinary and unjust financial burden on the State and its citizens, who bear the costs of testing, monitoring, and remediation although Defendants profited from the manufacturing, marketing, distribution, and/or sale of PFAS.

305. The Act authorizes the State to seek equitable relief and/or damages for the unreasonable harm caused by PFAS contamination.

306. As a direct and proximate result of Defendants' acts and omissions, groundwater in the State was and is contaminated with PFAS. The State has incurred, is incurring, and will incur, investigation, remediation, cleanup, restoration, removal, treatment, and monitoring costs and expenses related to contamination of groundwater in the State, including drinking water, for which Defendants are strictly, jointly, and severally liable.

307. As a further direct and proximate result of Defendants' acts and omissions, the State has sustained and will sustain other substantial expenses and damages, for which Defendants are strictly, jointly, and severally liable.

308. Defendants' acts and omissions have caused and/or threatened to cause injuries to groundwater in the State that is indivisible.

## XII.   THIRD CAUSE OF ACTION

### Strict Liability for Design Defect and/or Defective Product
### (All Defendants)

309.  The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

310.  Defendants during the relevant time period were designers, manufacturers, marketers, distributors, and/or sellers of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X.

311. As designers, manufacturers, marketers, distributors, and/or sellers of PFOS, PFOA, PFNA, PFHxS,  PFHpA, PFBS, and/or Gen-X, Defendants owed a duty to all persons whom Defendants' PFOS, PFOA, PFNA, PFHxS,  PFHpA, PFBS, and/or Gen-X might foreseeably harm, including the State and its citizens, not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

312.  Defendants represented, asserted, claimed, and warranted that PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X were safe for their intended and foreseeable uses.

313.  When Defendants placed PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X into the stream of commerce, they were defective, unreasonably dangerous, and not reasonably suited for their intended, foreseeable, and ordinary storage, handling, and uses, including for the following reasons:

    a.  Unintended releases of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X are commonplace;

    b.  PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X are released to the environment through the normal and foreseen use of PFOS, PFOA, PFNA, PFHxS PFHpA, PFBS, and/or Gen-X and/or products containing PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X;

    c.  When PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X are released into the environment, PFOS, PFOA, PFNA, PFHxS,  PFHpA, PFBS, and/or Gen-X have a tendency to mix with groundwater and migrate great distances;

    d.   When PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X are released into the environment, PFOS, PFOA, PFNA, PFHxS,  PFHpA, PFBS, and/or Gen-X persist over long periods of time because PFOS, PFOA, PFNA, PFHxS,  PFHpA, PFBS, and/or Gen-X are recalcitrant to biodegradation and bioremediation;

    e.   PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X bioaccumulate in humans and wildlife;

    f.   Very low concentrations of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X can make water unpotable;

    g.   PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X pose risks to human health;

    h.   Defendants with knowledge of the risks failed to use reasonable care in the design of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X;

    i.   PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X pose greater dangers to State natural resources and property than would be expected by ordinary persons such as the State, users, and the general public exercising reasonable care;

    j.   The risks which PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X pose to State natural resources and property outweigh their utility in making products stain and grease resistant, among other supposed benefits; and

    k.   Safer alternatives to PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X have existed and been available to Defendants at all times relevant to this litigation.

314.    The above-described defects exceeded the knowledge of the ordinary person and by the exercise of reasonable care the State would not be able to avoid the harm caused by PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X.

315.    PFOS, PFOA, PFNA, PFHxS, PFHpA. PFBS, and/or Gen-X were distributed and sold in the manner intended or reasonably foreseen by the Defendants, or as should have been reasonably foreseen by Defendants.

316.    PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X reached consumers and the environment in a condition substantially unchanged from that in which they left Defendants' control.

317.    PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X failed to perform as safely as an ordinary consumer would expect when used in their intended and reasonably foreseeable manner.

318.    As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X.  The State has incurred, is incurring, and will incur, investigation, remediation, cleanup, restoration, removal, treatment, and monitoring, and other costs and expenses related to PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X contamination of State natural resources and property, for which Defendants are strictly, jointly, and severally liable.

319.    As a further direct and proximate result of the acts and omissions of Defendants, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are strictly, jointly, and severally liable.

320.    Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

## XIII.   FOURTH CAUSE OF ACTION

### Strict Liability for Failure to Warn
### (All Defendants)

321.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

322.    As manufacturers, marketers, distributors, promoters and/or sellers of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X, Defendants had a duty to issue warnings to the State, the public, public officials, consumers, and users of the risks posed by PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X.

323.  Defendants knew that PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X would be purchased, transported, stored, handled, used, and disposed of without notice of the hazards which PFOS, PFOA, PFNA, PFHxS, PFHpA PFBS, and/or Gen-X pose to State natural resources and property.

324.  Defendants' failure to warn of these hazards made PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X unreasonably dangerous.

325.  At all times relevant to this litigation, Defendants have had actual and/or constructive knowledge of facts, including the following, which rendered PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X hazardous to State natural resources and property:

    a.  Unintended releases of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X are commonplace;

    b.  PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X are released to the environment through the normal and foreseen use of PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or Gen-X and/or products containing PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X;

    c.  When PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X are released into the environment, PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X have a tendency to mix with groundwater and migrate great distances;

    d.  When PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X are released into the environment, PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X persist over long periods of time because PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X are recalcitrant to biodegradation and bioremediation;

    e.  PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X bioaccumulate in humans and wildlife;

    f.  Very low concentrations of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X can make water unpotable;

    g.  PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X pose risks to human health; and

    h.  PFAS are associated with certain cancers in humans.

326. The foregoing facts relating to the hazards that PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X pose to State natural resources and property are not the sort of facts that, at the relevant times, the State, users, consumers, or the general public could ordinarily discover or protect themselves against absent sufficient warnings.

327. Defendants breached their duty to warn by unreasonably failing to provide warnings concerning any of the facts alleged here to the State, public officials, users, consumers, and/or the general public.

328. Defendants' failure to warn proximately caused reasonably foreseeable injuries to the State. The State and others would have heeded legally adequate warnings, and PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X would not have gained approval in the marketplace for use in household, consumer, and other products, and/or PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X would have been treated differently in terms of procedures for handling, storage, use, disposal, emergency response, and/or environmental clean-up.

329. As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X. The State has incurred, is incurring, and will incur, investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to contamination of the State's natural resources and property, for which Defendants are strictly, jointly, and severally liable.

330. As a further direct and proximate result of the acts and omissions of Defendants, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are strictly, jointly, and severally liable.

331.  Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

## XIV.  FIFTH CAUSE OF ACTION

### Negligence
### (All Defendants)

332.  The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

333.  As manufacturers, marketers, distributors, promoters, and/or sellers of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X and/or products containing PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X Defendants owed a duty to the State as well as to all persons whom Defendants' PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X products might foreseeably harm to exercise due care in the design, manufacturing, promotion, marketing, sale, distribution, testing, labeling, use, warning, and instructing for use of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X and/or products containing PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X.

334.  Defendants had a duty and the financial and technical means to test PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X and products containing PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X and to warn public officials, consumers, users, and the general public of the hazardous characteristics of PFAS.

335.  Defendants had a duty to not contaminate the environment.

336.  Defendants had a duty to not contaminate State natural resources.

337.  Defendants represented and claimed that PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X and products containing PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X and/or their precursors did not require any different or special handling or precautions.

Any warnings Defendants did provide were generic and did not suffice to warn reasonable users of the dangers to the environment posed by these chemicals.

338.  At times relevant to this litigation, Defendants knew or should have known of the following environmental and health risks, among others:

    a.  Unintended releases of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X are commonplace;

    b.  PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X are released to the environment through the normal and foreseen use of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X and/or products containing PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X;

    c.  When PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X are released into the environment, PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X have a tendency to mix with groundwater and migrate great distances;

    d.  When PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X are released into the environment, PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X persist over long periods of time because PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X are recalcitrant to biodegradation and bioremediation;

    e.  PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X bioaccumulate in humans and wildlife;

    f.  Very low concentrations of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X can make water unpotable;

    g.  PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X pose risks to human health; and

    h.  PFAS are associated with certain cancers in humans.

339.  The foregoing facts relating to the hazards which PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X pose to State natural resources and property, are not the sort of facts which the State, users, consumers, and the general public could ordinarily discover or protect themselves against absent sufficient warnings.

340. PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X and products containing PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X manufactured, marketed, distributed, promoted and/or sold by Defendants were used in a normal and foreseeable manner.

341. Defendants have negligently breached their duties of due care to the State, consumers, users, and the general public by, among other things:

    a. Promoting and defending PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X while concealing the threat PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X pose to natural resources and property;

    b. marketing, touting, and otherwise promoting the benefits of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X without disclosing the truth about the environmental and potential health hazards posed by PFOS, PFOA, PFNA, PFHxS, PFHpA PFBS, and/or Gen-X;

    c. failing to eliminate or minimize the harmful impacts and risks posed by PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X;

    d. failing to curtail or reduce the distribution of PFOS, PFOA, PFNA, PFHxS, PFBS, and/or Gen-X;

    e. failing to instruct the State, consumers, users, and the general public about the safe handling and use of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X; and/or

    f. failing to warn and instruct the State, consumers, users, and the general public about the risks to natural resources posed by PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X about the necessary precautions and steps to prevent or minimize releases of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X in distribution, storage, use and disposal, and about how to remediate such releases promptly.

342. As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with PFAS. The State has incurred, is incurring, and will incur, investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to contamination of the State's natural resources and property, for which Defendants are jointly and severally liable.

343. As a further direct and proximate result of the acts and omissions of the Defendants, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are jointly and severally liable.

344. Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

345. Defendants knew that it was substantially certain that their acts and omissions described above would threaten public health and cause extensive contamination of State natural resources and property. Defendants' conduct in continuing to promote PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X was outrageously reprehensible.

## XV.    SIXTH CAUSE OF ACTION

### Public Nuisance
### (All Defendants)

346. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

347. Defendants have manufactured, marketed, distributed, promoted, and/or sold PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X and/or products containing PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X in a manner that created or participated in creating a public nuisance that unreasonably endangers or injures the property, health, safety, and welfare of the general public and the State of Vermont, causing inconvenience and annoyance.

348. Defendants, by their negligent, reckless, and willful acts and omissions set forth above, have, among other things, knowingly unleashed long-lasting PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X contamination of State natural resources and property in throughout Vermont, having concealed the threat, thereby causing and threatening to cause PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X contamination of the State's natural

resources and property. Defendants' PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X continues to spread in and contaminate more State natural resources and property throughout the State.

349. Each Defendant has caused, contributed to, maintained, and/or participated in a public nuisance by substantially and unreasonably interfering with, obstructing and/or threatening, among other things, (i) Vermonters' common public rights to enjoy State natural resources and property free from unacceptable health risk, pollution, and contamination, and (ii) the State's *parens patriae* and public trust abilities to protect, conserve, and manage the State's natural resources.

350. Each Defendant has, at times relevant to this action, caused, contributed to, maintained, and/or participated in the creation of such public nuisance. Among other things, each Defendant is a substantial contributor to such public nuisance as follows:

   a. Defendants manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X and/or products containing PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X when they knew, or reasonably should have known, that PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X would escape from industrial processes and household, consumer, and commercial products and contaminate State natural resources and property;

   b. Defendants manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X and/or products containing PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X that were delivered into the State (and areas affecting the State's natural resources and property), when they knew, or reasonably should have known, that PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X would be released readily into the environment during the normal, intended, and foreseeable uses of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X and products containing PFOS, PFOA, PFNA, PFHxS, PFHpA PFBS, and/or Gen-X; and when released, PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X would persist in the environment and not break down, contaminate State natural resources and property, including soils, sediments, groundwater, surface waters, wildlife, and drinking water supplies, and, ultimately, be difficult and costly to remove; and

    c.   Defendants manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X and/or products containing PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X that were delivered into the State (and areas affecting the State's natural resources and property), when they knew, or reasonably should have known, that PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X posed substantial risks to human health.

351.  Defendants also had first-hand knowledge and experience regarding releases of PFAS to the environment, including groundwater and other natural resources, because each of them owned, operated, and/or controlled PFAS manufacturing facilities and/or facilities using PFAS where there were releases of PFAS into the surrounding environment that caused substantial contamination.  For example, 3M owned, operated, and/or controlled a PFAS manufacturing facility in Cottage Groves, Minnesota, and disposed of PFAS at sites located in the City of Oakdale, Minnesota; Cottage Grove and Woodbury, Minnesota; and the Washington County Landfill in City of Lake Elmo, Minnesota.  There was substantial PFAS contamination associated with these 3M facilities.  DuPont owned, operated, and/or controlled a PFAS manufacturing facility in Parkersburg, West Virginia, and the Chambers Works site in New Jersey.  There was substantial PFAS contamination associated with these DuPont facilities.

352.  Despite their knowledge that contamination of the State's natural resources and property with PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X was the inevitable consequence of their conduct, Defendants failed to provide adequate warnings or special instructions, failed to take any other reasonable precautionary measures to prevent or mitigate such contamination, and/or affirmatively misrepresented the hazards of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X in their product information and/or instructions for use.

353.  Defendants knew, or in the exercise of reasonable care should have known, that the introduction and use of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X would and

has unreasonably and seriously endangered, injured, and interfered with the ordinary comfort, use, and enjoyment of natural resources and property relied upon by the State and its citizens.

354.  Defendants have caused, contributed to, maintained, and/or participated in a public nuisance that has caused substantial injury to the State's natural resources and property, in which the public has interests represented by and protected by the State in its trustee and *parens patriae* capacities.  Defendants' conduct also threatens to cause substantial additional injury to the State's natural resources and property.  The public nuisance has caused and/or threatens to cause substantial injury to property directly owned by the State.

355.  The contamination of the State's natural resources and property with PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X is ongoing.  PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X continue to threaten, migrate into, and enter the State's natural resources and property, and cause new contamination in new locations.

356.  As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X.  The State has incurred, is incurring, and will incur, investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to contamination of the State's natural resources and property, for which Defendants are jointly and severally liable.

357.  As a further direct and proximate result of Defendants' acts and omissions, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are jointly and severally liable.

358.  Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

# XVI.   SEVENTH CAUSE OF ACTION

## Private Nuisance
## (All Defendants)

359.  The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

360.  The State's property and public trust resources have been contaminated by PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X as a direct and proximate result of the intentional and unreasonable, negligent and reckless conduct of Defendants, all as alleged in this Second Amended Complaint.  These resources and property include state parks, beds and banks of surface water bodies, water wells, and resources held in trust by the State, such as groundwater.

361.  As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, the State has suffered injuries from contamination of State-owned property and public trust resources.  Defendants' acts and omissions have substantially, intentionally, and unreasonably interfered with, obstructed, violated, and/or threatened, among other things, the State's interests in its property and public trust resources.  This harm far outweighs any utility or benefit derived from this intentional conduct.

362.  As a direct and proximate result of Defendants' acts and omissions, the State's property and public trust resources were and are contaminated with PFOS, PFOA, PFNA, PFHxS PFHpA, PFBS, and/or Gen-X.  The State has incurred, is incurring, and will incur, investigation, remediation, cleanup, restoration, removal, treatment, monitoring and/or other costs and expenses related to contamination of the State's property and public trust resources, for which Defendants are jointly and severally liable.

363.  As a further direct and proximate result of Defendants' acts and omissions, the State has sustained and will sustain other expenses and damages, including damages for loss of use and enjoyment, for which Defendants are jointly and severally liable.

364.  Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's property and public trust resources that are indivisible.

## XVII.  EIGHTH CAUSE OF ACTION

### Trespass
### (All Defendants)

365.  The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

366.  The State has significant property interests in the natural resources of the State.  These property rights and interests include, but are not limited to, the State's public trust and *parens patriae* interests and authority in protecting such natural resources from contamination and injury.

367.  A trustee by definition is authorized to take action to protect trust property as if the trustee were the owner of the property.

368.  The State also brings this action in its *parens patriae* capacity on behalf of its citizens to protect quasi-sovereign interests, including the integrity of the State's natural resources.  The State in its *parens patriae* capacity seeks relief for the invasion of its citizens' possessory interests by PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X.

369.  The State never authorized Defendant's invasion of its natural resources and property with PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X.

370.  The State owns in fee certain property within the State, including lands and water wells.

371. Defendants knew, or in the exercise of reasonable care should have known, that PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X are hazardous to natural resources and property, including groundwater, surface water, and public water systems, and including the property and interests of the State.

372. Defendants' acts and omissions directly and proximately caused and continue to cause PFAS to intrude onto and contaminate State natural resources and property, including water systems, surface water, groundwater systems, and zones of influence of the areas that supply production wells within the State.

373. At the time of Defendants' acts and omissions, Defendants knew with substantial certainty that PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X would reach onto and contaminate State natural resources and property, including water systems, surface water, groundwater systems, and zones of influence of the areas that supply production wells within the State.  Defendants' knowledge was based on their knowledge of the properties of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X their knowledge and experience regarding PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X contamination at their own facilities where they manufactured and/or used PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X and other conduct alleged in this Second Amended Complaint.  Despite this knowledge, Defendants manufactured, marketed, distributed, promoted, and/or sold PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X and/or products containing PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS, and/or Gen-X with a profit motive in a way that has harmed the State.

374. As a direct and proximate result of the trespass, the State has been damaged and is entitled to compensatory damages for the costs of investigation, remediation, and treatment, damages for loss of use and enjoyment of State natural resources and property, cost of restoring

State natural resources and property to their original conditions as if the trespass had not

occurred, and/or other relief the State may elect at trial.

375.  As a direct and proximate result of Defendants' acts and omissions, the State's natural

resources and property are contaminated with PFOS, PFOA, PFNA, PFHxS, PFHpA, PFBS,

and/or Gen-X.  The State has incurred, is incurring, and will incur, investigation, remediation,

cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to

contamination of the State's natural resources and property, for which Defendants are jointly and

severally liable.

376.  As a further direct and proximate result of Defendants' acts and omissions, the State has

sustained and will sustain other substantial expenses and damages, including damages for loss of

use and enjoyment, for which Defendants are jointly and severally liable.

377. Defendants' acts and omissions have caused and/or threatened to cause injuries to the

State's natural resources and property that are indivisible.

378. The Court's May 28, 2020 ruling on Defendants' motions to dismiss limited this claim to

harms to "lands owned by the State[.]"  The State pleads this claim here to preserve all rights

with respect to this claim.

XVIII.  **NINTH CAUSE OF ACTION**

**10 V.S.A. § 6615(a)(5) <u>(All Defendants)</u>**

379.  The State realleges and reaffirms each and every allegation set forth in all preceding

paragraphs as if fully restated in this section.

380.  Effective July 1, 2022, 10 V.S.A. § 6615(a)(5) imposes liability on "any person who

manufactured for commercial sale a hazardous material and who knew or should have known

that the material presented a threat of harm to human health or the natural environment."  Such a

manufacturer is liable "for abating a release or threatened release of hazardous material and the costs of investigation, removal, and remedial actions incurred by the State that are necessary to protect the public health or the environment."

381.  "Hazardous material" is defined by 10 V.S.A. § 6602(16)(a)(iv) to refer to "a chemical or substance that, when released, poses a risk to human health or other living organisms and that is listed by the Secretary by rule." 10 V.S.A. § 6602(16)(a)(iv).  PFOA, PFOS, PFHxS, PFHpA, and PFNA pose a risk to human health and to other living organisms and have been listed by the Secretary by rule as hazardous materials. 35 Vt. Envtl. Prot. Rules § 106, Appendix D, at 87,

382.  Defendants manufactured PFOA, PFOS, PFHxS, PFHpA, and/or PFNA for commercial sale.  For example:

    a.  3M manufactured for commercial sale PFOA, PFOS, and PFHxS as standalone products or as the principal ingredients in products.  3M manufactured for commercial sale products containing PFOA and/or PFOS that it intentionally added as ingredients to the products, products that contained PFOA and/or PFOS as byproducts or impurities, and products that contained precursor chemicals that broke down into PFOA and/or PFOS.  3M manufactured these products when it knew that the products contained PFOA and/or PFOS as byproducts or impurities, and that they contained precursor chemicals that broke down into PFOA and/or PFOS.  3M also manufactured these products when it should have known that its products contained PFOA and/or PFOS as byproducts or impurities, and contained precursor chemicals that would break down into PFOA and/or PFOS.

    3M manufactured for commercial sale products containing PFHxS, PFHpA, and/or PFNA.  3M manufactured for commercial sale products containing PFHxS, PFHpA, and/or PFNA as byproducts or impurities, and products that contained precursor chemicals that broke down into PFHxS, PFHpA, and/or PFNA.  3M manufactured these products when it knew that the products contained PFHxS, PFHpA, and/or PFNA as byproducts or impurities.  3M also manufactured these products when it should have known that its products contained PFHxS, PFHpA, and/or PFNA as byproducts or impurities, and that they contained precursor chemicals that broke down into PFHxS, PFHpA, and/or PFNA.

    b.  DuPont manufactured for commercial sale products containing PFOA that it intentionally added as an ingredient to the products, products that contained PFOA as a byproduct or impurity, and products that contained precursor chemicals that broke down into PFOA.  DuPont intentionally used PFOA as a processing aid in the

manufacture of certain products for commercial sale, and knew that certain of these products would contain PFOA. DuPont manufactured for commercial sale products containing PFOA when it knew that the products contained PFOA as a byproduct or impurity, and that they contained precursor chemicals that broke down into PFOA. DuPont also manufactured these products when it should have known that its products contained PFOA as a byproduct or impurity, and that they contained precursor chemicals that broke down into PFOA.

DuPont manufactured for commercial sale products containing PFHpA and/or PFNA. DuPont manufactured for commercial sale products containing PFHpA and/or PFNA as byproducts or impurities and products that contained precursor chemicals that broke down into PFHpA and/or PFNA. DuPont manufactured these products when it knew that the products contained PFHpA and/or PFNA as byproducts or impurities, or that they contained precursor chemicals that broke down into PFHpA and/or PFNA. DuPont also manufactured these products when it should have known that its products contained PFHpA and/or PFNA as byproducts or impurities, or that they contained precursor chemicals that broke down into PFHpA and/or PFNA.

383. At all relevant times, Defendants knew or should have known that PFOA, PFOS, PFHxS, PFHpA, and/or PFNA presented a threat of harm to human health or the natural environment. At all relevant times, Defendants knew or should have known that products containing PFOA, PFOS, PFHxS, PFHpA, and/or PFNA presented a threat of harm to human health or the natural environment.

384. "'Release' means any intentional or unintentional action or omission resulting in the spilling, leaking, pumping, pouring, emitting, emptying, dumping, or disposing of hazardous materials into the surface or groundwaters, or onto the lands in the State, or into waters outside the jurisdiction of the State when damage may result to the public health, lands, waters, or natural resources within the jurisdiction of the State." 10 V.S.A. § 6602(17). PFOA, PFOS, PFHxS, PFHpA, and/or PFNA manufactured for commercial sale by Defendants (as described above) have been released into the environment or there is a threat of such a release into the environment.

385. As a result of the releases and threatened releases described above, (i) abatement is necessary to protect human health and/or the environment, and (ii) the State has incurred (and is

incurring and will incur) costs of investigation, removal, and remedial actions that are necessary to protect human health and/or the environment.

386.  The July 1, 2022 amendment to section 6615 applies to "any relevant release of a hazardous material regardless of the date of the relevant release, including releases that occurred prior to the effective date" of the amendment.  *See* Act 93, S.113, § 3 (2022).  The State seeks to recover for releases both before and after July 1, 2022.

### XIX.   TENTH CAUSE OF ACTION

**Actual Fraudulent Transfer Related to the
Chemours Separation and Spin Transaction,
Pursuant to 9 V.S.A. §§ 2288(a)(1) & 2291(a) as in effect on July 1, 2015,
and/or such other applicable state law
<u>(Against Historical DuPont, The Chemours Company, DowDuPont, and Corteva)</u>**

387.  The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

388.  The State seeks relief pursuant to 9 V.S.A. §§ 2288(a)(1) & 2291(a) as in effect on July 1, 2015 (the Vermont Uniform Fraudulent Transfers Act (VT UFTA)), against Historical DuPont, The Chemours Company, DowDuPont, and Corteva.

389.  As a result of the transfer of assets and liabilities related to the Chemours Separation and Spin Transaction described in this Second Amended Complaint, Historical DuPont limited the availability of assets to cover judgements for all of the liability for damages and injuries arising from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS and PFAS-containing products.

390.  Historical DuPont has acted with actual intent to hinder, delay, and defraud creditors of Historical DuPont, and what would become Chemours, by (i) transferring the Dividend to

Historical DuPont, and (ii) causing the incurrence of obligations in connection with the

Chemours Separation and Spin Transaction.

391.  Historical DuPont engaged in acts in furtherance of a scheme to transfer its assets out of

the reach of parties, such as Vermont, that have been damaged as a result of Historical DuPont's

actions described in this Second Amended Complaint.

392.  Historical DuPont manufactured, marketed, distributed, sold, and promoted PFAS and

PFAS-containing products despite knowing of the health and environmental risks of PFAS for

decades before Chemours existed as an independent company.

393.  At the time of the Chemours Separation and Spin Transaction, Historical DuPont and the

business line that Chemours would come to own had been sued, threatened with suit, and/or had

knowledge of the likelihood of litigation to be filed regarding Historical DuPont's liability for

damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and

promotion of PFAS and PFAS-containing products, including those damages and injuries caused

by the business line that Chemours would come to own.

394.  The State was a creditor of Historical DuPont and the business line that Chemours would

come to own at the time of the Chemours Separation and Spin Transaction.

395.  A number of the statutorily enumerated badges of fraud are present with respect to the

Chemours Separation and Spin Transaction and evidence Defendants' fraudulent intent.  *See* VT

UFTA § 2288(b).

396.  **The transfer of the Dividend to Historical DuPont was a transfer to an insider of**

**Chemours, and the incurrence of obligations by Chemours to Historical DuPont, were to**

**an insider of Chemours, Historical DuPont**.  *See* VT UFTA §2288(b)(1).  That obligation was

the assumption of the Chemours Liabilities which include the Chemours Assumed

Environmental Liabilities (as each are defined in the Chemours Separation Agreement), as well as the indemnification obligations under Section 6.3 of the Chemours Separation Agreement. The transfer of these obligations to Chemours from Historical DuPont occurred at a time that Historical DuPont owned the requisite shares of Chemours, and through the DuPont Board's members, Historical DuPont employees (i.e., Nigel Pond and the other DuPont Employee Board Members), and Historical DuPont agents (i.e., Historical DuPont's outside counsel), to control Chemours. Historical DuPont was an insider of Chemours when the Chemours Spin transaction was approved and consummated.  *See* VT UFTA § 2285(1)(b), (e).

397.  **The Chemours Separation and Spin Transaction concealed the liabilities actually assumed by Chemours**.  *See* VT UFTA § 2288(b)(3).  The true scope of the obligations that were to be assumed by Chemours in the Chemours Separation and Spin Transaction were kept from Chemours management designees (and later when they were actually functioning in those roles). Additionally, the schedules to the Chemours Separation Agreement that correspond with the subsections of the definition of "Chemours Assumed Environmental Liabilities" were not publicly filed and the Info Statement dramatically understated the amount of those liabilities.

398.  **The Chemours Separation and Spin Transaction occurred at a time when Historical DuPont and/or the business line that Chemours would come to own had been sued or threatened with suit related to environmental liabilities**.  *See* VT UFTA § 2288(b)(4). The business line that Chemours would come to own and Historical DuPont were subject to a substantial amount of litigation at the time that the Chemours Separation and Spin Transaction

was approved and when it occurred, including numerous environmental suits and remediation actions.

399.  **The value of the consideration received by Chemours in respect of the Chemours Separation and Spin Transaction for the transfer of the Dividend to Historical DuPont, and the incurrence of obligations by Chemours to Historical DuPont in respect of the Chemours Separation and Spin Transaction, was not for reasonably equivalent value in respect of the value of the obligation incurred and the transfers made**. *See* VT UFTA § 2288(b)(8).  The Chemours Separation and Spin Transaction was predicated upon Historical DuPont's "High End (Maximum) Realistic Exposure" estimates for liabilities, which were valued based on accounting principles and have proven in several instances to be drastically below the actual liability amounts.

400.  **Chemours was insolvent or became insolvent shortly after the Chemours Separation and Spin Transaction**. *See* VT UFTA § 2288(b)(9).  The VT UFTA recognizes "[i]nsolvency" where the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation, or when a debtor is generally not paying debts as they become due.  *See* VT UFTA § 2286(a), (b).  Chemours was balance-sheet insolvent at the time of the Chemours Separation and Spin Transaction.   Additionally, the trading prices for Chemours's debt reflect insolvency as of the date the Chemours Separation and Spin Transaction closed and spiraled downhill in the immediate aftermath of the Chemours Separation and Spin Transaction.  Further, as a result of the Chemours Separation and Spin Transaction, Chemours could not pay its debts as they became due.

401.  Lastly, the existence of Houlihan's solvency opinion does not support Chemours's solvency because, among other things, Houlihan used Historical DuPont's contingent liability

figures that Historical DuPont engineered to massively understate the real potential maximum

exposure in preparing Houlihan's solvency opinion.

402. **Finally, the Chemours Separation and Spin Transaction occurred shortly before or**

**shortly after a substantial debt was incurred**. *See* VT UFTA § 2288(b)(10).  The Chemours

Separation and Spin Transaction occurred after the indebtedness under the Credit Agreement and

indentures was incurred.  As part of the Chemours Separation and Spin Transaction, Chemours

incurred significant obligations, namely the assumption of the Chemours Liabilities which

include the Chemours Assumed Environmental Liabilities (as each are defined in the Chemours

Separation Agreement), as well as the indemnification obligations under Section 6.3 of the

Chemours Separation Agreement.  Additionally, Chemours paid the Dividend to Historical

DuPont.

403. Pursuant to VT UFTA § 2291(a), the State seeks, to the extent necessary to satisfy the

State's claims in this Second Amended Complaint, the attachment or other provisional remedy

(including levy) against the assets transferred to Historical DuPont and the incurrence of

obligations to Historical DuPont in the Chemours Separation and Spin Transaction, or the

proceeds of such assets now held by DowDuPont, New Dow, and Corteva, or other property of

Historical DuPont, DowDuPont, New Dow, and Corteva, and/or to hold Historical DuPont, The

Chemours Company, DowDuPont, and Corteva liable for any damages or other remedies that

may be awarded through this lawsuit.

404. DowDuPont and Corteva are not good-faith transferees of the assets initially transferred,

including the Dividend, to Historical DuPont in the Chemours Separation and Spin Transaction,

and later to DowDuPont and Corteva because each of Historical DuPont, DowDuPont, and

Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the

- 83 -

fraudulent intent underlying the Chemours Separation and Spin Transaction; and/or (iii)

Chemours's insolvency.

405.  The State further reserves such other rights and remedies that may be available to it under

VT UFTA as may be necessary to fully compensate the State for the damages and injuries it has

suffered as alleged in this Second Amended Complaint.

## XX.    ELEVENTH CAUSE OF ACTION

**Constructive Fraudulent Transfer Related to the
Chemours Separation and Spin Transaction,
Pursuant to 9 V.S.A. §§ 2289(a) & 2291(a) as in effect on July 1, 2015,
and/or such other applicable state law
(Against Historical DuPont, The Chemours Company, DowDuPont, and Corteva)**

406.  The State realleges and reaffirms each and every allegation set forth in all preceding

paragraphs as if fully restated in this section.

407.  The State seeks relief pursuant to the VT UFTA section 2289(a), against Historical

DuPont, The Chemours Company, DowDuPont, and Corteva.

408.  The State was a creditor of Historical DuPont and Chemours at the time of the Chemours

Separation and Spin Transaction.

409.  Chemours did not receive reasonably equivalent value in return for the assumption and/or

incurrence of Chemours Separation and Spin Transaction related obligations, including the

transfer of the Dividend.

410.  Chemours was insolvent as a result of the Chemours Separation and Spin Transaction.

Chemours was balance-sheet insolvent at the time of the Chemours Separation and Spin

Transaction.  Additionally, the debt trading prices of the Notes reflect insolvency as of the date

the Chemours Separation and Spin Transaction closed and spiraled downhill in the immediate

aftermath of the Chemours Separation and Spin Transaction.  Further, as a result of the

Chemours Separation and Spin Transaction, Chemours could not pay its debts as they became due. Lastly, the existence of Houlihan's solvency opinion does not support Chemours's solvency.

411. Pursuant to VT UFTA section 2291(a), the State seeks, to the extent necessary to satisfy the State's claims in this Second Amended Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Historical DuPont and the incurrence of obligations to Historical DuPont in the Chemours Separation and Spin Transaction, or the proceeds of such assets now held by DowDuPont and Corteva, or other property of Historical DuPont, DowDuPont and Corteva, and/or to hold Historical DuPont, The Chemours Company, DowDuPont, and Corteva liable for any damages or other remedies that may be awarded through this lawsuit.

412. DowDuPont and Corteva are not good-faith transferees of the assets initially transferred, including the Dividend, to Historical DuPont in the Chemours Separation and Spin Transaction, and later to DowDuPont and Corteva because each of Historical DuPont, DowDuPont, and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Separation and Spin Transaction; and/or (iii) Chemours's insolvency.

413. The State further reserves such other rights and remedies that may be available to it under VT UFTA as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Second Amended Complaint.

## XXI.   TWELFTH CAUSE OF ACTION

**Constructive Fraudulent Transfer Related to the
Chemours Separation and Spin Transaction,
Pursuant to 9 V.S.A. §§ 2288(a)(2) & 2291(a) as in effect on July 1, 2015,**

**and/or such other applicable state law**
**<u>(Against Historical DuPont, The Chemours Company, DowDuPont, and Corteva)</u>**

414.  The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

415.  The State seeks relief pursuant to VT UFTA section 2288(a)(2), against Historical DuPont, The Chemours Company, DowDuPont, and Corteva.

416.  Chemours did not receive reasonably equivalent value in return for the assumption and/or incurrence of certain Chemours Separation and Spin Transaction related obligations, including the transfer of the Dividend.  Historical DuPont and Chemours acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and Historical DuPont believed or reasonably should have believed that it would incur debts beyond Chemours's ability to pay as they became due.

417.  At the time of the Chemours Separation and Spin Transaction, Chemours (i) was engaged or was about to engage in a business for which its remaining assets were unreasonably small in relation to Chemours' business, and/or (ii) intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

418.  At the time of the Chemours Separation and Spin Transaction, Historical DuPont and the business line that Chemours would come to own had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Historical DuPont's liability for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and

promotion of PFAS and PFAS-containing products, including those damages and injuries caused by the business line that Chemours would come to own.

419.  At the time of the Chemours Separation and Spin Transaction, and at all times relevant to this action, Chemours has been insolvent.

420.  Pursuant to VT UFTA section 2291(a), the State seeks, to the extent necessary to satisfy the State's claims in this Second Amended Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Historical DuPont and the incurrence of obligations to Historical DuPont in the Chemours Separation and Spin Transaction, or the proceeds of such assets now held by DowDuPont and Corteva, or other property of Historical DuPont, DowDuPont, and Corteva, and/or to hold Historical DuPont, The Chemours Company, DowDuPont, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

421.  DowDuPont and Corteva are not good-faith transferees of the assets initially transferred, including the Dividend, to Historical DuPont in the Chemours Separation and Spin Transaction, and later to DowDuPont and Corteva because each of Historical DuPont, DowDuPont, and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Separation and Spin Transaction; and/or (iii) Chemours's insolvency.

422.  The State further reserves such other rights and remedies that may be available to it under VT UFTA as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Second Amended Complaint.

## XXII.  THIRTEENTH CAUSE OF ACTION

**Actual Fraudulent Transfer Related to the
Merger, the Subsequent Restructuring Transactions and
Assets Transfers, the DowDuPont Separation Agreement, the
Dow Spin Transaction, and the Corteva Spin Transaction,
Pursuant to 9 V.S.A. §§ 2288(a)(1) & 2291(a) as in effect starting on July 1, 2017,
and/or 6 Del. C. §§ 1304(a)(1), & 1307 and/or such other applicable state law
<u>(Against Historical DuPont, DowDuPont, and Corteva)</u>**

423.  The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

424.  The State seeks relief pursuant to 9 V.S.A. §§ 2288(a)(1) as in effect starting on July 1, 2017 (the Vermont Uniform Voidable Transactions Act (VT UVTA)) and/or 6 Del. C. §§ 1304(a)(1) against Historical DuPont, DowDuPont, and Corteva.

425.  The State is and was a creditor of Historical DuPont and DowDuPont at all relevant times.

426.  Through its participation in the Merger, the subsequent restructuring transactions and assets transfers, the DowDuPont Separation, the Dow Spin Transaction, and the Corteva Spin

Transaction, Historical DuPont and DowDuPont transferred valuable assets and business to DowDuPont and Corteva (the Separation Transfers).

427. The Separation Transfers were made for the benefit of DowDuPont and Corteva.

428. At the time that the Separation Transfers were made, DowDuPont was in a position to control, and did control, DowDuPont and Corteva.

429. DowDuPont, Historical DuPont, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors of Historical DuPont and DowDuPont.

430. The State has been harmed as a result of the Separation Transfers.

431. DowDuPont, Historical DuPont, and Corteva engaged in acts in furtherance of a scheme to transfer assets out of the reach of parties, such as Vermont, that have been harmed as a result of Historical DuPont's and DowDuPont's actions described in this Second Amended Complaint.

432. As a result of the transfer of assets and liabilities related to the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin Transaction, and the Corteva Spin Transaction described in this Second Amended Complaint, DowDuPont and Corteva sought to limit the availability of assets to cover judgements for all of the liability for damages and injuries arising from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS and PFAS-containing products.

433. Historical DuPont manufactured, marketed, distributed, sold, and promoted PFAS and PFAS-containing products despite knowing of the health and environmental risks of PFAS for decades before Chemours existed as an independent company.

434. At the time of the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin Transaction, and the Corteva Spin Transaction, Historical DuPont and/or DowDuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of

litigation to be filed regarding liability of Historical DuPont and DowDuPont, for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS and PFAS-containing products.

435.  The State was a creditor of Historical DuPont and DowDuPont at the time of the Merger, the subsequent restructuring transactions and assets transfers, the DowDuPont Separation, the Dow Spin Transaction, and the Corteva Spin Transaction.

436.  Historical DuPont and/or DowDuPont acted without receiving reasonably equivalent value in exchange for the transfers and/or obligations comprising the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin Transaction, and the Corteva Spin Transaction.  Historical DuPont and/or DowDuPont believed or reasonably should have believed that DowDuPont would incur debts beyond its ability to pay as they became due.

437.  At the time of the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin Transaction, and the Corteva Spin Transaction, and at all times relevant to this action, Historical DuPont and DowDuPont had been insolvent because each of their debts were greater than the fair saleable value of each of their assets.

438.  A number of the statutorily enumerated badges of fraud are present with respect to the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin Transaction, and the Corteva Spin Transaction, and evidence Defendants' fraudulent intent.  *See* VT UVTA § 2288(b); 6 Del. C. § 1304(b).

439.  **In connection with the DowDuPont Separation, DowDuPont divided up its assets and obligations among entities it controlled, namely DowDuPont and Corteva**.  *See* VT UVTA § 2288(b)(1); 6 Del. C. § 1304(b)(1).  Certain obligations were assumed by DowDuPont and Corteva, but not New Dow, including Historical DuPont's liabilities, as well as the

indemnification obligations under Article VIII of the DowDuPont Separation Agreement. The transfer of these obligations from Historical DuPont to DowDuPont, then from DowDuPont to DowDuPont and Corteva, occurred at a time that DowDuPont controlled DowDuPont and Corteva through DowDuPont's Board's members, DowDuPont employees, and DowDuPont agents. DowDuPont was an insider of DowDuPont and Corteva, when the DowDuPont Separation was approved and consummated. *See* VT UVTA § 2285(1)(b), (e); 6 Del. C. § 1301(1)(b), (e).

440. **The DowDuPont Separation concealed the liabilities actually assumed by DowDuPont and Corteva**. *See* VT UVTA § 2288(b)(3); 6 Del. C. § 1304(b)(3). The true scope of the obligations that were to be assumed by DowDuPont and Corteva in the DowDuPont Separation Agreement were concealed. Additionally, the schedules to the DowDuPont Separation Agreement were not publicly filed.

441. **The DowDuPont Separation occurred at a time when Historical DuPont and DowDuPont had been sued or threatened with suit related to environmental liabilities**. *See* VT UVTA § 2288(b)(4); 6 Del. C. § 1304(b)(4). Historical DuPont and DowDuPont were subject to a substantial amount of litigation at the time that the DowDuPont Separation was approved and when it occurred, including numerous environmental suits and remediation actions.

442. **The value of the consideration received by DowDuPont and Corteva in respect of the DowDuPont Separation was not reasonably equivalent to the value of the obligation**

incurred by DowDuPont and Corteva in the DowDuPont Separation. *See* VT UVTA § 2288(b)(8); 6 Del. C. § 1304(b)(8).

443. **DowDuPont was insolvent or became insolvent shortly after the DowDuPont Separation, the Dow Spin Transaction, and the Corteva Spin Transaction**. *See* VT UVTA § 2288(b)(9); 6 Del. C. § 1304(b)(9). The VT UVTA recognizes "[i]nsolvency" where the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation. *See* VT UVTA § 2286(a), (b); 6 Del. C. § 1302(a), (b). DowDuPont was balance sheet insolvent at the time of the DowDuPont Separation and the Corteva Spin Transaction.

444. **Finally, the DowDuPont Separation and the Corteva Spin Transaction occurred shortly before or shortly after a substantial debt was incurred**. *See* VT UVTA § 2288(b)(10); 6 Del. C. § 1304(b)(10). The DowDuPont Separation and the Corteva Spin Transaction occurred either shortly before or shortly after DowDuPont's incurrence of $4 billion in indebtedness to Corteva. As part of the DowDuPont Separation and the Corteva Spin Transaction, DowDuPont incurred significant obligations, namely the assumption of the liabilities and indemnification obligations, each under the DowDuPont Separation Agreement.

445. Pursuant to VT UVTA § 2291(a) and/or 6 Del. C. § 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Second Amended Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Corteva and New Dow and the incurrence of obligations to Corteva pursuant to the Corteva Spin Transaction and the Dow Spin Transaction, respectively, or the proceeds of such assets now held by DowDuPont and Corteva, or other property of Historical DuPont, DowDuPont, and Corteva, and/or to hold

Historical DuPont, DowDuPont, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

446.  DowDuPont and Corteva are not good-faith transferees of the assets initially transferred to Historical DuPont in the Merger, the Subsequent Restructuring Transactions and Asset Transfers, the DowDuPont Separation Agreement, the Dow Spin Transaction, and the Corteva Spin Transaction, and later to DowDuPont and Corteva because DowDuPont and Corteva knew or should have known of (i) the fraudulent intent underlying the Merger, the Subsequent Restructuring Transaction and Assets Transfers, the DowDuPont Separation Agreement, the Dow Spin Transaction, and the Corteva Spin Transaction Dividend; and/or (ii) the insolvency of DowDuPont.

447.  The State further reserves such other rights and remedies that may be available to it under VT UVTA as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Second Amended Complaint.

**XXIII. FOURTEENTH CAUSE OF ACTION**
**Constructive Fraudulent Transfer Related to the**
**Merger, the Subsequent Restructuring Transactions and**
**Assets Transfers, the DowDuPont Separation Agreement,**
**the Dow Spin Transaction, and the Corteva Spin Transaction,**
**Pursuant to 9 V.S.A. §§ 2289(a) & 2291(a) as in effect starting on July 1, 2017,**
**and/or 6 Del. C. § 1305(a) & 1307**
**<u>(Against Historical DuPont, DowDuPont, and Corteva)</u>**

448.  The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

449.  The State seeks relief pursuant to VT UVTA § 2289(a) and/or 6 Del. C. § 1305(a) against Historical DuPont, DowDuPont, and Corteva.

450.  The State was a creditor of Historical DuPont and DowDuPont at the time of the DowDuPont Separation.

451.  DowDuPont and Corteva did not receive reasonably equivalent value in return for the assumption and/or incurrence of DowDuPont Separation related obligations.

452.  DowDuPont was insolvent as a result of the DowDuPont Separation.  DowDuPont was balance-sheet insolvent at the time of the DowDuPont Separation.

453.  Pursuant to VT UVTA § 2291(a) and/or 6 Del. C. § 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Second Amended Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to DowDuPont and Corteva and the incurrence of obligations to Corteva in the DowDuPont Separation, or the proceeds of such assets now held by DowDuPont and Corteva, or other property of Historical DuPont, DowDuPont, and Corteva, and/or to hold Historical DuPont, DowDuPont, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

454.  DowDuPont and Corteva are not good-faith transferees of the assets initially transferred to Historical DuPont in the Merger, the Subsequent Restructuring Transactions and Asset Transfers, the DowDuPont Separation Agreement, the Dow Spin Transaction, and the Corteva Spin Transaction, and later to DowDuPont and Corteva because DowDuPont and Corteva knew or should have known of (i) the fraudulent intent underlying the Merger, the Subsequent Restructuring Transaction and Assets Transfers, the DowDuPont Separation Agreement, the

Dow Spin Transaction, and the Corteva Spin Transaction Dividend; and/or (ii) the insolvency of DowDuPont.

455. The State further reserves such other rights and remedies that may be available to it under VT UVTA as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Second Amended Complaint.

## XXIV. FIFTEENTH CAUSE OF ACTION
### Constructive Fraudulent Transfer Related to the
### Merger, the Subsequent Restructuring Transactions and
### Assets Transfers, the DowDuPont Separation Agreement,
### the Dow Spin Transaction, and the Corteva Spin Transaction,
### Pursuant to 9 V.S.A. §§ 2288(a)(2) & 2291(a) as in effect starting on July 1, 2017,
### and/or 6 Del. C. § 1304(a)(2) & 1307
### (Against Historical DuPont, DowDuPont, and Corteva)

456. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

457. The State seeks relief pursuant to VT UVTA § 2288(a)(2) and/or 6 Del. C. § 1304(a)(2) against Historical DuPont, DowDuPont, and Corteva.

458. Historical DuPont and DowDuPont did not receive reasonably equivalent value in return for the assumption and/or incurrence of certain DowDuPont Separation related obligations. DowDuPont acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and DowDuPont believed or reasonably should have believed that DowDuPont would incur debts beyond its ability to pay as they became due.

459. At the time of the DowDuPont Separation, DowDuPont was engaged or was about to engage in a business for which its remaining assets were unreasonably small in relation to the

business or intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

460. At the time of the DowDuPont Separation, DowDuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Historical DuPont's and DowDuPont's liability for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS and PFAS-containing products.

461. At the time of the DowDuPont Separation, and at all times relevant to this action, DowDuPont has been insolvent because its debts were greater than the fair saleable value of its assets.

462. Pursuant to VT UVTA § 2291(a) and/or 6 Del. C. § 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Second Amended Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to DowDuPont and the incurrence of obligations to Corteva in the DowDuPont Separation, or the proceeds of such assets now held by DowDuPont and Corteva, or other property of Historical DuPont, DowDuPont, and Corteva, and/or to hold Historical DuPont, DowDuPont, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

463. DowDuPont and Corteva are not good-faith transferees of the assets initially transferred to Historical DuPont in the Merger, the Subsequent Restructuring Transactions and Assets Transfers, the DowDuPont Separation Agreement, the Dow Spin Transaction, and the Corteva Spin Transaction, and later to DowDuPont and Corteva because DowDuPont and Corteva knew or should have known of (i) the fraudulent intent underlying the Merger, the Subsequent Restructuring Transaction and Assets Transfers, the DowDuPont Separation Agreement, the

Dow Spin Transaction, and the Corteva Spin Transaction Dividend; and/or (ii) the insolvency of DowDuPont.

464.  The State further reserves such other rights and remedies that may be available to it under VT UVTA as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Second Amended Complaint.

## XXV.  PUNITIVE DAMAGES

### (All Defendants)

465.  Defendants' reprehensible conduct in manufacturing, marketing, distributing, promoting, and/or selling PFAS and/or products containing PFAS was undertaken with conscious, willful, and wanton disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon the State of Vermont.  Defendants' conduct was outrageously reprehensible and malicious.  Defendants acted and/or failed to act with conscious and deliberate disregard for a known, substantial, and intolerable risk of harm, with the knowledge that their acts or omissions were substantially certain to result in the threatened harm, and/or as a matter of free and intentional business choices.  Therefore, the State requests an award of punitive damages to the maximum extent permitted by law in an amount reasonable, appropriate, and sufficient to punish Defendants and deter them from committing the same or similar tortious acts in the future.

## PRAYER FOR RELIEF

The State of Vermont seeks judgment against all Defendants for:

A.    Compensatory damages arising from PFAS contamination and injury of State natural resources and property, including groundwater, surface waters, drinking water supplies, biota, wildlife including fish, and their associated soils, sediments, and uses,

and other State natural resources and property, according to proof, including, but not limited to:

(i)     natural resource damages;[2]

(ii)    loss-of use damages;

(iii)   costs of investigation;

(iv)    costs of testing and monitoring;

(v)     costs of providing water from an alternate source;

(vi)    costs of installing and maintaining wellhead treatment;

(vii)   costs of installing and maintaining a wellhead protection program;

(viii)  costs of installing and maintaining an early warning system to detect PFAS before it reaches wells;

(ix)    costs of remediating PFAS from natural resources including groundwater, surface waters, soils, sediments, and other natural resources;

(x)     costs of remediating PFAS contamination at release sites;

(xi)    any other costs or other expenditures incurred to address PFAS contamination and injury; and

(xii)   interest on the damages according to law;

B.     Pursuant to 10 V.S.A. § 6615(a), the costs of investigation, removal, and remedial actions incurred and to be incurred by the State to protect public health and/or the environment;

---

[2] The State prayer for natural resource damages is based on all causes of action except the violation of 10 V.S.A. § 6615. The State does not seek natural resource damages in connection with the section 6615 claim.

C.      Pursuant to (i) VT UFTA §§ 2288(a), 2289(a), and 2291(a), (ii) VT UVTA §§ 2288(a), 2289(a), and 2291(a), 6 Del. C. §§ 1304(a), 1305, and 1307, as applicable, and/or such other applicable state law, all remedies including an attachment or other provisional remedy (including levy) against the assets transferred to, and the incurrence of obligations to, Historical DuPont, DowDuPont, and/or Corteva, or other property of Historical DuPont, DowDuPont, and Corteva, and/or to hold Historical DuPont, The Chemours Company, DowDuPont, and Corteva liable for any damages that may be awarded under this Second Amended Complaint;

D.      An order to compel Defendants to abate PFAS contamination by removing PFAS from State natural resources and property and/or by paying the State's costs to abate the contamination;

E.      An order that the State is entitled to avoid any transfer of Historical DuPont liabilities to The Chemours Company and put the State in the position it would have been had the transfer not occurred;

F.      Civil penalties for Defendants' violations of 10 V.S.A. § 6615, including the recapture of the economic benefit Defendants obtained as a result of these violations;

G.      Punitive damages;

H.      Costs (including reasonable attorney fees, court costs, and other expenses of litigation);

I.      Prejudgment interest; and

J.      Any other and further relief as the Court deems just, proper, and equitable.

**JURY TRIAL DEMANDED**

The State demands a trial by jury on all claims so triable.

**Dated:**    March 23, 2023

STATE OF VERMONT

CHARITY R. CLARK
ATTORNEY GENERAL

Laura B. Murphy
Assistant Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-3186
laura.murphy@vermont.gov

Matthew F. Pawa
Benjamin A. Krass (admitted *pro hac vice*)
Wesley Kelman (admitted *pro hac vice*)
Seeger Weiss LLP
1280 Centre Street, Suite 230
Newton Centre, MA  02459
(617) 641-9550

David Buchanan (admitted *pro hac vice*)
Nigel Halliday (admitted *pro hac vice*)
Seeger Weiss LLP
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
(212) 584-0755

Kyle J. McGee (admitted *pro hac vice*)
Viola Vetter (admitted *pro hac vice*)
Jason H. Wilson (admitted *pro hac vice*)
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE 19801
(302) 622-7000

Gordon Z. Novod (admitted *pro hac vice*)
Grant & Eisenhofer P.A.
485 Lexington Ave.
29th Floor
New York, NY 10017

(646) 722-8523