# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

|  |  |
|---|---|
| **State of Vermont,**<br><br>vs.<br><br>**3M Company;**<br>**Buckeye Fire Equipment Company;**<br>**Carrier Fire & Security Americas LLC**<br>(*formerly known as* **Carrier Fire & Security**<br>**Americas Corporation**);<br>**Carrier Global Corporation;**<br>**Chemguard, Inc.;**<br>**Corteva, Inc.;**<br>**Dupont de Nemours, Inc.;**<br>**EIDP, Inc. (***formerly known as* **E. I. du Pont**<br>**de Nemours and Company**);<br>**Kidde-Fenwal, Inc.;**<br>**National Foam, Inc.;**<br>**RTX Corporation;**<br>**The Chemours Company;**<br>**The Chemours Company FC, LLC; and**<br>**Tyco Fire Products L.P.** | **MDL No. 2873**<br><br>**Master Docket No: 2:18-mn-2873-RMG**<br><br>**JUDGE RICHARD GERGEL**<br><br>**Civil Action No. 2:19-cv-02281-RMG**<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S AMENDED COMPLAINT

Plaintiff, the State of Vermont, as trustee of State natural resources, as owner of State property, and in its *parens patriae* capacity on behalf of its citizens, makes the following allegations against Defendants.

### I.    SUMMARY OF THE CASE

1.    The State of Vermont, by and through Attorney General Charity R. Clark, brings this action to protect and restore State natural resources and State property from contamination and injury by per- and polyfluoroalkyl substances (PFAS) related to the use of aqueous film-forming foam (AFFF), a fire-fighting foam containing PFAS compounds.

- 1 -

2.      Defendants are the manufacturers of PFAS-containing AFFF, and/or the manufacturers of PFAS, which include perfluorooctanesulfonic acid (PFOS), perfluorooctanoic acid (PFOA), perfluorononanoic acid (PFNA), perfluorohexanesulfonic acid (PFHxS), and perfluoroheptanoic acid (PFHpA).  As used in this Amended Complaint, the terms PFOS, PFOA, PFNA, PFHxS, and PFHpA include those chemicals themselves (including all of their salts, ionic states and acid forms of the molecules) and the "precursor" chemicals that break down into these five pollutants.

3.      PFAS are human-made, synthetic chemicals that do not exist naturally in the environment and are toxic at extremely low levels (in the parts per trillion (ppt).   The ubiquitous contamination and injury caused by these chemicals in Vermont has only recently come to light.

4.      PFAS are known as "forever" chemicals because they persist in the environment for an indefinite (and very long) period of time.  PFAS bioaccumulate in the human body and can bio-magnify in animals, particularly fish and "top of the food chain" mammals.  PFAS exposure is correlated with a wide array of harmful health effects, including kidney and testicular cancer, ulcerative colitis, and adverse effects on the liver, the immune system, the thyroid, cholesterol levels, and fetal development during pregnancy.

5.      AFFF was developed in the 1960s to be used for flammable liquid fire extinguishment, including flammable vapor suppression.  Training with AFFF is a critical part of proper AFFF use.  AFFF concentrate contains PFAS, including PFOA and PFOS, used to meet performance standards for fire extinguishing agents.

6.      Defendants are major chemical companies that manufactured PFAS-containing AFFF and/or PFAS, including PFOS, PFOA, PFNA, PFHxS, and/or PFHpA.

7.      Defendant 3M Company (3M) was the primary manufacturer of PFAS chemicals in the United States from the 1940s until 2002.   3M marketed and sold PFAS to be used in AFFF

throughout the United States.  3M also manufactured and sold AFFF that contained PFAS compounds.

8.    When 3M phased out production of PFOA, Defendant E. I. du Pont de Nemours Company (Historical DuPont) began manufacturing its own PFAS chemicals, despite knowing about the health and environmental risks of PFAS from its use of PFAS for consumer products starting in 1951.  DuPont marketed and sold PFAS to be used in AFFF throughout the United States.  In 2015, DuPont transferred its performance chemicals business and some associated liabilities to Defendant The Chemours Company and/or The Chemours Company FC, LLC (Chemours).  Defendants Corteva, Inc. (Corteva) and DuPont de Nemours, Inc. (New DuPont) are other DuPont affiliates that manufactured PFAS chemicals and/or have succeeded to Historical DuPont's PFAS liabilities.  Historical DuPont, Chemours, Corteva, and New DuPont are collectively referred to in this Amended Complaint as "DuPont."

9.    In addition to 3M, Defendants Chemguard Inc. (Chemguard), Tyco Fire Products L.P. (Tyco), National Foam, Inc. (National Foam), Buckeye Fire Equipment Company (Buckeye), Kidde-Fenwal, Inc. (Kidde), Carrier Fire & Security Americas LLC (Carrier Fire), Carrier Global Corporation (Carrier), and RTX Corporation (RTX) each manufactured AFFF that contained PFAS chemicals and/or have contractual assumption of liability or successor liability for AFFF products.[1]

---

[1] Plaintiff's claims as against Defendant Kidde are stayed pursuant to Section 362(a) of the Bankruptcy Code based on the voluntary Chapter 11 petition filed by Kidde in the United States Bankruptcy Court for the District of Delaware.  *See In re Kidde-Fenwal, Inc.*, Case No. 23-10638 (Bankr. D. Del.), D.I. 1.  For the avoidance of doubt, and notwithstanding anything stated herein or in any of the subsequent filings made in the above-captioned action, this action is not and should not be deemed an attempt to commence or continue an action against Kidde, to collect a debt against Kidde, or take any other action in violation of the automatic stay imposed by section 362 of Title 11 of the United States Code.  Plaintiff's claims as against Defendant National Foam are

10.    Defendants' AFFF products, which were sold and used in the State of Vermont, were unreasonably dangerous and the Defendants failed to warn of this danger.  The result has been contamination and injury of State natural resources with AFFF-related PFAS.

11.    3M and DuPont knew for decades that PFAS chemicals were toxic and posed substantial health and environmental risks, but they continued to promote these chemical products for use in AFFF or, in the case of 3M, to use PFAS in the manufacture of its own AFFF products.  Even though toxicity tests confirmed that 3M's AFFF product was "hazardous to marine life," 3M distributed ad brochures for its AFFF that stated that "[t]ests and actual use situations have shown that animal and aquatic life are not adversely affected."  Despite its extensive knowledge of the dangers of PFAS, DuPont was a founding member of the Fire Fighting Foam Coalition, which was formed to advocate for AFFF's continued viability despite the public beginning to become aware of its dangers.  Each Defendant had access to information related to the dangers of PFAS compounds used in their AFFF products, but they kept this information hidden from the public as they continued to profit from the sale of AFFF products or PFAS to be used in AFFF.

---

stayed by order of this Court.  *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, Nos. 2:18-mn-02873-RMG, 2:18-cv-03487-RMG, Text Order (D.S.C. May 15, 2023) (observing "claims against Kidde and National Foam are automatically stayed by the filing of bankruptcy on May 14, 2023.").  While Plaintiff believes that Section 362(a) of the Bankruptcy Code does not apply to National Foam, since National Foam has not filed a petition for relief under the Bankruptcy Code, for the avoidance of doubt, and notwithstanding anything stated herein or in any of the subsequent filings made in the above-captioned action, this action is not and should not be deemed an attempt to commence or continue an action against National Foam, to collect a debt against National Foam, or take any other action in violation of this Court's order.  Notwithstanding the foregoing, pursuant to the orders entered in *Kidde-Fenwal Inc. v. Those Parties Listed on Exhibit A to Adversary Complaint and Jane and John Does 1-1000*, a plaintiff may file and serve an amended complaint as necessary to protect its rights regarding timeliness arguments.  *Kidde-Fenwal Inc. v. Those Parties Listed on Exhibit A to Adversary Complaint and Jane and John Does 1-1000*, Adv. Case No. 23-50387 (LSS) (Bankr. D. Del.), Adv. D.I. 69 (at ¶ 4), 82 (at ¶ 2), 91 (at ¶ 2).

12.    PFAS related to the sale and uses of AFFF have contaminated Vermont drinking water, groundwater, surface water, wildlife, soil, and sediment.

13.    Since the discovery of PFOA contamination in Bennington in 2016, the State has launched a statewide investigation to identify sources of PFAS contamination throughout the State, including sites where PFAS-containing AFFF were known to be used.  Over the last three years, the State has discovered AFFF-related PFAS contamination at a number of locations in Vermont.  Following these discoveries, in May of 2019, the Vermont Legislature enacted Act 21 of the 201 session, requiring (among other things) statewide sampling for PFAS contamination beginning no later than July 2019, which is to include sampling at locations where PFAS-containing AFFF was used.  Pursuant to this new law, the State issued a PFAS Statewide Sampling Plan in June 2019.  As the State continues its ongoing investigation of PFAS contamination throughout the State it continues to discover additional PFAS contamination, including contamination related to the use of AFFF.

14.    The State has the authority and responsibility to protect, conserve, and manage State natural resources for present and future generations.  The State seeks damages and other relief for AFFF-related PFAS contamination and injury in its capacity as trustee of State natural resources and in its *parens patriae* capacity on behalf of the State.  The State also acts to protect its own interests in property.

15.    The State alleges that Defendants are:  liable for natural resource damages; liable for altering the quality of groundwater as prohibited by 10 V.S.A. § 1410; strictly liable for manufacturing and supplying defective products; strictly liable for failing to provide adequate warnings in connection with those products; liable for negligently causing damage to the State's natural resources and property, and to the property of citizens of the State; liable for creating a

public nuisance; liable for creating a private nuisance; liable for trespass upon the State's natural resources and property, and property of citizens of the State; liable for violating Vermont's Uniform Fraudulent Transfer Act as in effect on July 1, 2015 and Vermont's Uniform Voidable Transactions Act as in effect starting on July 1, 2017 (E. I. du Pont de Nemours and Company, Corteva, Inc., DuPont de Nemours, Inc. (f/k/a DowDuPont Inc.), and The Chemours Company only); and liable for all resulting damages, including punitive damages.

16.    The State brings this action to recover compensatory damage and natural resource damages, to ensure that Defendants bear such expense, rather than the State or its citizens and taxpayers.  These damages include restoration and loss-of-use damages and costs to investigate, monitor, abate, contain, prevent, treat, and remove AFFF-related PFAS from the State's natural resources and property.  The State also seeks punitive damages to reflect Defendants' truly reprehensible conduct.

17.    This Amended Complaint alleges claims based on contamination caused by the five specific PFAS chemicals listed above (PFOS, PFOA, PFNA, PFHxS, and PFHpA), as well as their precursors, acids, salts, ionic forms, and byproducts.  The State is not seeking to recover through this Amended Complaint any relief for contamination and injury from PFAS that is not related to the manufacture and use of AFFF, which the State is addressing through a separate legal action.  The State is also not seeking to recover through this Amended Complaint any relief for past, present, or future personal injury claims or diminution in value of private property. Finally, although this Amended Complaint alleges claims based on these five specific PFAS chemicals, PFAS contamination, including AFFF-related PFAS contamination, is a rapidly developing issue, and additional information (potentially including information on other PFAS chemicals) is expected to come to light over the course of this litigation.

## II.    PLAINTIFF

18.    Plaintiff is the State of Vermont, as represented by and through the Attorney General of the State of Vermont, with its principal office at 109 State Street, Montpelier, Vermont 05609-1001.

19.    The State brings this action in its capacity as sovereign, as trustee of State natural resources and owner of property (or of substantial interests in property) contaminated and injured by Defendants, and pursuant to its *parens patriae* authority on behalf of the citizens of Vermont.

20.    The State also brings this action based upon its statutory authority to protect State natural resources and its common law police power.  This power includes, but is not limited to, its power to prevent pollution of the State's natural resources and property, to prevent nuisances, and to prevent and abate hazards to public health, safety, welfare, and the environment.

21.    In this Amended Complaint, the term "State's natural resources and property" refers to natural resources or property for which the State seeks damages, which may include fish, wildlife, biota, air, surface water, groundwater, wetlands, drinking water supplies, State-held public lands, and State-owned lands.

## III.    DEFENDANTS

22.    Defendants are manufacturers, marketers, distributors, sellers, and promoters of PFAS-containing AFFF and/or PFAS for use in AFFF.  The following Defendants, at times relevant to this action, manufactured, marketed, distributed, and/or otherwise sold (directly or indirectly) PFAS-containing AFFF or PFAS for use in AFFF that each such Defendant knew or should have known would be delivered into areas affecting the State's natural resources and property, or otherwise did business in the State.

23.    Defendant **3M Company (3M)** is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55144.  3M does business throughout the United States, including conducting business in Vermont.

24.    Defendant **Tyco Fire Products L.P. (Tyco)** is a Delaware limited partnership with principal offices at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. Upon information and belief, Tyco is the successor-in-interest to Ansul, Inc. (Ansul). Tyco manufactures the Ansul brand of products. Tyco does business throughout the United States, including conducting business in Vermont.

25.    Defendant **Buckeye Fire Equipment Company (Buckeye)** is a corporation organized under the laws of the State of Ohio, with principal offices at 110 Kings Road, Kings Mountain, North Carolina 28086.  Buckeye does business throughout the United States, including conducting business in Vermont.

26.    Defendant **Chemguard, Inc. (Chemguard)** is a corporation organized under the laws of the State of Texas, with principal offices at One Stanton Street, Marinette, Wisconsin 54143-2542.  Chemguard does business throughout the United States, including conducting business in Vermont.

27.    Defendant **National Foam, Inc. (National Foam)** is a corporation organized under the laws of the State of Delaware, with principal offices at 141 Junny Road, Angier, North Carolina 27501.  National Foam is the successor in interest to Angus Fire Armour Corporation, and manufactures the Angus brand of products.  National Foam does business throughout the United States, including conducting business in Vermont.

28.    Defendant **Kidde-Fenwal, Inc. (Kidde)** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at One Financial Plaza, Hartford,

Connecticut 06101.  Kidde is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.).  Kidde does business throughout the United States, including conducting business in Vermont.

29.    Defendant **Carrier Fire & Security Americas LLC (Carrier Fire)** (formerly known as Carrier Fire & Security Americas Corporation) is a limited liability company organized under the laws of Delaware, with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.  Carrier Fire is the indirect parent of Kidde-Fenwal, Inc.  Carrier Fire is a successor to UTC Fire & Security Americas Corporation, Inc.  Carrier Fire does business throughout the United States, including conducting business in Vermont.

30.    Defendant **Carrier Global Corporation (Carrier)** is a corporation organized under the laws of Delaware with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.  On or around April 3, 2020, United Technologies Corporation (UTC) completed the spin-off of one of its reportable segments into Carrier Global, a separate, publicly traded company.  Pursuant to the 2020 Separation and Distribution Agreement by and among United Technologies Corporation, Carrier Global Corporation, and Otis Worldwide Corporation, Carrier Global assumed certain liabilities held by United Technologies Corporation, including those related to the business operated by Kidde-Fenwal, Inc.  Carrier Global, including through its assumed liabilities, has designed, manufactured, marketed, distributed, and/or sold PFAS-containing AFFF throughout the United States, including products sold under the brand names "Chubb" and "Kidde."  Carrier does business throughout the United States, including conducting business in Vermont.

31.    Defendant **RTX Corporation (RTX)**, formerly known as Raytheon Technologies Corporation, is a corporation organized under the laws of Delaware with its principal place of

business located at 1000 Wilson Boulevard, Arlington, Virginia 22209. RTX is a successor to UTC and the liabilities held by UTC as the parent company of Kidde. RTX, including through its contractual assumption of liabilities and its own independent conduct, has designed, manufactured, marketed, distributed, and/or sold PFAS-containing AFFF throughout the United States. RTX does business throughout the United States, including conducting business in Vermont.

32.    Defendant **E. I. du Pont de Nemours and Company** (Historical DuPont and now known as EIDP, Inc.) is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. Historical DuPont is currently a wholly-owned subsidiary of Defendant Corteva, defined below. E.I. Du Pont de Nemours and Company does business throughout the United States, including conducting business in Vermont.

33.    Defendant **The Chemours Company** is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19899. The Chemours Company does business throughout the United States, including conducting business in Vermont.

34.    The Chemours Company was incorporated as a subsidiary of Historical DuPont as of April 30, 2015. From that time until July 1, 2015, The Chemours Company was a wholly-owned subsidiary of Historical DuPont. On July 1, 2015, E.I. Du Pont de Nemours and Company spun off The Chemours Company and transferred to The Chemours Company its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of The Chemours Company stock to Historical DuPont stockholders, and The Chemours Company has since been an independent, publicly traded company.

35.    Defendant **The Chemours Company FC, LLC** is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware. The Chemours

Company FC, LLC is a wholly-owned subsidiary of The Chemours Company and manufactures fluoropolymer resins.

36.    The Chemours Company and The Chemours Company FC, LLC are collectively referred to throughout this Amended Complaint as "Chemours."

37.    Historical DuPont merged with The Dow Chemical Company on August 31, 2017 to create DowDuPont Inc. (DowDuPont) (the Merger).  In connection with the signing of the agreement and plan of merger for the Merger, Historical DuPont and The Dow Chemical Company announced their intention to pursue the separation of the combined company, DowDuPont, into three independent publicly traded companies, one for each of the combined company's agriculture, materials science, and specialty products businesses.  Historical DuPont and The Dow Chemical Company each merged with wholly-owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont.  Since that time, DowDuPont has effected a series of separation transactions to separate its businesses into three independent, publicly-traded companies for each of its agriculture, materials science, and specialty products businesses, discussed below.

38.    Defendant **Corteva, Inc.** (Corteva) is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware.  Corteva, Inc. has been served with process in this action through its registered agent CT Corporation System, 17 G W Tatro Drive, Jeffersonville, Vermont, 05464-9919.  Corteva Inc. does business throughout the United States, including conducting business in Vermont.

39.    On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva, Inc.

40.    Corteva, Inc. was initially formed in February 2018.  From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

41.    On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva, Inc. common stock by way of a pro rata dividend.  Following that distribution, Corteva, Inc. is the direct parent of Historical DuPont (*i.e.*, E. I. du Pont de Nemours and Company) and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.  On June 1, 2019, what remained of DowDuPont Inc. was renamed DuPont de Nemours, Inc.

42.    Defendant **DuPont de Nemours, Inc.** (f/k/a DowDuPont Inc.) (DowDuPont) is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.  DuPont de Nemours, Inc. has been  served with process through its registered agent in Delaware, The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, DE 19801.   DuPont de Nemours, Inc. does business throughout the United States, including conducting business in Vermont.

43.    On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva, Inc. and of another entity known as Dow Inc. (New Dow), changed its name to DuPont de Nemours, Inc., to be known as DowDuPont.  DowDuPont retained assets in the specialty products business lines following the above described spin-offs, as well as the balance of the financial assets and liabilities of Historical DuPont not assumed by Corteva, Inc.

44.    Prior to taking its current corporate form on June 1, 2019, DowDuPont, through the businesses that it owned and operated, and those owned and operated by its subsidiaries, had a decades-long history as a performance chemicals company, among other things.

45.    Defendants E. I. du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Amended Complaint.

46.    In 2001, DuPont became a founding member of the Fire Fighting Foam Coalition (FFFC).

47.    In part, through its involvement in the FFFC, DuPont actively marketed its fluorosurfactants, which contain PFAS, to AFFF manufacturers for use in the production of AFFF.

48.    Some or all of the AFFF manufactured and sold by the Defendants contained fluorosurfactants manufactured and sold by DuPont.

49.    3M Company; E.I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc.; Chemguard, Inc.; Tyco Fire Products L.P.; National Foam, Inc.; Buckeye Fire Equipment Company; Kidde-Fenwal, Inc.; Carrier Fire & Security Americas LLC; Carrier Global Corporation; and RTX Corporation are collectively referred to as "Defendants."

50.    Defendants, among other things: (a) designed, manufactured, formulated, promoted, marketed, sold, and/or otherwise supplied (directly or indirectly) PFAS-containing AFFF and/or PFAS for use in AFFF that was delivered into areas affecting the State's natural resources and property, such that AFFF-related PFAS have contaminated and threaten the State's natural resources and property; (b) acted with actual or constructive knowledge that PFAS-containing AFFF and/or PFAS for use in AFFF would be delivered into areas affecting the State's natural resources and property; (c) are legally responsible for and committed each of the multiple tortious and wrongful acts alleged in this Amended Complaint; and (d) promoted PFAS-

containing AFFF and/or PFAS for use in AFFF, despite the availability of reasonable alternatives and their actual or constructive knowledge that the pollution alleged in this Amended Complaint would be the inevitable result of their conduct.

51.    To the extent any act or omission of any Defendant is alleged in this Amended Complaint, the officers, directors, agents, employees, or representatives of each such Defendant committed or authorized each such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of such Defendants, and did so while acting within the scope of their duties, employment or agency.

52.    Any and all references to a Defendant or Defendants in this Amended Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

## IV.    JURISDICTION

53.    On July 31, 2019, 3M Company, Tyco Fire Products LP, and Chemguard, Inc. removed this action to the federal District Court for the District of Vermont alleging federal officer jurisdiction.  The case was subsequently transferred into the multi-district litigation captioned In re: Aqueous Film-Forming Foams Products Liability Litigation (the "AFFF MDL").  The State files this Amended Complaint in the District of South Carolina consistent with the Case Management Orders entered in the AFFF MDL, but reserves all rights to object to federal jurisdiction.  This Court may exercise jurisdiction over Defendants because they either are or at the relevant time were: authorized to do business in Vermont, registered with the Vermont Secretary of State, transacting sufficient business with sufficient minimum contacts in Vermont, or otherwise intentionally availing themselves of the Vermont market through the manufacturing,

marketing, distribution, and/or sale of PFAS-containing AFFF and/or PFAS for use in AFFF in
Vermont so as to satisfy minimum contacts and to render the exercise of jurisdiction over
Defendants by the Vermont courts consistent with traditional notions of fair play and substantial
justice.

## V.    AFFF-RELATED PFAS ARE TOXIC AND POSE SUBSTANTIAL HEALTH AND ENVIRONMENTAL RISKS

54.    AFFF is a foam intended for fighting high-hazard flammable liquid fires.

55.    AFFF products are typically formed by combining hydrocarbon foaming agents with
fluorinated surfactants.  PFAS are the active ingredients in fluorosurfactants.

56.    PFAS are a family of chemical compounds containing fluorine and carbon atoms.

57.    PFAS are humanmade, synthetic chemicals that do not exist naturally in the environment.

58.    PFAS, which include PFOS, PFOA, PFNA, PFHxS, and PFHpA, are persistent in the
environment and do not readily break down or biodegrade.  PFOS, PFOA, PFNA, PFHxS, and
PFHpA are stable in the environment and will persist for an indefinite (and very long) period of
time.  Because of their persistence, unless PFOS, PFOA, PFNA, PFHxS, and PFHpA are actively
cleaned up from contaminated State natural resources and property, these chemicals will remain
and continue to contaminate State natural resources and property indefinitely.  While it is
possible to clean up PFAS from certain State natural resources and State property, it is difficult
and expensive to do so.

59.    PFOS, PFOA, PFNA, PFHxS, and PFHpA are soluble in water, do not adsorb or stick to
soil particles, are mobile in the environment, and migrate long distances through soil and
groundwater.

60.    PFOS, PFOA, PFNA, PFHxS, and PFHpA are transported long distances through the air.

61.    The pernicious characteristics of PFOS, PFOA, PFNA, PFHxS, and PFHpA mean that once these chemicals are released into the environment, they migrate into and cause extensive contamination of State natural resources and property.

62.    PFOS, PFOA, PFNA, PFHxS, and PFHpA bioaccumulate and biomagnify in humans and in wildlife such as fish.

63.    PFOS, PFOA, PFNA, PFHxS, and PFHpA are toxic to humans at extremely low levels.

64.    PFOS, PFOA, PFNA, PFHxS, and PFHpA are difficult and costly to treat and remove from State natural resources and property.

65.    Exposure to certain PFAS is associated with harmful and serious health effects in humans and animals, including but not limited to:

    a.  altered growth;

    b.  impacts to learning and behavior of infants and children;

    c.  lowering a woman's chance of getting pregnant;

    d.  interference with the body's natural hormones;

    e.  increased cholesterol levels;

    f.  modulation of the immune system; and

    g.  increased risks of testicular and kidney cancers.

Some or all of these health effects are associated with PFOS, PFOA, PFNA, PFHxS, and PFHpA.

66.    PFOS, PFOA, PFNA, PFHxS, and PFHpA contamination is a serious threat to human health and State natural resources and property.

67.    Humans are exposed to PFOS, PFOA, PFNA, PFHxS, and PFHpA through ingestion of drinking water and contaminated food, inhalation, and dermal contact, among other pathways.

68.    Known pathways for AFFF-related PFAS to enter the environment include releases to air, waters, and soil from extinguishment of non-training fires, fire-fighting drills, and other related normal and foreseeable use and disposal.

69.    AFFF is commonly stored and used by chemical plants; flammable liquid storage and processing facilities; airports; HAZMAT teams; military facilities; fire training facilities; local fire departments; and merchant operations, such as oil tankers and offshore platforms.

70.    In addition to PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, other PFAS contaminants are also associated with AFFF.

## VI.    VERMONT IS INVESTIGATING PFAS CONTAMINATION, INCLUDING AFFF-RELATED CONTAMINATION

71.    The State of Vermont has conducted a series of investigations and collected sampling data to identify, characterize, and address risks to public health and State natural resources as quickly as possible.  The State's investigation and response are ongoing given the scope of the problem and the fact that knowledge of the public health and environmental risks associated with PFAS is evolving.

72.    The Vermont Department of Health has developed a health advisory for five PFAS to protect public health, that the cumulative level of  PFOS, PFOA, PFNA, PFHxS, and PFHpA in drinking water should not exceed 20 ppt.  The Vermont Agency of Natural Resources used this advisory to help establish a groundwater quality enforcement standard, as described below.  The United States Environmental Protection Agency (EPA) has similarly issued health advisories for PFOA and PFOS.

A.    **Statewide PFAS Investigations**

73.    In February 2016, the Vermont Department of Environmental Conservation (DEC)

discovered PFAS contamination in Bennington associated with a former Teflon coating facilities

in Bennington and North Bennington.

74.    Since that first discovery, the Vermont Agency of Natural Resources (ANR) through the

DEC has undertaken a broader investigation to identify PFAS contamination in Vermont and the

most likely sources of PFAS contamination, including locations where PFAS-containing AFFF

was known to be stored and/or used.  This investigation is ongoing.

75.    The State investigated the use of AFFF in Vermont by searching spill reports for

hazardous material fires, tanker fires, and other rollovers and crashes, as well as identifying sites

where AFFF was likely to be used, such as military bases, airports, and fire training academies.

The State then performed targeted sampling at several of these locations throughout the State.

The State continues to identify and sample other sources of AFFF-related PFAS contamination.

76.    In July 2018, the DEC issued its *Perfluoroalkyl Substances (PFAS) Contamination Status*

*Report*, which provided an overview of the findings of DEC's investigations to date.  The Status

Report summarized findings from a variety of sampling sites, which confirmed the presence of

AFFF-related PFAS contamination at four sites within the State, including the Air National

Guard facility in South Burlington; the Camp Ethan Allen Training Site in Jericho/Underhill; the

Vermont Fire Training Academy in Pittsford; and the Southern Vermont Airport in Clarendon.

77.    The Status Report also made recommendations on additional work needed in the future,

including additional sampling.

78.    In June 2019, DEC published a *Perfluoroalkyl Substances (PFAS) Statewide Sampling*

*Plan*.  The 2019 Plan was submitted pursuant to S. 49, a bill passed in 2019 by the Vermont

Legislature, which directs the ANR Secretary to publish a plan for a statewide investigation of potential sources of PFAS contamination, which includes AFFF-related PFAS contamination, for public review and comment. The law requires the Secretary of Natural Resources to begin implementing this statewide sampling plan by no later than July 1, 2019.

79. In response to the State's findings regarding AFFF, the DEC worked with the Division of Fire Safety to survey fire departments in Vermont that may have used or stored PFAS-containing AFFF to determine its location and potentially dispose of remaining supplies. So far, 89 fire departments have responded to a survey sent to all local, municipal, and city fire chiefs in the State, with 29 departments responding that they have AFFF in storage, some of which was more than 20 years old. The survey indicated a clear need for the disposal of AFFF.

80. In the fall of 2018, the DEC initiated the AFFF Takeback Program. A total of 10.24 tons (approximately 2,150 gallons) of AFFF concentrate was collected from 38 municipal and city fire departments throughout the State. Many of the containers collected were in poor condition and thus vulnerable to leaks, and some fire departments had pumper trucks filled with legacy AFFF formulations in service and ready for use for their next flammable liquid fire. Fire departments provided positive feedback for the takeback program as they did not want to cause environmental damage in their communities as a result of responding to emergencies.

**B.    Vermont PFAS Standards**

81. In 2016, the Vermont Department of Health (VDH) issued a drinking water health advisory of 20 ppt applicable to the combined level of both PFOA and PFOS. In July 2018, VDH issued a revised health advisory, which added three additional PFAS compounds – PFHxS, PFHpA, and PFNA – to the 20 ppt standard (Health Advisory). Thus, the current Health Advisory of 20 ppt is applicable to the sum of PFOA, PFOS, PFHxS, PFHpA, and PFNA.

Information on the health and environmental risks of PFAS is still being developed, and the federal government and other states are continuing to lower health advisories and related standards for PFAS chemicals as more information on the toxicity of these pernicious chemicals becomes known.   Vermont's Health Advisory may be revised as additional data and information become available.

82.    Each of the five PFAS compounds subject to the State's Health Advisory poses significant human health risks.

83.    PFOA and PFOS target many organ systems, including but not limited to the liver, endocrine, and the immune system.

84.    The National Toxicology Program, a Division of the National Institute of Environmental Health Sciences, concludes that PFOA and PFOS are presumed to be immune hazards to humans, based on high levels of evidence in animals that PFOA and PFOS suppress the antibody response.  "Presumed" is a term of art that means one level of certainty below a known human hazard.

85.    Exposure to PFOA and PFOS is also associated with developmental toxicity, including neurodevelopmental effects and skeletal alterations.

86.    Toxicity studies indicate that exposure to PFHxS, PFHpA, and PFNA have similar impacts as exposure to PFOA and PFOS, including but not limited to immunotoxicity, disruption of the endocrine system, developmental toxicity, and liver toxicity.

87.    The combination of multiple PFAS also poses a substantial risk to human health.  PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together.  Further, some PFAS chemicals degrade into other PFAS chemicals.

88.   The DEC has also promulgated rules establishing the Health Advisory for PFAS as a groundwater quality enforcement standard, and listing PFOA, PFOS, PFHxS, PFHpA, and PFNA as hazardous materials.  These rules were put into effect on an emergency basis; permanent versions of the rules went into effect on July 6, 2019.

### VII.   DEFENDANTS HAVE CAUSED AFFF-RELATED PFAS CONTAMINATION AND INJURY IN VERMONT

**A.   Defendants' Manufacturing of PFAS for Use in AFFF and PFAS-Containing AFFF.**

89.   AFFF is a fire-suppressing foam used to extinguish flammable liquid fires, including jet-fuel fires, aviation-related fires, hangar fires, ship fires, vehicle fires, and chemical fires, and is routinely used to train firefighters and test firefighting equipment.

90.   As a reference, a single firefighting training event can release thousands of gallons of foam-laced water into the environment.

91.   The following image, reprinted as part of the investigative series published by journalists at The Intercept, depicts firefighting training exercises/suppression system testing, drenching the test space in AFFF.



92.  For decades, PFAS have been used in the manufacture of AFFF.

93.  The PFAS family of chemicals are entirely human-made and do not exist in nature.

94.  3M was the primary manufacturer of PFAS chemicals in the United States from the 1940s through the early 2000s.

95.  3M manufactured PFAS by electrochemical fluorination beginning in the 1940s. The electrochemical fluorination process results in a product that contains and/or breaks down into compounds containing PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, among other PFAS.

96.  3M was a major manufacturer of PFOA.

97.  3M was the only known manufacturer of PFOS and PFHxS in the United States.

98.  In response to pressure from the United States Environmental Protection Agency (EPA), 3M began to phase out production of PFOS and PFOA products in 2000.

99.  Although DuPont knew about the health and environmental risks of PFAS from its use of PFAS starting in 1951, DuPont began manufacturing its own PFAS chemicals in 2002 for use in manufacturing when 3M phased out production of PFOA. DuPont continued to manufacture, market, and sell PFOA until at least 2013.

100.  3M and DuPont were the only companies to manufacture PFOA in the United States.

101.  3M manufactured PFOA and PFOS as raw chemical materials for use in 3M products, including its own AFFF products and AFFF products made by third parties from the 1960s to the early 2000s.

102.  3M marketed and sold PFAS and AFFF containing PFAS throughout the United States, including in Vermont.

103.  3M sold AFFF products containing PFAS to the United States Department of Defense (DOD) and others from approximately 1964 through at least 2000.

104.  In the late 1960s, the United States military issued military specification MIL-F-24385 governing the requirements for AFFF (AFFF Mil-Spec). It requires that the AFFF concentrate "consist of fluorocarbon surfactants plus other compounds. . . . " The AFFF Mil-Spec, however, contains no further requirements concerning these fluorocarbons surfactants, such as the length of the fluorine-carbon chain.

105.  The AFFF Mil-Spec also states that "[t]he material shall have no adverse effect on the health of personnel when used for its intended purpose." The current version of the AFFF Mil-Spec still contains that language.

106.  National Foam and Tyco began to manufacture, market, and sell PFAS-containing AFFF in the 1970s.

107.  From the 1960s through 2001, the DOD purchased AFFF exclusively from 3M and Tyco.

108.  Angus Fire and Chemguard began to manufacture, market, and sell PFAS-containing AFFF in the 1990s.

109.  Buckeye began to manufacture, market, and sell PFAS-containing AFFF in the 2000s.

110.  3M, Chemguard, Tyco, National Foam, Buckeye, Kidde, Carrier Fire, Carrier Global, RTX, and/or their predecessors also sold AFFF products to DOD.

111.  After 3M exited the AFFF market in 2000, the remaining Defendants continued to manufacture and sell AFFF and/or PFAS compounds to be used in AFFF.

112.  Chemguard, Tyco, National Foam, Buckeye, Kidde, Carrier Fire, Carrier Global, and RTX AFFF products also contain PFAS and their precursors.

113.  3M, Chemguard, Tyco, National Foam, Buckeye, Kidde, Carrier Fire, Carrier Global, and RTX advertised, offered for sale, and sold AFFF to the military as well as State government

entities, counties, municipalities, local fire departments, and/or other governmental entities and quasi-governmental entities for use in Vermont.

114.  When used as intended, AFFF will contaminate the environment in a variety of ways, including but not limited to, through soil, surface water and groundwater, in relation to firefighting events, training exercises, fire preparations, equipment maintenance, and other activities.

115.  The manufacture, distribution and/or sale of AFFF by 3M, Chemguard, Tyco, National Foam, Buckeye, Kidde, Carrier Fire, Carrier Global, and RTX resulted in the release of PFOS, PFOA, PFNA, PFHxS, and/or PFHpA into the environment.

116.  3M, Chemguard, Tyco, National Foam, Buckeye, Kidde, Carrier Fire, Carrier Global, and RTX through their manufacturing, distribution and/or sale of AFFF, and through their involvement and/or participation in the creation of training and instructional materials and activities, knew, foresaw, and/or should have known and/or foreseen that PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, would contaminate the environment.

117.  3M, Chemguard, Tyco, National Foam, Buckeye, Kidde, Carrier Fire, Carrier Global, and RTX were and/or should have been aware, knew and/or should have known, and/or foresaw and/or should have foreseen that their marketing, development, manufacture, distribution, release, training of users of, production of instructional materials about, sale and/or use or disposal of AFFF, including in Vermont, would result in the contamination and injury of the State's natural resources and property.

118.  3M, Chemguard, Tyco, National Foam, Buckeye, Kidde, Carrier Fire, Carrier Global, and RTX's AFFF products were unreasonably dangerous and the Defendants failed to warn of this danger.

119. 3M, Chemguard, Tyco, National Foam, Buckeye, Kidde, Carrier Fire, Carrier Global, and RTX knew their customers warehoused large stockpiles of AFFF and touted the shelf-life of AFFF.

120. While 3M, Chemguard, Tyco, National Foam, Buckeye, Kidde, Carrier Fire, Carrier Global, and RTX phased out production or transitioned to new formulas of AFFF, they did not instruct users of AFFF that they should not use existing stockpiles AFFF that contained PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, and/or their precursors.

121. 3M, Chemguard, Tyco, National Foam, Buckeye, Kidde, Carrier Fire, Carrier Global, and RTX further did not act to remove AFFF from the stream of commerce.

122. 3M, Chemguard, Tyco, National Foam, Buckeye, Kidde, Carrier Fire, Carrier Global, and RTX did not warn public entities or others that AFFF would harm the environment, endanger human health, or cause them to incur substantial costs to investigate and clean up contamination of groundwater and other natural resources and to dispose of AFFF.

123. Accordingly, for many years after the original sale of AFFF, these AFFF products were and are still being applied directly to the ground, discharged into floor drains and washed into sediments, soils, and waters, harming the environment and endangering human health.

124. 3M, Chemguard, Tyco, National Foam, Buckeye, Kidde, Carrier Fire, Carrier Global, and RTX did not properly instruct users, consumers, public officials or those who were in a position to properly guard against the dangers of PFAS that they needed to properly dispose of their stockpiles of AFFF or how to properly dispose of AFFF.

125. DuPont also manufactured, marketed, and sold PFAS to be used in AFFF throughout the United States.

126. In part, through its involvement in the FFFC, DuPont actively marketed its fluorosurfactants to AFFF manufacturers for use in the production of AFFF.

127. Some or all of the AFFF manufactured and sold by the Defendants contained fluorosurfactants manufactured and sold by 3M or DuPont.

128. DuPont's manufacture, distribution, and/or sale of fluorosurfactants used in the manufacture of AFFF resulted in the release of PFAS into the environment.

129. DuPont, through its manufacturing, distribution, and/or sale of fluorosurfactants used in the manufacture of AFFF, and through its involvement and/or participation in the creation of training and instructional materials and activities, knew, foresaw, and/or should have known and/or foreseen that PFAS would contaminate the environment.

130. DuPont was and/or should have been aware, knew and/or should have known, and/or foresaw and/or should have foreseen that its marketing, development, manufacture, distribution, release, training of users of, production of instructional materials about, sale, and/or use or disposal of fluorosurfactants used in the manufacture of AFFF, including in Vermont, would result in the contamination and injury of the State's natural resources and property.

131. Defendants' products were unreasonably dangerous and the Defendants failed to warn of this danger.

132. Practical and feasible alternative designs capable of reducing the State's injuries were available.

133. Defendants knew, or should have known, that PFOS, PFOA, PFNA, PFHxS, and/or PFHpA would contaminate the environment through their manufacturing, marketing, distribution, and sales of PFAS chemicals to be used in AFFF and/or AFFF containing PFAS.

134. Defendants knew, or should have known, that their manufacturing, marketing, distribution, and sales of AFFF containing PFOS, PFOA, PFNA, PFHxS, and/or PFHpA and/or PFOS, PFOA, PFNA, PFHxS, and/or PFHpA for use in AFFF, including in Vermont, would result in contamination and injury of the State's natural resources and property.

**B.    3M Has Known for Decades of PFAS Health and Environmental Risks.**

135. 3M knew of the health hazards and environmental risks and impacts posed by PFAS and its PFAS-containing AFFF products for decades but continued to manufacture, market, distribute, and/or sell PFAS for use in AFFF and AFFF containing PFAS for decades.

136. Based on its own internal studies, 3M knew that PFOA and PFOS were harmful to humans and the environment as early as the 1950s.

137. In the 1950s, 3M knew that PFAS chemicals had the ability to move throughout groundwater.  By 1960, 3M knew that PFOA and PFOS were capable of leaching into the groundwater and contaminating the environment.  For example, chemical wastes from its PFAS manufacturing were known to be able to leach from its waste dumps into groundwater and pollute underground basins.  An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

138. By the early 1960s, 3M understood that some PFAS are stable and persist in the environment and that they do not degrade.

139. 3M failed to disclose the risks to regulators or to the public.

140. 3M began testing the physiological and toxicological properties of PFAS compounds as early as 1950.

141. 3M began testing for PFAS in well waters in the 1960s and in 1960 confirmed the presence of surfactant pollution in the wells.

142. A 1963 3M report described PFAS as being stable in the environment, "completely resistant to biological attack," and also confirmed that 3M knew the chemicals to be "toxic."

143. In the 1970s, 3M researchers documented PFOA and PFOS chemicals in fish.

144. At that time, 3M was aware that its AFFF products were hazardous to marine life. In fact, effects of toxicity testing of 3M's "Light Water" line of PFAS-containing AFFF conducted in 1970 were, according to an outside researcher, "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

145. Toxicity tests conducted in 1972 on 3M's Light Water AFFF on bluegill, grass shrimp, fiddler crab, and mummichog further confirmed the AFFF's toxicity. After exposure to a 33.4 mg/l concentration of Light Water AFFF, 100% of bluegills died.

146. Despite these findings, 3M's 1978 advertising brochure touted Light Water AFFF as "biodegradable" and "low in toxicity." Specifically, the ad stated that "[t]ests and actual use situations have shown that animal and aquatic life are not adversely affected." Further, it stated that "as a foam solution, there are no noticeable negative effects."

147. In 1975, 3M scientists were informed that PFAS had been found within, and could build up in, the human body. The source of these chemicals was suspected by a researcher at the University of Florida investigating the matter to be Teflon cookware or "Scotchguarded" fabrics, but when questioned about these concerns, 3M researchers said that they "plead[ed] ignorance."

148. In the 1970s, 3M began monitoring the blood of its employees for PFAS because 3M was concerned about the health effects of PFAS, and in 1976, confirmed that PFAS chemicals were in fact in its workers' blood. For example, 3M measured fluorochemicals in the blood of workers at its PFAS-manufacturing plant in Cottage Grove, Minnesota at "1,000 times normal."

149.  In 1975, 3M found PFOA to be "widespread in human plasma" according to samples taken from across the United States.

150.  Since PFOA is not naturally occurring, these findings in blood in the human body reasonably should have alerted 3M that it was likely that its products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company.

151.  These findings also should have alerted 3M that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the presence of PFOA from 3M's products in blood.

152.  In 1978, 3M studied, and independent experts confirmed, the risks of PFAS.  A 3M internal report from 1978 warned that PFAS chemicals "are likely to persist in the environment for extended periods."

153.  Similarly, a 3M internal document from 1979 stated that PFOA and PFOS "are known to persist for a long time in the body and thereby give long term chronic exposure."

154.  A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and PFAS bioaccumulating in fish tissue taken from the Tennessee River.

155.  Results of a 90-day animal study conducted by 3M in 1978 indicated that PFAS "should be regarded as toxic," and that those aware of the results "urgently recommended that all reasonable steps be taken immediately to reduce exposure of employees to these compounds."

156.  A 1979 report further discussing the study on PFOS and PFOA toxicity to animals stated that the compounds were "more toxic than anticipated," and further recommended that "lifetime rodent studies . . . be undertaken as soon as possible."

157.  Despite these warnings and recommendations, 3M decided to not publish the findings of this investigation.

158. A 1979 memo from M.T. Case, formerly within 3M's medical department in Corporate Toxicology and Regulatory Services, stated that he believed it "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long-term chronic exposure."

159. At a meeting among 3M employees in June of 1979 discussing the "Fluorochemicals in Blood Program," an outside researcher named Dr. H.C. Hodge noted that "[r]eduction in exposure [to 3M employees to fluorochemicals] should have a top priority" and that further testing be conducted. According to Dr. Hodge, "[i]t should be determined if FC-807 [a PFAS chemical] or its metabolites are present in man, what level they are present, and the degree of persistence (half-life) of these materials."

160. In 1981, 3M moved 25 female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure." This was based on internal research showing that PFAS compounds were causing birth defects in rats. Yet 3M did not alert the public or regulatory agencies of its concerns with effects of exposure to PFAS.

161. In 1983, 3M scientists concluded that concerns about PFAS "give rise to concern for environmental safety," including "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

162. Even then, 3M's practices were concerning even to its own employees. In March 1999, 3M environmental scientist Rich Purdy wrote to 3M and expressed his "profound disappointment" with "3M's handling of the environmental risks associated with the manufacture and use of" PFOS. Mr. Purdy described PFOS as "the most insidious pollutant since PCB," and that it is "probably more damaging than PCB because it does not degrade,

where as PCB does; it is more toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB." Mr. Purdy described his attempts to discuss the dangers of the chemical with the company, and 3M's refusal to act. Finally, Mr. Purdy stated that "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

163. Despite decades of research, 3M first shared its concerns with EPA in the late 1990s. In a May 1998 report submitted to EPA, "3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information" according to a former 3M employee.

164. In response to pressure from EPA, 3M began to phase out production of PFOS and PFOA products in 2000.

165. In connection with the phase out, 3M issued a press release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

166. The EPA press release regarding 3M's phase-out of PFOS and PFOA presented a different story, stating: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

167. 3M worked to control and distort the science on PFAS. For example, 3M provided millions of dollars in grants to a professor, John Giesy, who publicly presented himself as independent but worked for 3M behind the scenes. Giesy's goal, as expressed in a March 25,

2008 email, was to "keep 'bad' papers [regarding PFAS] out of the literature [because]

otherwise in litigation situations they can be a large obstacle to refute."

168.  In 2006, EPA cited 3M for 244 violations of the Toxic Substances Control Act, accusing

3M of failing to notify the agency about new chemicals and of late reporting of "substantial risk

information."  3M was fined $1.52 million for these violations.

169.  Despite the large body of research demonstrating the serious health risks posed by

PFAS, much of which 3M has been aware of for decades, as recently as *November 2018*, 3M

stated that "the vast body of scientific evidence does not show that PFOS or PFOA cause adverse

health effects in humans at current exposure levels, or even at the historically higher levels found

in blood."

170.  3M knew or should have known that in their intended and/or common use, products

containing PFAS would injure and/or threaten public health and the environment in Vermont.

**C.    DuPont Has Known for Decades of PFAS Health and Environmental Risks**

171.  Like 3M, DuPont has known for decades of the health and environmental risks of PFAS

but instead of warning the public, users or consumers about such risks, covered up this

information and promoted PFAS and PFAS-containing products as safe.

172.  In approximately 1951, DuPont started using PFOA in making Teflon at its Washington

Works manufacturing plant in Parkersburg, West Virginia.  As early as 1954, employees at

DuPont's Washington Works plant reported that C-8 (another name for PFOA) might be toxic.

DuPont was concerned enough about the complaints that it delayed marketing Teflon containing

PFOA to the public.  In 1961, seven years later, Teflon consumer products hit the marketplace.

173.  By 1961, DuPont's researchers had concluded that PFOA was toxic and DuPont's chief

toxicologist, Dorothy Hood, warned in a memo to executives that products containing PFOA

should be "handled with extreme care." As early as the 1960s, DuPont knew that PFOA caused adverse liver reactions in dogs and rats.

174. As early as 1966, DuPont was aware that PFOA could leach into groundwater.

175. By 1976, DuPont knew about research showing detections of organic fluorine in blood bank samples in the United States, which the researchers thought could be a potential result of human exposure to PFOA.

176. In 1978, DuPont's medical director published an article in the *Bulletin of the New York Academy of Medicine* in which he acknowledged DuPont's duty to "to discover and reveal the unvarnished facts about health hazards," and that a company "should be candid, and lay all the facts on the table. This is the only responsible and ethical way to go."

177. By 1979, DuPont had data indicating that its workers who were exposed to PFOA had a significantly higher frequency of health issues compared to unexposed workers but did not report this data to any government agency or any community where it used PFOA.

178. By at least 1980, DuPont had internally confirmed that PFOA "is toxic," that "continued exposure is not tolerable," and that people accumulate PFOA in their bodies.

179. By at least 1981, DuPont had obtained a 3M internal study that had documented birth defects in the eyes of unborn rats exposed to PFOA in utero and urged female workers who came into contact with PFOA to consult their doctors "prior to contemplating pregnancy." Around this same time, a DuPont worker in the Teflon division of the Washington Works plant who was pregnant began moving PFOA waste into pits using a pump-like device as part of her job responsibilities. Tragically, when the DuPont employee gave birth in January 1981, the baby had only half a nose and a ragged eyelid that gaped down to the middle of his cheek. This was consistent with the 3M study and in March 1981, DuPont had a pathologist and a birth defects

expert review the 3M study. They concluded that "the study was valid" and that "the observed fetal eye defects were due to C8." DuPont immediately removed all female workers from areas where they might come into contact with PFOA.

180. In April 1981, DuPont began secretly monitoring 50 female employees who had been exposed to PFOA. As DuPont's medical director Bruce Karrh explained in a memo, this monitoring was undertaken to "answer a single question—does C8 cause abnormal children?" Initial data showed that two of the seven pregnant workers exposed to PFOA had babies with eye and nostril deformities, which the researchers concluded was "statistically significant." DuPont abandoned the study rather than inform regulators or employees.

181. In a confidential November 1982 memo, DuPont's medical director warned about employees being exposed to potentially dangerous levels of PFOA. He recommended that all "available practical steps be taken to reduce this exposure."

182. By at least the early 1980s, DuPont began considering the effects of PFOA beyond its Washington Works plant. In 1984, DuPont sent employees to secretly fill jugs of water from gas stations and general stores around the plant. Testing of the water revealed PFOA in Lubeck, West Virginia and Little Hocking, Ohio. But, DuPont decided not to notify the public.

183. In 1984, DuPont held a meeting at its corporate headquarters in Wilmington, Delaware to discuss health and environmental issues related to PFOA. The corporate managers expressed concern about "C-8 exposures off plant as well as to our customers and the communities in which they operate." The corporate managers admitted internally that "none of the options developed are . . . economically attractive and would essentially put the long term viability of this business segment on the line." The DuPont corporate managers predicted that the medical and legal departments "will likely take a position of total elimination," of PFOA but

instead decided that "corporate image, and corporate liability" would drive decisions about PFOA. And the corporate managers admitted that it was too late to address past liability: "Liability was further defined as the incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation." DuPont did not disclose the information discussed at the 1984 meeting to U.S. EPA, the State, or the general public. DuPont began manufacturing PFOA itself over 15 years later and continued to use PFOA for almost another 30 years.

184. By the mid-1980s, DuPont was aware that PFOA is biopersistent and bioaccumulative.

185. In an October 20, 1986 memorandum, a DuPont employee stated that DuPont's management in Wilmington, Delaware was "concerned about the possible liability resulting from long-term C-8 exposure to our employees and to the population in the surrounding communities and those down river from the [Washington Works] plant, since we don't know the ultimate effect of C8 on the human body and that the potential liability resulting from C-8 exposure is large."

186. In 1988, DuPont classified PFOA as a possible human carcinogen.

187. In 1999, DuPont received preliminary results from a monkey health study showing that C-8 caused monkeys to lose weight and increased their liver size. Even monkeys given the lowest doses suffered liver enlargement, and one was so ill it had to be euthanized.

188. An internal DuPont memorandum regarding its litigation strategy shows that DuPont sought to "not create [the] impression that DuPont did harm to the environment" and wanted to "keep [the] issue out of the press as much as possible."

189. In 2000, John R. Bowman, a DuPont in-house counsel for C-8 issues, wrote an email to several colleagues in which he urged: "I think we need to make more of an effort to get

[DuPont] to look into what we can do to get the Lubeck community a clean source of water or filter the C-8 out of the water."  Bowman continued:

> I think we are more vulnerable than the MTBE defendants [manufacturers of another notorious groundwater contaminant, MTBE] because many states have adopted a drinking water guideline for MTBE and it is not biopersistent.  My gut tells me the biopersistence issue will kill us because of an overwhelming public attitude that anything biopersistent is harmful.

> We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives.  [Bernard Reilly, another DuPont attorney] and I have been unsuccessful in even engaging the clients in any meaningful discussion of the subject.  Our story is not a good one, we continued to increase our emissions into the [Ohio] river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical.

190.  In a 2001 e-mail, DuPont in-house lawyer Bernard Reilly described DuPont's response to the C-8 issue as "a debacle at best."  Reflecting on a late 2001 meeting with EPA concerning PFAS contamination in Parkersburg, West Virginia, Reilly wrote of DuPont: "[T]he business did not want to deal with this issue in the 1990s, and now it is in their face, and some still are clueless.  Very poor leadership, the worst I have seen in the face of a serious issue since I have been with DuPont."

191.  Notwithstanding its internal knowledge of PFOA's health and environmental risks beginning as early as the 1950s, DuPont publicly stated in 2003 that "[w]e are confident that there are no health effects associated with C-8 exposure," and that "C-8 is not a human health issue."

192.  DuPont's own Epidemiology Review Board (ERB) repeatedly raised concerns about DuPont's practice of stating publicly that there were no adverse health effects associated with human exposure to PFOA.  In June 2005, DuPont reported to the press that "no human health

effects are known to be caused by PFOA." An ERB member called that statement "[s]omewhere between misleading and disingenuous." In February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of DuPont's public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

193. In October 2006, contrary to ERB's advice, DuPont's chief medical officer issued a false and misleading press release stating that "there are no health effects known to be caused by PFOA." An ERB member criticized the press release because it "appear[ed] written to leave the impression 'don't worry.'"

194. By December 2005, EPA uncovered evidence that DuPont had concealed the environmental and health effects of C-8 for more than two decades. In response, EPA levied a $16.5 million administrative penalty on DuPont, which at that time was the largest civil administrative penalty EPA had ever obtained under any federal environmental statute.

195. At approximately the same time this penalty was issued, DuPont was making approximately $1 billion a year in revenue from products containing C-8.

196. Facing increased scrutiny from EPA, DuPont began to gradually phase out PFOA production in 2006.

## D. Other Defendants Have also Known of the Dangers of PFAS-Containing AFFF.

197. Tyco, Chemguard, Buckeye, Kidde, National Foam, Carrier Fire, Carrier Global, and RTX knew, or at the very least should have known, that in their intended and common use, their PFAS-containing AFFF products would harm the environment and human health.

198.  Tyco, Chemguard, Buckeye, Kidde, National Foam, Carrier Fire, Carrier Global, and RTX knew, or at the very least should have known, that through their intended and common use, their PFAS-containing AFFF products would injure the State's natural resources.

199.  Information regarding PFAS compounds was readily accessible to Tyco, Chemguard, Buckeye, Kidde, National Foam, Carrier Fire, Carrier Global, and RTX because each is an expert in the field of AFFF manufacturing and/or the materials needed to manufacture AFFF, and each has detailed information and understanding about the chemical compounds that form AFFF products.

200.  The Firefighting Foam Coalition is an AFFF trade group that was formed in 2001 to advocate for AFFF's continued viability.

201.  All of the Defendants, including through their predecessors and/or subsidiaries, with the exception of 3M, were members of the FFFC, including DuPont, which as described above had extensive knowledge about the toxicity associated with PFAS (FFFC Defendants).

202.  Through their involvement in the FFFC, as well as a variety of other trade associations and groups, FFFC Defendants shared knowledge and information regarding PFAS.

203.  The FFFC Defendants worked together to protect AFFF from scrutiny.

204.  Their close cooperation included messaging on PFOA's toxicological profile.

205.  The FFFC's efforts were designed to shield its members and the AFFF industry from the detrimental impact of the public and regulators learning about PFOA's harms to human health and the environment.

206.  FFFC Defendants regularly published newsletters and attended conferences promoting their AFFF products as appropriate for widespread use.

207.  These coordinated efforts by the FFFC Defendants were meant to dispel concerns about the impact AFFF had on the environment and human health. They worked in concert to conceal known risks of their AFFF from the government and public.

208.  FFFC Defendants repeated the same message for years: Only one PFAS chemical, PFOS, had been taken off the market.  Since the FFFC Defendants' products did not contain PFOS, they claimed their products were safe.

209.  FFFC Defendants knew the use of their AFFF products presented a similar threat to human health and the environment, yet they continued to promote their AFFF products and claim they were safe.

210.  While this was known to FFFC Defendants, it was not fully understood by the users of AFFF, the public, and regulators, including the State.

**E.    Defendants Failed to Act on Their Knowledge of the Health and Environmental Risks of PFAS and PFAS-Containing AFFF.**

211.  Despite their knowledge that PFAS posed environmental and human health risks, and despite the availability of reasonable alternatives, Defendants failed to warn customers, users, the public or the State, and failed to take any other appropriate precautionary measures to prevent or mitigate such contamination.  Instead, Defendants promoted AFFF-containing PFAS and PFAS for use in AFFF as environmentally sound products appropriate for widespread use.

212.  At all times relevant to this litigation, Defendants were or should have been aware that AFFF-related PFAS contamination of State natural resources and property was inevitable.  This was due to PFAS's solubility, recalcitrance to biodegradation and bioremediation, and the normal and foreseen use of PFAS-containing AFFF, including in Vermont.

213.  Defendants possess and have always possessed superior knowledge, resources, experience, and other advantages, in comparison to anyone or any agency, concerning the

manufacture, distribution, nature, and properties of PFAS used in AFFF and PFAS-containing AFFF.

214.  By virtue of their economic power and analytical resources, including the employment of scientists such as chemists, engineers, and toxicologists, Defendants have at all relevant times been in a position to know, identify, and confirm the threat PFAS posed and poses to State natural resources and property.

215.  In addition, by virtue of this superior knowledge, and/or by virtue of Defendants' misleading statements regarding the nature and impacts of AFFF-related PFAS, Defendants had a duty to disclose the truth and to act in accordance with the truth about PFAS and PFAS-containing AFFF.

## VIII.   HISTORICAL DUPONT'S SPINOFF OF THE CHEMOURS COMPANY

### A.    Historical DuPont Spins Off Chemours to Insulate Itself from Environmental Liabilities.

216.  After Historical DuPont had been sued and faced the threat of further lawsuits regarding its manufacturing and releases of PFOA, Historical DuPont announced in October 2013 its intention to spin off its "performance chemicals" business, responsible for manufacturing and sales of PFAS and PFAS-containing products, including PFOA and Gen-X.  .

217.  Historical DuPont intended to do so by spinning off its performance chemicals line of business, which includes the PFAS business, as a new, independently owned company named The Chemours Company (the Chemours Separation and Spin Transaction), and having The Chemours Company assume certain liabilities.

218.  In February 2014, Historical DuPont formed The Chemours Company as a wholly-owned subsidiary.

219. As a wholly-owned subsidiary, The Chemours Company had a separate board of directors, but that board was controlled by Historical DuPont employees.

**B.    Historical DuPont Dictated the Terms of the Chemours Separation and Spin Transaction.**

220. The Chemours Separation and Spin Transaction was not an arm's-length transaction. Chemours's Verified First Amended Complaint, C.A. No. 2019-0351-SG (Del. Ch.) (the Chemours Compl.), ¶ 25. There were no procedural protections for Chemours, and Historical DuPont dictated the terms of the Chemours Separation and Spin Transaction. *Id.*

221. Historical DuPont did not allow Chemours (or its prospective management team) to have independent counsel to represent Chemours's interests in structuring the Chemours Separation and Spin Transaction. *Id.* ¶ 26. Instead, Historical DuPont and its outside counsel unilaterally prepared all of the documents underlying and effectuating the Chemours Separation and Spin Transaction. *Id.*

222. From formation through consummation of the Chemours Separation and Spin Transaction, Historical DuPont controlled development of the Chemours Separation and Spin Transaction terms. *Id.* ¶ 27

223. The initial draft Chemours Separation Agreement did not include the schedules listing the assets and liabilities to Chemours, preventing Chemours's designated management team from evaluating central economic terms of the transaction. *Id.* ¶ 29. Historical DuPont did not provide Chemours's designated management team the requested copies of these schedules during winter and spring 2015. *Id.*

C.    **Historical DuPont Dominated the Corporate Governance of Chemours in the Lead Up to the Chemours Separation and Spin Transaction.**

224.  On May 12, 2015, the Chemours Board, which then consisted of three Historical DuPont employees, Michael Heffernan, Nigel Pond, and Steven Zelac (the DuPont Employee Board Members), who were not going to be with Chemours following the Chemours Separation and Spin Transaction, authorized the Dividend. *Id.* ¶ 35(a).

225.  On June 5, 2015, the DuPont Board approved the Chemours Separation and Spin Transaction. *Id.* ¶ 70.

226.  On June 9, 2015, DuPont Employee Board Members, as the sole members of the Chemours' Board, held a DuPont Board "meeting" to "discuss" whether Chemours should approve the Chemours Separation and Spin Transaction and the Chemours Separation Agreement. *Id.* ¶ 35(c).  That meeting was also attended by other Historical DuPont employees and Historical DuPont's outside counsel. *Id.*  The meeting consisted of "presentations" by Historical DuPont's outside counsel and Historical DuPont. *Id.*  The DuPont Employee Board Members (1) took "notice" that "DuPont, as the sole stockholder of [Chemours], has communicated" that the DuPont Board had determined that the Chemours Separation and Spin Transaction "are in DuPont's best interests," and (2) "unanimously" adopted resolutions approving the Chemours Separation and Spin Transaction on Chemours's supposed behalf. *Id.*

227.  On June 26, 2015, Nigel Pond, Historical DuPont's M&A Counsel, formerly one of the DuPont Employee Board Members, and then designated a "Vice President" of Chemours (a temporary position he would resign immediately thereafter) executed the Chemours Separation Agreement on Chemours's behalf. *Id.* ¶ 35(d).

228.  On July 1, 2015, Michael Heffernan, Nigel Pond, and Steven Zelac all resigned from the Chemours Board.

229.  In connection with the Chemours Separation and Spin Transaction, Historical DuPont and Chemours executed a "Separation Agreement" (the Chemours Separation Agreement) dated as of June 26, 2015.

**D.    Chemours Incurred Significant Indebtedness in Connection With The Chemours Separation and Spin Transaction**

230.  On May 12, 2015, Chemours borrowed over $4 billion through Senior Secured Term Loans (the Term Loans), Notes, and related indentures.

231.  The Term Loans were incurred pursuant to the terms of the Credit Agreement, dated May 12, 2015 by and among Chemours, certain Guarantors party thereto and JPMorgan Chase Bank, N.A., as administrative agent.  *See* Chemours's Form 10, Amendment No. 3, Ex. 10.14, filed on May 13, 2015 (as amended) (the Credit Agreement).

232.  The Information Statement for the Chemours Separation and Spin Transaction dated June 5, 2015 (the Info Statement), disclosed that a "Dividend" of over $3.9 billion would be paid to Historical DuPont.

**E.    The Chemours Separation and Spin Transaction Resulted in a Disproportionate Allocation of Assets, Debts, and Liabilities.**

233.  As part of the Chemours Separation and Spin Transaction, Chemours received approximately 19% of Historical DuPont's business lines, while being saddled with approximately two-thirds of Historical DuPont's environmental liabilities and 90% of Historical DuPont's pending litigation by volume of cases.  Chemours Compl., ¶ 38.

234.  These environmental liabilities included those related to over 80 Historical DuPont-associated sites, the majority of which were sites that Chemours would never operate.  *Id.* ¶ 39.

235. Historical DuPont even gave Chemours all liabilities related to Historical DuPont's historical explosives operations and asbestos and benzene exposures that had nothing to do with its performance chemicals business.

236. As a result of the Chemours Separation and Spin Transaction, Chemours's capital structure carried a debt-to-EBITDA (earnings before interest, taxes, depreciation, and amortization) ratio of 7.3 to 1.0. *Id.* ¶ 41.

237. Under the Chemours Separation Agreement, The Chemours Company agreed to defend and indemnify Historical DuPont against, and assumed for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all liabilities relating," "primarily to, arising primarily out of or resulting primarily from, the operation of or conduct of the [Performance Chemicals] Business at any time." This indemnification is uncapped and does not have a survival period.

238. The Chemours Company agreed to indemnify Historical DuPont against and assume for itself the Performance Chemical Business's liabilities regardless of: (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Historical DuPont group or the Chemours group; and (v) which entity is named in any action associated with any liability.

239. The Chemours Company agreed to indemnify Historical DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business. Such liabilities were deemed "primarily associated" if

Historical DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business.

240.  The Chemours Company also agreed to use its best efforts to be fully substituted for Historical DuPont with respect to "any order, decree, judgment, agreement or [any litigation or investigation] with respect to Chemours Assumed Environmental Liabilities" in effect at the time of the Chemours Separation and Spin Transaction.  Chemours Separation Agreement at § 6.10(b).

241.  The schedules to the Chemours Separation Agreement, as referenced in the "Chemours Assumed Environmental Liabilities" definition, have never been publicly filed.

**F.    Historical DuPont's "High End (Maximum) Realistic Exposure" Figures Were Unrealistic and Designed to Mask Chemours' Insolvency.**

242.  The Chemours Separation and Spin Transaction was predicated upon a determination that Chemours would be solvent following the Chemours Separation and Spin Transaction.  *See id.*, § 4.5(e).  However, the solvency opinion was based upon faulty, and indeed fictitious, certified "maximum" liability figures that were unrealistic and designed to mask Chemours's insolvency.

243.  Houlihan Lokey (Houlihan) was commissioned to provide a financial opinion regarding Chemours's solvency on the spinoff date.  Chemours Compl., ¶¶ 49-50.  Houlihan's opinion, however, was based on Historical DuPont's "High End (Maximum) Realistic Exposure" estimates for dozens of sites that were given to it by Historical DuPont.  *Id.* ¶ 50.

244.  DuPont engineered the "High End Maximum Realistic Exposure" figures to massively understate the real potential maximum exposure.  *Id.* ¶ 56.

245.  In May 2015, Historical DuPont demanded that Chemours's newly appointed chief financial officer (Mark E. Newman) certify to the accuracy of the "High End (Maximum) Realistic Exposure" numbers.  *Id.* ¶ 52.  Newman conditioned his certification upon Historical

DuPont's acknowledgement that it supplied the maximum liability numbers, which Historical DuPont did through "Backup Certificates" signed by its employees. *Id.*

246. Historical DuPont understated the real maximum liabilities.

247. For multiple categories of litigation (such PFOA, benzene, and other PFAS), Historical DuPont does not appear to have undertaken any analysis. *Id.* ¶ 58. Rather, Historical DuPont's certification invoked a supposed "analysis" of the maximum liabilities done by Deloitte Transactions and Business Analytics LLP (Deloitte). *Id.*

248. Deloitte did not certify "maximums." *Id.*

**G. Chemours's Management Raised Cash Flow Concerns Prior to the Chemours Separation and Spin Transaction.**

249. Prior to the closing of the Chemours Separation and Spin Transaction, Chemours's management complained to Historical DuPont's senior management that Chemours would lack appropriate cash reserves. *Id.* ¶ 51.

250. In June 2015, Historical DuPont summarily rejected the plea of Chemours's chief financial officer for an additional $200-300 million in cash reserves to function on day one. *Id.* ¶ 32.

251. Historical DuPont ignored the concerns of Chemours's management that paying quarterly stockholder dividends of $100 million would adversely affect Chemours's cash position. *Id.* ¶ 51. Chemours's management went on to cut future dividends to almost zero after the Chemours Separation and Spin Transaction. *Id.* ¶ 74.

**H.    Chemours's Financial Condition Was Deteriorating When the Chemours Separation and Spin Transaction Occurred, Leaving Chemours Insolvent.**

252.    Chemours's financial condition at the time of the Chemours Separation and Spin Transaction was rapidly deteriorating.  Chemours's business, as a stand-alone enterprise, was suffering from slumping EBITDA.

253.    In the midst of weakness in the global titanium dioxide market cycle and continued foreign currency impacts, Chemours had vastly overstated its own financial health.

254.    Chemours's financial condition was much worse at the time of the Chemours Separation and Spin Transaction than Chemours and Historical DuPont publicly disclosed.

255.    At the time of the Chemours Separation and Spin Transaction, Chemours's debt-to-EBITDA ratio was 7.3 to 1.0.  *Id.* ¶ 41.  This far exceeded the Credit Agreement's maximum "Total Net Leverage Ratio," barring Chemours from accessing $1 billion of revolving loans.  *See* Credit Agreement, § 6.13.

256.    Chemours suffered a liquidity shortage within months of the Chemours Separation and Spin Transaction.  Chemours Compl., ¶ 75.  As a result, Chemours laid off 1,000 employees, shut plants or production lines in Delaware and Tennessee, sold off business lines, undertook two corporate restructurings, and made multiple amendments to the Credit Agreement.  *Id.* ¶ 76.

257.    In November 2015, Chemours announced that it would sell to Dow its facility in Beaumont, Texas for approximately $140 million in cash.  *Id.* ¶ 77.

258.    In February 2016, Historical DuPont advanced Chemours $190 million for goods and services to be provided to Historical DuPont through mid-2017.  *Id*.

I.    **The Debt Trading Prices of Chemours's Funded Debt Reflects Chemours's Insolvency as of the Date the Chemours Separation and Spin Transaction and Spiraled Downhill in the Immediate Aftermath Thereof.[2]**

259.    As of the last trading date before the Chemours Separation and Spin Transaction closed, the markets reflected Chemours's insolvency.  As set forth in Chemours's publicly filed financial statements, the market believed that Chemours was insolvent by $77 million.

260.    On August 6, 2015, Chemours filed its first Form 10-Q following the Chemours Separation and Spin Transaction, containing a deconsolidated balance sheet as of June 30, 2015, immediately prior to the Chemours Separation and Spin Transaction, reflecting Chemours's insolvency by at least $309 million.

261.    Just three months after the Chemours Separation and Spin Transaction, Chemours was insolvent by $829 million based upon the value of its traded debt.

J.    **Historical DuPont Saddled Chemours with Liabilities Far in Excess of the Amounts Attributed to Such Liabilities at the Time of The Chemours Separation and Spin Transaction.**

262.    In 2005, Historical DuPont settled a class action lawsuit filed on behalf of 70,000 residents of Ohio and West Virginia for $343 million.  Under the terms of the 2005 class action settlement, Historical DuPont agreed to fund a panel of scientists to determine if any diseases were linked to PFOA exposure, to filter local water for as long as C-8 concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.

---

[2] Chemours's share price, originally pegged by DuPont at $21 per share, declined to $11.48 within a month, and to $3.16 within six months.  *Id.* ¶ 65.

263.  Also in 2005, Historical DuPont agreed to pay $16.5 million to resolve eight counts brought by the EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act concerning the toxicity of PFAS compounds.

264.  The C-8 Science Panel completed its research in 2013 and found several significant diseases, including cancer, linked to PFOA.  Thereafter, more than 3,500 personal injury claims were filed in Ohio and West Virginia as part of the 2005 settlement that were consolidated into a multidistrict litigation court in Ohio (the "Ohio MDL").

265.  At the time of the Chemours Separation and Spin Transaction, Historical DuPont certified to Houlihan a "maximum" liability figure for the 3,500 cancer and other bodily injury claims relating to PFOA of $128 million.  *Id.* ¶¶ 82, 84.

266.  In mid-2016, Historical DuPont lost the first three bellwether trials, the first having gone to trial just two months after the Chemours Separation and Spin Transaction.  Juries returned multi-million dollar verdicts against Historical DuPont, awarding compensatory damages and, in two cases, punitive damages to plaintiffs who claimed PFOA exposure caused their illnesses, in the total amount of $19.7 million.  *Id.* ¶ 85.

267.  On February 13, 2017, Historical DuPont and The Chemours Company reached a global settlement of the Parkersburg, West Virginia cases agreeing to pay $670.7 million to resolve the Ohio MDL.  *Id.* ¶¶ 89-90.

268.  At the time of the Chemours Separation and Spin Transaction, Historical DuPont certified Chemours's "maximum" exposure as $2.09 million with respect to Historical DuPont's Fayetteville Works operation in North Carolina.  *Id.* ¶ 93.  At the time of the Chemours Separation and Spin Transaction, Historical DuPont knew that the Fayetteville plant had been

discharging PFAS for 30 years or more into the Cape Fear River, which serves as the source of drinking water for tens of thousands of people. *Id*. ¶ 94.

269. Beginning in September 2017, the State of North Carolina, public water authorities, well owners, and a consolidated putative class of North Carolina residents, among others, filed suit against Chemours and/or Historical DuPont. *Id*. ¶ 97.

270. In February 2019, Chemours entered into a judicially approved consent order with the State of North Carolina to resolve the State's claims arising from Historical DuPont's long-running discharges into the Cape Fear River and contamination of area groundwater. *Id*. ¶ 99. That consent order requires Chemours to take steps to remediate Historical DuPont's historical contamination and to implement environmental protection measures at a cost of more than $200 million. Additionally, a number of private lawsuits relating to Historical DuPont's activities in the region remain outstanding, including a class action.

271. At the time of the Chemours Separation and Spin Transaction, Historical DuPont certified that the "maximum" Chemours could have to pay for total New Jersey environmental liabilities was $337 million, divided among different sites in New Jersey. *Id*. ¶ 101. In 2018, in connection with the DowDuPont spin-off, Historical DuPont revised its liability estimate upward to approximately $620 million. *Id*. The State of New Jersey has criticized even Historical DuPont's upward-revised estimates, claiming it "implausible" that these amounts could represent "good-faith estimates of [Historical DuPont's historical New Jersey] environmental obligations and liabilities." *Id*.

272. For benzene, Historical DuPont certified a "maximum" liability of $17 million, including defense costs, at the time of the Chemours Separation and Spin Transaction. *Id*. ¶ 108. In 2018, Historical DuPont provided Chemours with a more comprehensive study valuing the potential

maximum costs at over $111 million. *Id.* Historical DuPont addressed PFAS litigation, if at all, as part of a catch-all "maximum" of $194 million covering "General Litigation . . . to Perpetuity," which apparently included everything from PFAS liabilities to commercial litigation. *Id.* ¶ 110.

273. Significant additional environmental and other litigation arising from Historical DuPont's performance chemical business was likewise pending or threatened at the time of the Chemours Separation and Spin Transaction and additional lawsuits continue to be filed against Historical DuPont relating to its performance chemicals business.

274. In 2017, Chemours then also agreed, in an amendment to the Chemours Separation Agreement, to pay $25 million for future PFOA costs not covered by the Chemours Separation Agreement for each of the next five years (up to an additional $125 million).

275. Historical DuPont also agreed to cover additional amounts up to $25 million for five years with Chemours taking responsibility for any amounts greater than $50 million.

276. The effect of the spin-off of Chemours was to segregate a large portion of Historical DuPont's environmental (and other) liabilities, including liabilities related to its manufacture, use, and disposal of PFAS compounds, and give them to an undercapitalized entity, thus attempting to limit the funds available to satisfy Historical DuPont's legacy liabilities.

277. Given that Chemours is purportedly responsible for all or substantially all of Historical DuPont's historic environmental liabilities, is saddled with debt, and has comparatively few assets, the separation and spin-off has been described by some market commentors as "a bankruptcy waiting to happen" and "complete securities fraud."

**K.    Following the Chemours Separation and Spin Transaction, Historical DuPont Turned Its Attention To The Next Steps In Its Multi-Step Scheme To Move Valuable Assets Away From PFAS Creditors.**

278.   On December 11, 2015, Historical DuPont announced a merger with Dow Chemical Company, into the combined DowDuPont in what would become the Merger.  DowDuPont would eventually, in 2019, split into three independent companies: an agriculture company, a materials science company, and specialty products company.  These actions were all a continuation of the fraudulent Chemours Separation and Spin Transaction, which was a necessary precondition to these later mergers and spins.

279.   The DowDuPont Merger closed on August 31, 2017, with each of Dow Chemical Company and DuPont becoming wholly owned subsidiaries of DowDuPont.

280.   During the two years following the Merger, DowDuPont engaged in a series of internal reorganizations to realign its businesses into three subgroups: agriculture, materials science, and specialty products.

281.   After the completion of the Merger, DowDuPont engaged in a number of internal transactions, realignments, and diversities, that resulted in the transfer, directly or indirectly, of a substantial portion of what had been Historical DuPont's assets from the combined DowDuPont.

282.   Pursuant to an April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the DowDuPont Separation Agreement), DowDuPont jettisoned away from Chemours' and Historical DuPont's creditors DowDuPont's agriculture chemical and seed business (which went with Corteva) and DowDuPont's materials science business (which went with New Dow) (the DowDuPont Separation).

283.   The spin-off of DowDuPont's materials science division into New Dow (the Dow Spin Off) occurred on April 1, 2019 and New Dow became an independent, publicly traded company

on April 1, 2019. New Dow was formed as a wholly-owned subsidiary of DowDuPont to serve as the holding company for the materials science business, and Corteva Inc. was formed as a wholly-owned subsidiary of DowDuPont to serve as the holding company for the agriculture business. The Dow Spin Off was accomplished through a pro rata dividend in-kind of all of New Dow's then-issued and outstanding shares of common stock, to holders of DowDuPont's common stock as of the close of business on March 21, 2019 (the Dow Distribution).

284. The spin-off of DowDuPont's agriculture chemical and seed business to Corteva (a/k/a as Corteva Agriscience) (the Corteva Spin Off) occurred on June 1, 2019. The Corteva Spin Off was accomplished through a pro rata dividend in-kind of all of the then-issued and outstanding shares of Corteva's common stock, to holders of Historical DuPont's common stock as of the close of business on May 24, 2019 (the Corteva Distribution).

285. In connection with the Dow Distribution and the Corteva Distribution, DowDuPont entered into certain agreements that, among other things, effect the separations, provide for the allocation of assets, employees, liabilities, and obligations (including its investments, property and employee benefits and tax-related assets and liabilities) among DowDuPont, New Dow, and Corteva.

286. Pursuant to the DowDuPont Separation and Distribution Agreement as well as a June 1, 2019 "Letter Agreement," DowDuPont agreed to indemnify both New Dow and Corteva against certain litigation, environmental, workers' compensation, and other liabilities that arose prior to the distribution.

287. On or about June 1, 2019, DowDuPont changed its name to DuPont de Nemours, Inc., which now holds the former conglomerate's specialty products business.

288. The DowDuPont board of directors believed the completion of the post-Merger separations was, in DowDuPont's words, "the best available opportunity to unlock the value of DowDuPont's businesses." The practical effect of the post-Merger separations was to frustrate and hinder creditors of Historical DuPont and Chemours by moving valuable assets further away from Historical DuPont.

289. As a result of these transactions, the assets Historical DuPont had held following the Chemours Separation and Spin Transaction, including the Dividend and/or the proceeds or products thereof, are now distributed across at least three independent companies, DowDuPont, New Dow, and Corteva, or their subsidiaries or affiliates.

290. Many details about these transactions are hidden from the public in confidential and/or non-public schedules and exhibits to the various agreements. As a result of the obfuscation of the specific details of these transactions, creditors' efforts to understand the final disposition of Historical DuPont's valuable assets and the adequacy of the consideration received in return has been hampered.

291. Pursuant to the DowDuPont Separation Agreement, DowDuPont and Corteva assumed direct financial liability of Historical DuPont, including liability that was *not* related to the Agriculture, Materials Science, or Specialty Products Businesses. More specifically, Corteva was allocated twenty-nine percent (29%) of all financial liabilities of Historical DuPont that are not related to the agriculture business, the materials science business, or the specialty products business. DowDuPont was allocated seventy-one percent (71%) of all financial liabilities of Historical DuPont that are not related to the agriculture business, the materials science business, or the specialty products business.

292.  Liabilities related to businesses and operations of Historical DuPont that were previously discontinued or divested have been allocated between Corteva and DowDuPont as set forth in the non-public confidential schedules to the DowDuPont Separation Agreement.  To the extent that liabilities related to businesses and operations of Historical DuPont that were previously discontinued or divested are not listed on the non-public confidential schedules to the DowDuPont Separation Agreement, each of DowDuPont and Corteva may be responsible for $200 million each in the aggregate, and once liability exceeds the aggregate cap, then excess liability will be allocated to the other.  In the event such liabilities exceed $200 million in the aggregate for each of DowDuPont and Corteva, liabilities are allocated 71% to DowDuPont and 29% to Corteva.

293.  The DowDuPont Separation Agreement allocates DowDuPont's assets between DowDuPont, New Dow, and Corteva.  Similarly, the DowDuPont Separation Agreement allocates DowDuPont's liabilities, including the liabilities of Historical DuPont.

294.  While the non-public nature of the schedules to the DowDuPont Separation Agreement obscures the liabilities retained by New Dow and those transferred to Corteva, it is fair to say that the DowDuPont Separation Agreement caused Corteva and DowDuPont to bear the brunt of liabilities for Historical DuPont, including Historical DuPont's legacy PFAS liabilities and the liabilities of its former Performance Chemicals Business.

295.  As a result of the Merger, DowDuPont was not a good-faith transferee of the proceeds of the Dividend because DowDuPont had sufficient knowledge about the Chemours Separation and Spin Transaction to induce it to inquire further about that transaction.

296.  In each of the Dow Spin Off and the Corteva Spin Off, neither the newly created New Dow nor Corteva were good-faith transferees of the proceeds of the Dividend, because each of

New Dow and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Separation and Spin Transaction; and/or (iii) Chemours's insolvency.

297.  New Dow was not a good-faith transferee of Historical DuPont's and DowDuPont's assets received by New Dow in the Dow Spin Off.  This is because New Dow had sufficient knowledge about Historical DuPont's PFAS liabilities and other legacy environmental liabilities to induce New Dow to inquire further about those liabilities.

298.  Likewise, Corteva was not a good-faith transferee of Historical DuPont's and DowDuPont's assets received by Corteva in the Corteva Spin Off.  This is because Corteva had sufficient knowledge about Historical DuPont's PFAS liabilities and other legacy environmental liabilities to induce Corteva to inquire further about those liabilities.

299.  Prior to the Dow Spin Off, The Dow Chemical Company's March 31, 2019 consolidated balance sheet reflected tangible assets of $49,153,000,000 and balance sheet liabilities of $51,591,000,000. Following the Dow Spin Off, New Dow's June 30, 2019 consolidated balance sheet reflected balance sheet tangible assets of $39,887,000,000 and balance sheet liabilities of $46,389,000,000.  Thus, The Dow Chemical Company's and New Dow's balance sheets' liabilities *exceeded* their balance sheet tangible assets, for The Dow Chemical Company before the Dow Spin Off, and for New Dow after the Dow Spin Off.

300.  Before the Corteva Spin Off, Historical DuPont's March 31, 2019 balance sheet reflected tangible assets of $31,327,000,000 and liabilities of $32,002,000,000.  After the Corteva Spin Off, (i) Corteva's June 30, 2019 consolidated balance sheet, which includes Historical DuPont, reflected tangible assets of $19,064,000,000 and liabilities of $17,855,000,000 and (ii) Historical DuPont's June 30, 2019 balance sheet reflected tangible assets of $19,071,000,000 and liabilities

of $21,928,000,000. Thus, Historical DuPont's balance sheet liabilities *exceeded* its balance sheet tangible assets both before *and* after the Corteva Spin Off. Additionally, after the Corteva Spin Transaction, Historical DuPont's liabilities included a $4.16 billion intercompany loan to Corteva.

301. Prior to the Dow Spin Off and the Corteva Spin Off, Historical DuPont's balance sheet reflected an aggregate total cash, cash equivalents, and marketable securities of $3,814,000,000. After the Dow Spin Off and the Corteva Spin Off, DowDuPont's balance sheet reflected an aggregate total cash, cash equivalents and marketable securities of $2,083,000,000.

## L. The Chemours Separation and Spin Transaction, the Dow Spin Off, and the Corteva Spin Off were Coordinated Corporate Transactions to Siphon Valuable Assets away from PFAS Creditors.

302. The Chemours Separation and Spin Transaction, the Dow Spin Off, and the Corteva Spin Off (Spin Transactions), were a coordinated series of transactions through which Historical DuPont sought to spin-off (and separate) profitable and valuable assets, free and clear of billions of dollars of legacy environmental liabilities, including AFFF liabilities.

303. The Chemours Separation and Spin Transaction was part of a single integrated scheme that cumulated with the Dow Spin Off and the Corteva Spin Off.

## IX.    CARRIER FIRE, CARRIER GLOBAL, AND RTX TRANSACTIONS

304. In 2000, Williams plc demerged into Chubb plc and Kidde plc. Kidde-Fenwal, Inc. was a subsidiary of Kidde plc at the time of the demerger, and Kidde-Fenwal Inc.'s AFFF business became part of the newly formed Kidde plc. National Foam, Inc. was a subsidiary of Kidde plc at the time of the demerger, and National Foam, Inc.'s AFFF business became part of the newly formed Kidde plc. Kidde plc contractually acquired the assets of and contractually assumed the debts and liabilities of Kidde-Fenwal, Inc., National Foam, Inc., and more generally the Kidde

group of companies that it acquired.  In July 2003, United Technologies Corporation (UTC)

acquired Chubb plc, which became a business unit of UTC that focused on security and fire

protection products and services.  UTC contractually acquired the assets of Chubb plc and

contractually assumed the debts and liabilities of Chubb plc.  In 2005, UTC contractually

acquired Kidde plc's assets and contractually assumed Kidde plc's debts and liabilities, including

AFFF liabilities.  At the time of this transaction, Kidde plc owned Kidde and National Foam,

Inc.'s AFFF businesses.  Thus, as part of this transaction, UTC contractually assumed National

Foam, Inc.'s assets, contractually assumed National Foam, Inc.'s debts and liabilities including

AFFF liabilities, and contractually assumed Kidde-Fenwal Inc.'s assets and contractually

assumed Kidde-Fenwal Inc.'s debts and liabilities, including AFFF liabilities.  UTC is liable for

the AFFF liabilities of Kidde and National Foam, Inc. including but not limited through

contractual assumption of liabilities and principles of successor liability.  UTC was the ultimate

parent of Kidde-Fenwal Inc. from 2005-2020.

305.  According to UTC's 10-K for 2005 filed with the United States Securities & Exchange

Commission (2005 10-K), in 2005 upon acquiring Kidde plc, UTC created a new fire and

security business (UTC F&S)  which included UTC's "former Chubb segment and Kidde's

industrial, residential and commercial fire safety businesses."  In or around 2005, UTC also

created a separate company known as UTC Fire & Security Americas Corporation, Inc.

According to UTC's 2005 10-K, UTC F&S "designs, integrates, installs and services fire

detection and fixed suppression systems and manufactures, sells and services portable fire

extinguishers and other fire fighting equipment."  UTC stated that "Kidde's U.S. presence will

complement the largely European and Australian revenue base of the existing Chubb

operations."  UTC F&S provided "its products and services under Chubb, Kidde, Lenel and other

brand names and sells directly to the customer as well as through manufacturers' representatives, distributors and dealers." In 2005 when UTC acquired Kidde plc, Kidde and Chubb brand products were being sold in the United States.

306. In 2007, Kidde Fire Fighting, Inc. was merged into Kidde-Fenwal, Inc.

307. In 2011, UTC moved UTC F&S to a new segment within UTC called UTC Climate, Controls & Security.

308. After UTC bought Kidde plc in 2005, UTC and UTC Fire & Security Americas Corporation, Inc. designed, manufactured, marketed, distributed, and/or sold PFAS-containing AFFF throughout the United States, including through the Kidde brand.

309. Carrier Fire is the successor to UTC Fire & Security Americas Corporation, Inc. Carrier Fire therefore has successor liability for UTC Fire & Security Americas Corporation, Inc.'s design, manufacturing, marketing, distributing, and/or sales of PFAS-containing AFFF throughout the United States.

310. After the acquisition of Kidde in 2005, UTC and UTC Fire & Security Americas Corporation, Inc. manufactured Kidde branded AFFF products at the same physical location in West Chester, Pennsylvania that Kidde-Fenwal had used to manufacture AFFF products prior to 2005.

311. UTC and UTC Fire & Security Americas Corporation, Inc. controlled companywide decisions and strategy regarding the design, manufacturing, distribution, and sales of PFAS-containing AFFF.

312. UTC controlled and coordinated "matters relating to our business as a whole" including its AFFF business, including research and development, sourcing of raw materials for products, strategic acquisitions, and its portfolio of assets including manufacturing facilities.

313. UTC controlled research and development and spent substantial amounts of its own funds on these activities: "[s]ince changes in technology can have a significant impact on our operations and competitive position, we spend substantial amounts of our own funds on research and development." UTC controlled and engaged in research and development activities including through the United Technologies Research Center which serviced businesses across the entire company.

314. UTC also controlled sourcing of raw materials for UTC's products based upon a companywide strategy: "We believe we have adequate sources for our purchases of materials, components, services and supplies used in our manufacturing. We work continuously with our supply base to ensure an adequate source of supply and to reduce costs. We pursue cost reductions through a number of mechanisms, including consolidating our own purchases, reducing the number of suppliers, strategic global sourcing and using online bidding competitions among potential suppliers."

315. UTC decided to grow its AFFF business by acquiring Kidde plc in 2005. UTC stated in its 2005 10-K: "We seek to grow through strategic acquisitions. In the past several years, we have made various acquisitions and entered into joint venture arrangements intended to complement and expand our businesses, and may continue to do so in the future. The success of these transactions will depend on our ability to integrate assets and personnel acquired in these transactions, apply our internal controls processes to these acquired businesses, and cooperate with strategic partners." Thus, UTC controlled strategic decisions to expand its AFFF business and used its expertise to integrate its newly acquired AFFF business with its existing AFFF business.

316. UTC controlled and evaluated companywide assets, including manufacturing facilities

where it made AFFF products: "Our management believes that the fixed assets capitalized and the facilities in operation at December 31, 2005 for the production of our products are suitable and adequate for the business conducted therein in the current business environment and have sufficient production capacity for their present intended purposes. Utilization of the facilities varies based on demand for the products. We continuously review our anticipated requirements for facilities, and based on that review, may from time to time adjust our facility needs."

317. UTC recognized that it was subject to liability for the "safety or liability" of its products, including AFFF products: "product liability claims (including claims related to the safety or reliability of our products) can result in significant costs, including fines, as well as negative publicity, management distraction and damage to our reputation that could reduce demand for our products and services."

318. UTC knew that the FFFC falsely told the federal government that UTC's telomer-based AFFF did not contain C8 surfactants. In a 2008 email exchange, two UTC employees discussed the FFFC's claim to the U.S. Department of Defense that telomer-based products were made with C6 surfactants rather than C8 surfactants. They agreed this claim was untrue and was likely done to distinguish telomer AFFF from 3M's discredited AFFF. One of UTC's employees observed that the FFFC had been "economical with the truth" when it led "the EPA to believe that fire fighting foam agents were only made with C6 surfactants."

319. UTC and the Raytheon Company merged in April 2020. Afterwards, UTC was renamed Raytheon Technologies Corporation and recently renamed RTX Corporation.

320. In April 2020, in connection with UTC's merger with the Raytheon Company, the former UTC F&S segment was spun off and became part of Carrier Global. As part of this transaction, Carrier Global contractually assumed all liabilities connected to the UTC F&S segment and the

subsidiaries that it acquired, including all AFFF liabilities.  At the time the 2020 Separation

Agreement was executed, UTC already had been named as a defendant in numerous AFFF cases.

321.  Following the 2020 spin transaction, Carrier Global became the ultimate parent of Kidde.

322.  As part of the 2020 Separation Agreement, Carrier Global contractually agreed to

indemnify UTC (now RTX) for all AFFF claims arising from all liabilities connected to UTC,

UTC Fire & Security Americas Corporation, Inc., the UTC F&S segment, and the subsidiaries

that Carrier Global acquired.  Carrier Global's contractual indemnification obligations to UTC

are, by definition, co-extensive with Carrier Global's contractual assumption of liabilities.

Specifically, under the 2020 Separation Agreement, Carrier Global contractually assumed, and is

obligated to contractually indemnify UTC for all "Carrier Liabilities," regardless of when they

arose (i.e., regardless of whether they arose before, at, or after the Effective Time) or against

whom such liabilities are asserted:

> *Acceptance and Assumption of Carrier Liabilities.* Carrier and the applicable
> Carrier Designees shall accept, assume and agree faithfully to perform, discharge
> and fulfill all the Carrier Liabilities in accordance with their respective terms (it
> being understood that if any Carrier Liability is a liability of a Carrier Transferred
> Entity or a wholly owned Subsidiary of a Carrier Transferred Entity, such Carrier
> Liability may be assumed by Carrier as a result of the transfer of all of UTC's and
> Otis's and any member of their respective Group's (as applicable) equity interests
> in such Carrier Transferred Entity from UTC, Otis, such member of the UTC
> Group and/or such member of the Otis Group, to Carrier or the applicable Carrier
> Designee). Carrier and such Carrier Designees shall be responsible for all Carrier
> Liabilities, regardless of when or where such Carrier Liabilities arose or arise, or
> whether the facts on which they are based occurred prior to or subsequent to the
> Effective Time, regardless of where or against whom such Carrier Liabilities are
> asserted or determined (including any Carrier Liabilities arising out of claims
> made by UTC's, Otis's or Carrier's respective directors, officers, employees,
> agents, Subsidiaries or Affiliates against any member of the UTC Group, the Otis
> Group or the Carrier Group) or whether asserted or determined prior to the date
> hereof, and regardless of whether arising from or alleged to arise from negligence,
> recklessness, violation of Law, fraud or misrepresentation by any member of the
> UTC Group, the Otis Group or the Carrier Group, or any of their respective
> directors, officers, employees, agents, Subsidiaries or Affiliates[.]

323. The "Carrier Liabilities" include but are not limited to the liabilities of UTC, UTC Fire & Security Americas Corporation, Inc., Kidde, and Kidde plc. Specifically, under Section 2.3(a) of the 2020 Separation Agreement, "'Carrier Liabilities' shall mean the following Liabilities of any of the Parties or any members of their respective Groups:"

> (iv) "all Liabilities" existing or occurring prior to the Separation, "to the extent that such Liabilities relate to, arise out of or result from the conduct of the Carrier Business or a Carrier Asset, including all Liabilities relating to, arising out of or resulting from any matter set forth on Schedule 2.3(a)(iv).

Thus, Carrier contractually assumed the AFFF liabilities of Kidde-Fenwal, Inc. and Kidde plc.

324. Section 2.3(a) of the 2020 Separation Agreement further provides that "Carrier Liabilities" shall also mean the following Liabilities of any of the Parties or any members of their respective Groups:

> (v) any and all Liabilities that are expressly provided by this Agreement or any Ancillary Agreement (or the Schedules hereto or thereto) as Liabilities to be assumed by Carrier or any other member of the Carrier Group, and all agreements, obligations and Liabilities of any member of the Carrier Group under this Agreement or any of the Ancillary Agreements; [and]

> (viii) all Liabilities arising out of litigation or other claims (including in respect of Environmental Liabilities or asbestos Liabilities) made by any Third Party (including UTC's, Otis's or Carrier's respective directors, officers, stockholders, employees and agents) against, or any investigations, sanctions or orders of any Governmental Authority in respect of or binding upon, any member of the UTC Group, the Otis Group or the Carrier Group to the extent (A) the facts underlying such litigation, claim, investigation, sanction or order relate to, arise out of or result from the conduct of the Carrier Business or the Carrier Assets or the other Liabilities of Carrier referred to in the foregoing clauses (i) through (vii) . . . .

325. Article I of the 2020 Separation Agreement defines Carrier Group to include any entity, such as UTC Fire & Security Americas Corporation, Inc., Kidde, and Kidde plc, that were subsidiaries of Carrier either before or after the transaction: "(a) prior to the Effective Time, Carrier and each Person that will be a Subsidiary of Carrier as of immediately after the Effective Time, including the Carrier Transferred Entities and their respective Subsidiaries" and "(b) on

and after the Effective Time, Carrier and each Person that is a Subsidiary of Carrier." Article I also provides that "Carrier Business" includes the reporting segment (UTC Climate, Controls & Security) that contained the National Foam Business operated by Kidde plc.

326. In addition to contractually assuming all Carrier Liabilities, under Section 4.1(a) of the 2020 Separation Agreement, Carrier Global also must contractually indemnify UTC/RTX for all Carrier Liabilities. This provision seeks to relieve UTC of any remaining AFFF Liability and to prevent Raytheon from taking on any.

## X.    STATE NATURAL RESOURCES AND PROPERTY INJURIES

327. AFFF-related PFOS, PFOA, PFNA, PFHxS, and PFHpA compounds have been found in and around State natural resources and property, including groundwater, surface waters, and soil.

328. DEC investigations revealed AFFF-related PFAS contamination and injury associated with a number of known sites in Vermont, including but not limited to the following:

   a.   Air National Guard facility, South Burlington;

   b.   Camp Ethan Allen Training Site, Jericho/Underhill;

   c.   Vermont Fire Training Academy, Pittsford; and

   d.   Southern Vermont Airport, Clarendon.

329. PFAS, including PFOS, PFHxS, and PFOA, were detected in a water supply well at the Air National Guard site at concentrations above groundwater standards in a groundwater recovery trench and in a private well used primarily for agricultural purposes.

330. Waters sampled from a groundwater collection system at the Air National Guard site showed PFOA concentration of 9,300 ppt, which is 465 times the State's health advisory level, and PFOS concentration of 38,000 ppt, 1,900 times the State's health advisory level. Additional site investigation is occurring at the site.

331. An agriculture well at Belter Farm located north of the Air National Guard site also tested positive for PFOA. Milk from cows at the Farm was found to contain PFAS. In response, DEC installed a water treatment system on the agriculture well to remove PFAS contamination at a large cost to the State.

332. PFAS was detected above Vermont's standards in a water supply well at the Camp Ethan Allen Training Site. One onsite water supply well had PFOA at 30.8 ppt. At this time, this water supply well is not being used for drinking.

333. PFAS was found in an onsite training water recycling underground tank at the Vermont Fire Training Academy. PFOS and PFOA were detected at a combined level of 80 ppt in water and 220 ppb in tank-bottom sludge. The Fire Training Academy used PFAS-containing AFFF from the 1970s until 2011 during training exercises.

334. At the Southern Vermont Airport in Clarendon, PFAS have been detected near current and former firefighting training areas where AFFF has been used.

335. PFAS have also been found at the Airport's fire station where firetrucks were washed after training exercises and where AFFF pumper trucks are stored.

336. PFAS is also suspected to be present at a stormwater/surface water discharge location at the southeastern corner of the Airport, and at the location of an August 6, 1986 crash of a Learjet and resulting fire. The plane was carrying 1,000 pounds of aviation fuel when it crashed. A fire broke out that was extinguished using AFFF. According to fire officials, the plane was covered in AFFF throughout the salvage operation as well. Additional plane crashes occurred at the Airport and AFFF was applied as a precautionary measure. Additional investigations are ongoing at these locations.

337. Of the 75 bedrock wells sampled at the Southern Vermont Airport to date, PFAS has been detected in 24 of them. The highest level of PFAS detected so far was 2,666 ppt, which is more than 133 times Vermont's health advisory limit of 20 ppt.

338. The furthest wells with detections are 1.5 miles southwest of the Airport. The extent of PFAS contamination has not been fully defined.

339. There are more than 83 private wells and 5 public wells within ¼ of a mile of the Airport, as well as 2 source protection areas located on Airport property. A source protection area is an area of land that likely recharges or passes groundwater through it to a public water source. The Airport's AFFF test area is located within one of those source protection areas. Within one mile of the Airport, there are approximately 253 private wells, 9 public wells, and 3 source protection areas.

340. Two springs sampled at the Airport have detected PFAS greater than the Vermont advisory levels.

341. PFAS concentrations were also detected in soil at the Airport.

342. In March 2018, PFAS contamination was discovered in the Airport business park treatment system. The affected wells serve hundreds of people at nearby businesses. In response, DEC installed water treatment systems on the public drinking water system and on the private wells at a large cost to the State.

343. The DEC continues to investigate other potential sources of PFAS, including AFFF fire-fighting foam locations, to ensure protection of the public health and the environment.

344. Additional site investigation is planned for these sites, as well as others where AFFF-related PFAS contamination is suspected to be found.

345. As the State continues its investigation, it is likely that it will discover other sites that will require remediation and restoration due to contamination with PFAS from AFFF. The State likely will also discover that additional natural resources have been damaged due to such contamination.

346. AFFF-related PFAS contamination has injured State natural resources and/or adversely impacted their beneficial public trust uses including those for drinking water, recreation, and fishing.

347. AFFF-related PFAS contamination and injury has substantially damaged the intrinsic value of these State natural resources.

348. Vermont and its citizens have been deprived of the full use, enjoyment, and benefit of the State's public trust resources, and the intrinsic values of such State natural resources have been substantially harmed by PFOS, PFOA, PFNA, PFHxS, and PFHpA found within AFFF.

349. The State's natural resources and property have been contaminated and injured by PFOS, PFOA, PFNA, PFHxS, and PFHpA found within AFFF through foreseeable releases from the use of AFFF.

350. Defendants' acts or omissions have caused and/or contributed to these AFFF-related PFAS releases.

351. Defendants failed to disclose the environmental and health risks of PFAS that were known or should have been known to them, to the owners or operators of sites from which PFAS-containing AFFF was used, resulting in the release of PFOS, PFOA, PFNA, PFHxS, and/or PFHpA. As a result, the risks associated with PFAS were generally unknown to the users of AFFF containing PFOS, PFOA, PFNA, PFHxS, and/or PFHpA; were unknown to the State; and were generally unknown to those other than Defendants who could have reduced or limited

the AFFF-related PFAS contamination and injury described above.  As manufacturers, marketers, and sellers of PFAS-containing AFFF and/or PFAS, Defendants were in the best position to reduce the risk of harm of their products.

352.  Each of the State's natural resources is precious, limited, and invaluable, as described in more detail below.

## A.    Groundwater

353.  Groundwater is a precious, limited, and invaluable State natural resource that is used for drinking water, irrigation, and other important purposes.

354.  Over 60% of Vermonters rely upon groundwater as a source for their drinking water.

355.  State natural resources, including groundwater, are vital to the health, safety, and welfare of Vermont citizens, and to the State's economy and ecology.

356.  PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found within Defendants' AFFF products and/or manufactured by Defendants for use in AFFF have contaminated groundwater in the State, including, for example, at the following locations:

> a.    Air National Guard facility, South Burlington;
>
> b.    Camp Ethan Allen Training Site, Jericho/Underhill;
>
> c.    Vermont Fire Training Academy, Pittsford; and
>
> d.    Southern Vermont Airport, Clarendon.

357.  PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found within Defendants' AFFF products and/or manufactured by Defendants for use in AFFF have contaminated drinking water that is drawn from groundwater sources in the State, including, for example, at the following locations:

> a.    Vermont Fire Training Academy, Pittsford; and
>
> b.    Southern Vermont Airport, Clarendon.

358. Ongoing additional testing continues to reveal further AFFF-related PFAS contamination and injury of groundwater in Vermont.

359. It is virtually certain that additional testing will reveal further AFFF-related PFAS contamination and injury of groundwater and drinking water in Vermont.

**B.    Surface Waters**

360. Surface waters are precious, limited, and invaluable State natural resources that are used for drinking water, irrigation, recreation such as swimming and fishing, and ecological and other important purposes.

361. Over 30% of Vermonters rely upon surface waters as sources for drinking water.

362. The State's tourism and recreation industries are dependent upon clean water, including surface waters.

363. Surface waters also are commercially, recreationally, aesthetically, and ecologically important to the State and its citizens, including by supporting aquatic ecosystems, and biota such as fish.

364. PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found within Defendants' AFFF products and/or manufactured by Defendants for use in AFFF have contaminated surface waters in the State, including, the Air National Guard facility, South Burlington, and the Southern Vermont Airport, Clarendon.

365. Ongoing additional testing continues to reveal further AFFF-related PFAS contamination and injury of surface waters in Vermont.

366. It is virtually certain that additional testing will reveal further AFFF-related PFAS contamination and injury of surface water in locations throughout Vermont.

**C.    Wildlife, Soils, and Sediments**

367. Wildlife is a precious, limited, and invaluable State natural resource.

368. Soils and sediments are part of or interconnected with the health of State natural resources such as surface waters, groundwater, and wildlife, and provide numerous values and services. For instance, sediments are important as habitat for wildlife including fish, among other important ecological uses; and soils may contain contaminants that migrate to groundwater. A healthy and functioning ecosystem depends upon the interplay between non-impaired soils, sediments, and wildlife.

369. PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found within Defendants' AFFF products and/or manufactured by Defendants for use in AFFF have contaminated soils and sediments in the State, including, for example, the Southern Vermont Airport, Clarendon.

370. Wildlife are critical ecological resources.

371. PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found within Defendants' AFFF products and/or manufactured by Defendants for use in AFFF have contaminated wildlife.

372. Vermont's biodiversity is vital to its ecology, economy, and culture.

373. Vermont's fish, and other wildlife are used for food, recreational purposes, and provide a significant economic benefit to the State, including through tourism and recreation.

374. Injuries to wildlife affect not only individual wildlife, but the entire ecosystem of which they are part.

375. Ongoing additional testing continues to reveal further AFFF-related PFAS contamination and injury of soils and sediments in Vermont.

376. It is virtually certain that additional testing will reveal AFFF-related PFAS contamination and injury of wildlife, soils, and sediments in locations throughout Vermont.

**D.    New AFFF-related PFAS Contamination Continues to be Discovered and Existing Contamination Continues to Injure State Natural Resources and Property.**

377.  AFFF-related PFAS has contaminated State natural resources and property throughout the State.  This contamination has injured these resources, threatens State citizens' health, safety, and welfare, and interferes with the use of these precious resources.

378.  Given PFAS's properties, including their resistance to biodegradation and their solubility, AFFF-related PFAS continues to move through groundwater, surface waters, and soils, and other natural resources, and cause initial contamination in new locations, adversely impacting State natural resources and property.

379.  AFFF-related PFAS continues to move through the environment and contaminate State natural resources and property at a number of locations throughout the State with known PFAS contamination.

380.  Defendants' acts and omissions directly and proximately caused and continue to cause AFFF-related PFAS to intrude into and contaminate these natural resources and property.

381.  There are proven and preliminary remedial techniques for cleaning up AFFF-related PFAS in environmental media.

382.  Absent use of the remediation and treatment methods, AFFF-related PFAS contamination will continue to spread through the State's natural resources and property.  Although PFAS is persistent in the environment, AFFF-related PFAS can be successfully remediated in certain natural resources and/or successfully treated, but at significant expense.

383.  AFFF-related PFAS contamination levels in State natural resources including groundwater and drinking water typically fluctuate, *i.e.,* increase and decrease, over time as PFAS moves through groundwater and due to other factors, including changes in seasonal precipitation levels.  PFAS levels can fluctuate at a single PFAS contamination site over time.

For this reason, the only way to be certain that AFFF-related PFAS no longer exists in State

natural resources such as groundwater or drinking water is to remediate and treat the PFAS.

384.  AFFF-related PFAS's presence and migration in Vermont's natural resources and

property, absent large-scale and costly remediation, will continue indefinitely, and will continue

to indefinitely threaten such natural resources and property.

## XI.    FIRST CAUSE OF ACTION

### Civil Action for Natural Resource Damages and Restoration
### (All Defendants)

385.  The State realleges and reaffirms each and every allegation set forth in all preceding

paragraphs as if fully restated in this section.

386.  Surface waters, groundwater, and wildlife are public trust resources in Vermont.

387.  The State in its role as trustee must manage its public trust resources for the benefit of its

citizens.

388.  The State, as trustee, may bring a cause of action to recover damages to and restoration of

natural resources held in trust by the State.

389.  The State also may act in its *parens patriae* capacity to protect and restore the State's

natural resources.

390.  Defendants have unreasonably interfered with the use and enjoyment of public trust

rights, and have injured the natural resources of the State of Vermont through the acts and

omissions alleged in this Amended Complaint.

391.  As a direct and proximate result of Defendants' acts and omissions as alleged in this

Amended Complaint, AFFF-related PFAS have injured the State's natural resources by causing

contamination and injury of groundwater, drinking water supplies, public drinking water supply

wells, private drinking water wells, surface waters, fish, and other natural resources of the State.

- 72 -

392. As a further direct and proximate result of the acts and omissions of Defendants, the State has sustained and will sustain substantial expenses and damages, for which Defendants are strictly, jointly, and severally liable.

393. Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources that are indivisible.

## XII.    SECOND CAUSE OF ACTION

### Groundwater Protection Act, 10 V.S.A. § 1410
### (All Defendants)

394. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

395. The State of Vermont is a "person" as defined by 10 V.S.A. § 1410(b)(3).

396. Defendants have altered the character and/or quality of the groundwater in the State by engaging in the acts and omissions alleged in this Amended Complaint. For example, as discussed above, PFAS is associated with significant harmful health effects in humans and animals, including at low concentrations.

397. Defendants' alteration of the groundwater caused unreasonable harm by contaminating groundwater, drinking water supplies, public drinking water supply wells, private drinking water wells, public property, and/or other waters and property of the State.

398. AFFF-related PFAS has profoundly and unreasonably affected the waters of the State, compromising their use for household purposes including drinking, cooking, and bathing, and risking public health via exposure to PFAS. AFFF-related PFAS contamination poses an extraordinary and unjust financial burden on the State and its citizens, who bear the costs of testing, monitoring, and remediation although Defendants profited from the manufacturing, marketing, distribution, and/or sale of PFAS-containing AFFF and/or PFAS for use in AFFF.

399.  The Act authorizes the State to seek equitable relief and/or damages for the unreasonable harm caused by AFFF-related PFAS contamination.

400.  As a direct and proximate result of Defendants' acts and omissions, the State's waters and property were and are contaminated with AFFF-related PFAS.  The State has incurred, is incurring, and will incur, investigation, remediation, cleanup, restoration, removal, treatment and monitoring costs and expenses related to contamination and injury of the State's groundwater, including drinking water, for which Defendants are strictly, jointly, and severally liable.

401.  As a further direct and proximate result of Defendants' acts and omissions, the State has sustained and will sustain other substantial expenses and damages, for which Defendants are strictly, jointly, and severally liable.

402.  Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's waters and property that are indivisible.

## XIII.    THIRD CAUSE OF ACTION

### Strict Liability for Design Defect and/or Defective Product
### (All Defendants)

403.  The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

404.  Defendants during the relevant time period were designers, manufacturers, marketers, distributors, and/or sellers of AFFF containing PFOS, PFOA, PFNA, PFHxS, and/or PFHpA PFOS, PFOA, PFNA, PFHxS, and/or PFHpA for use in AFFF.

405.  As designers, manufacturers, marketers, distributors, and/or sellers of AFFF containing PFOS, PFOA, PFNA, PFHxS, and/or PFHpA PFOS, PFOA, PFNA, PFHxS, and/or PFHpA for use in AFFF, Defendants owed a duty to all persons whom Defendants' AFFF-related PFOS, PFOA, PFNA, PFHxS, and/or PFHpA might foreseeably harm, including the State and its

citizens, not to market any product which is unreasonably dangerous for its intended and

foreseeable uses.

406. Defendants represented, asserted, claimed, and warranted that AFFF-related PFOS,

PFOA, PFNA, PFHxS, and/or PFHpA were safe for their intended and foreseeable uses.

407. When Defendants placed AFFF-related PFOS, PFOA, PFNA, PFHxS, and/or PFHpA

into the stream of commerce, they were defective, unreasonably dangerous, and not reasonably

suited for their intended, foreseeable and ordinary storage, handling, and uses, including for the

following reasons:

a. Unintended releases of AFFF products containing PFOS, PFOA, PFNA, PFHxS, and/or PFHpA are commonplace;

b. PFOS, PFOA, PFNA, PFHxS, and/or PFHpA are released to the environment through the normal and foreseen use of AFFF products containing PFOS, PFOA, PFNA, PFHxS, and/or PFHpA;

c. When PFOS, PFOA, PFNA, PFHxS, and/or PFHpA are released into the environment through the intentional use of or accidental spilling of PFAS-containing AFFF, PFOS, PFOA, PFNA, PFHxS, and/or PFHpA have a tendency to mix with groundwater and migrate great distances;

d. When PFOS, PFOA, PFNA, PFHxS, and/or PFHpA are released into the environment through the intentional use of or accidental spilling of PFAS-containing AFFF, PFOS, PFOA, PFNA, PFHxS, and/or PFHpA persist over long periods of time because PFOS, PFOA, PFNA, PFHxS, and/or PFHpA are recalcitrant to biodegradation and bioremediation;

e. PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found within AFFF products bioaccumulate in humans and wildlife;

f. Very low concentrations of PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found with AFFF products can make water unpotable;

g. PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found within AFFF products pose risks to human health;

h. Defendants with knowledge of the risks failed to use reasonable care in the design of PFOS, PFOA, PFNA, PFHxS, and/or PFHpA to be used in AFFF and/or AFFF containing PFOS, PFOA, PFNA, PFHxS, and/or PFHpA;

    i.    PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found within AFFF pose greater dangers to State natural resources and property than would be expected by ordinary persons such as the State, users and the general public exercising reasonable care;

    j.    The risks which PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found within AFFF pose to State natural resources and property outweigh their utility in firefighting activities and training exercises; and

    k.    Safer alternatives to PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found within AFFF and/or AFFF products containing PFOS, PFOA, PFNA, PFHxS, and/or PFHpA have existed and been available to Defendants at all times relevant to this litigation.

408.  The above-described defects exceeded the knowledge of the ordinary person and by the exercise of reasonable care the State would not be able to avoid the harm caused by PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found within AFFF.

409.  AFFF containing PFOS, PFOA, PFNA, PFHxS, and/or PFHpA PFOS, PFOA, PFNA, PFHxS, and/or PFHpA for use in AFFF were distributed and sold in the manner intended or reasonably foreseen by the Defendants, or as should have been reasonably foreseen by Defendants.

410.  AFFF containing PFOS, PFOA, PFNA, PFHxS, and/or PFHpA PFOS, PFOA, PFNA, PFHxS, and/or PFHpA for use in AFFF reached consumers and the environment in a condition substantially unchanged from that in which they left Defendants' control.

411.  AFFF containing PFOS, PFOA, PFNA, PFHxS, and/or PFHpA PFOS, PFOA, PFNA, PFHxS, and/or PFHpA for use in AFFF failed to perform as safely as an ordinary consumer would expect when used in their intended and reasonably foreseeable manner.

412. As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with AFFF-related PFOS, PFOA, PFNA, PFHxS, and/or PFHpA.  The State has incurred, is incurring, and will incur, investigation, remediation, cleanup, restoration, removal, treatment, and monitoring, and other costs and expenses related to

AFFF-related PFOS, PFOA, PFNA, PFHxS, and/or PFHpA contamination and injury of State natural resources and property, for which Defendants are strictly, jointly, and severally liable.

413. As a further direct and proximate result of the acts and omissions of Defendants, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are strictly, jointly, and severally liable.

414. Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

## XIV.    FOURTH CAUSE OF ACTION

### Strict Liability for Failure to Warn
### (All Defendants)

415. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

416. As manufacturers, marketers, distributors, promoters and/or sellers of AFFF containing PFAS and/or PFAS for use in AFFF, Defendants had a duty to issue warnings to the State, the public, public officials, consumers, and users of the risks posed by PFOS, PFOA, PFNA, PFHxS, and/or PFHpA.

417. Defendants knew that AFFF containing PFAS and/or PFAS for use in AFFF would be purchased, transported, stored, handled, used, and disposed of without notice of the hazards which PFAS, including PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, pose to State natural resources and property.

418. Defendants' failure to warn of these hazards made AFFF containing PFAS and/or PFAS for use in AFFF unreasonably dangerous.

419. At all times relevant to this litigation, Defendants have had actual and/or constructive knowledge of facts, including the following, which rendered AFFF containing PFAS and/or PFAS for use in AFFF hazardous to State natural resources and property:

    a. Unintended releases of AFFF products containing PFOS, PFOA, PFNA, PFHxS, and/or PFHpA are commonplace;

    b. PFOS, PFOA, PFNA, PFHxS, and/or PFHpA are released to the environment through the normal and foreseen use of AFFF products containing PFOS, PFOA, PFNA, PFHxS, and/or PFHpA;

    c. When PFOS, PFOA, PFNA, PFHxS, and/or PFHpA are released into the environment through the intentional use of or accidental spilling of PFAS-containing AFFF, PFOS, PFOA, PFNA, PFHxS, and/or PFHpA have a tendency to mix with groundwater and migrate great distances;

    d. When PFOS, PFOA, PFNA, PFHxS, and/or PFHpA are released into the environment through the intentional use of or accidental spilling of PFAS-containing AFFF, PFOS, PFOA, PFNA, PFHxS, and/or PFHpA persist over long periods of time because PFOS, PFOA, PFNA, PFHxS, and/or PFHpA are recalcitrant to biodegradation and bioremediation;

    e. PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found within AFFF products bioaccumulate in humans and wildlife;

    f. Very low concentrations of PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found with AFFF products can make water unpotable;

    g. PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found within AFFF products pose risks to human health; and

    h. PFAS found within AFFF are associated with certain cancers in humans.

420. The foregoing facts relating to the hazards that AFFF containing PFAS and/or PFAS for use in AFFF pose to State natural resources and property are not the sort of facts that, at the relevant times, the State, users, consumers, or the general public could ordinarily discover or protect themselves against absent sufficient warnings.

421.  Defendants breached their duty to warn by unreasonably failing to provide warnings concerning any of the facts alleged here to the State, public officials, users, consumers, and/or the general public.

422.  Defendants' failure to warn proximately caused reasonably foreseeable injuries to the State.  The State and others would have heeded legally adequate warnings, and AFFF containing PFAS and/or PFAS for use in AFFF would not have gained approval in the marketplace, and AFFF containing PFAS and/or PFAS for use in AFFF would have been treated differently in terms of procedures for firefighting training and extinguishment activities.

423.  As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with AFFF-related PFAS, including PFOS, PFOA, PFNA, PFHxS, and/or PFHpA.  The State has incurred, is incurring, and will incur, investigation, remediation, cleanup, restoration, removal, treatment, monitoring and other costs and expenses related to contamination and injury of the State's natural resources and property, for which Defendants are strictly, jointly, and severally liable.

424.  As a further direct and proximate result of the acts and omissions of Defendants, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are strictly, jointly, and severally liable.

425.  Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

## XV.    FIFTH CAUSE OF ACTION

### Negligence
### (All Defendants)

426.  The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

427.  As manufacturers, marketers, distributors, promoters, and/or sellers of AFFF containing PFAS and/or PFAS for use in AFFF, Defendants owed a duty to the State as well as to all persons whom Defendants' AFFF-related PFAS products might foreseeably harm to exercise due care in the design, manufacturing, promotion, marketing, sale, distribution, testing, labeling, use, warning, and instructing for use of AFFF containing PFAS and/or PFAS for use in AFFF.

428.  Defendants had a duty and the financial and technical means to test AFFF containing PFAS and/or PFAS for use in AFFF, and to warn public officials, consumers, users, and the general public of the hazardous characteristics of PFAS.

429.  Defendants had a duty to not contaminate the environment.

430.  Defendants had a duty to not contaminate State natural resources.

431.  Defendants represented and claimed that AFFF containing PFAS and/or PFAS for use in AFFF did not require any different or special handling or precautions.  Any warnings Defendants did provide were generic and did not suffice to warn reasonable users of the dangers to the environment posed by these AFFF products and/or chemicals found within such products.

432.  At times relevant to this litigation, Defendants knew or should have known of the following environmental and health risks, among others:

    a.  Unintended releases of AFFF products containing PFAS, including PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, are commonplace;

    b.  PFOS, PFOA, PFNA, PFHxS, and/or PFHpA are released to the environment through the normal and foreseen use of AFFF products containing PFOS, PFOA, PFNA, PFHxS, and/or PFHpA;

    c.  When PFOS, PFOA, PFNA, PFHxS, and/or PFHpA are released into the environment through the intentional use of or accidental spilling of PFAS-containing AFFF, PFOS, PFOA, PFNA, PFHxS, and/or PFHpA have a tendency to mix with groundwater and migrate great distances;

    d.  When PFOS, PFOA, PFNA, PFHxS, and/or PFHpA are released into the environment through the intentional use of or accidental spilling of PFAS-containing AFFF, PFOS,

PFOA, PFNA, PFHxS, and/or PFHpA persist over long periods of time because PFOS, PFOA, PFNA, PFHxS, and/or PFHpA are recalcitrant to biodegradation and bioremediation;

e. PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found within AFFF products bioaccumulate in humans and wildlife;

f. Very low concentrations of PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found with AFFF products can make water unpotable;

g. PFOS, PFOA, PFNA, PFHxS, and/or PFHpA found within AFFF products pose risks to human health; and

h. PFAS found within AFFF are associated with certain cancers in humans.

433. The foregoing facts relating to the hazards which AFFF-related PFAS, including PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, pose to State natural resources and property, are not the sort of facts which the State, users, consumers, and the general public could ordinarily discover or protect themselves against absent sufficient warnings.

434. AFFF containing PFAS and/or PFAS for use in AFFF manufactured, marketed, distributed, promoted and/or sold by Defendants were used in a normal and foreseeable manner.

435. Defendants have negligently breached their duties of due care to the State, consumers, users, and the general public by, among other things:

a. Promoting and defending AFFF containing PFAS and/or PFAS, including PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, to be used in AFFF and/or while concealing the threat PFOS, PFOA, PFNA, PFHxS, and/or PFHpA pose to natural resources and property;

b. marketing, touting, and otherwise promoting the benefits of AFFF containing PFAS and/or PFAS, including PFOS, PFOA, PFNA, PFHxS and/or PFHpA, to be used in AFFF without disclosing the truth about the environmental and potential health hazards posed by PFOS, PFOA, PFNA, PFHxS, and/or PFHpA;

c. failing to eliminate or minimize the harmful impacts and risks posed by AFFF containing PFAS and/or PFAS, including PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, to be used in AFFF;

    d.  failing to curtail or reduce the distribution of AFFF containing PFAS and/or PFAS, including PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, to be used in AFFF;

    e.  failing to instruct the State, consumers, users and the general public about the safe handling and use of AFFF containing PFAS and/or PFAS, including PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, to be used in AFFF; and/or

    f.  failing to warn and instruct the State, consumers, users and the general public about the risks to natural resources posed by AFFF containing PFAS and/or PFAS, including PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, to be used in AFFF, about the necessary precautions and steps to prevent or minimize releases of AFFF-related PFOS, PFOA, PFNA, PFHxS, and/or PFHpA in distribution, storage, use and disposal, and about how to remediate such releases promptly.

436.  As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with AFFF-related PFAS.  The State has incurred, is incurring, and will incur, investigation, remediation, cleanup, restoration, removal, treatment, monitoring and other costs and expenses related to contamination and injury of the State's natural resources and property, for which Defendants are jointly and severally liable.

437.  As a further direct and proximate result of the acts and omissions of the Defendants, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are jointly and severally liable.

438.  Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

439.  Defendants knew that it was substantially certain that their acts and omissions described above would threaten public health and cause extensive contamination and injury of State natural resources and property.  Defendants' conduct in continuing to promote AFFF containing PFAS and/or PFAS, including PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, to be used in AFFF was outrageously reprehensible.

## XVI.   SIXTH CAUSE OF ACTION

### Public Nuisance
### (All Defendants)

440.  The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

441.  Defendants have manufactured, marketed, distributed, promoted and/or sold AFFF containing PFAS and/ or PFAS to be used in AFFF, including PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, in a manner that created or participated in creating a public nuisance that unreasonably endangers or injures the property, health, safety and welfare of the general public and the State of Vermont, causing inconvenience and annoyance.

442.  Defendants, by their negligent, reckless, and willful acts and omissions set forth above, have, among other things, knowingly unleashed long-lasting AFFF-related PFOS, PFOA, PFNA, PFHxS, and/or PFHpA contamination and injury of State natural resources and property throughout Vermont, having concealed the threat from all, thereby causing and threatening to cause AFFF-related PFOS, PFOA, PFNA, PFHxS, and/or PFHpA contamination and injury of the State's natural resources and property.  Defendants' AFFF-related PFOS, PFOA, PFNA, PFHxS, and/or PFHpA continues to spread in and contaminate more State natural resources and property throughout the State.

443.  Each Defendant has caused, contributed to, maintained, and/or participated in a public nuisance by substantially and unreasonably interfering with, obstructing and/or threatening, among other things, (i) Vermonters' common public rights to enjoy State natural resources and property free from unacceptable health risk, pollution, and contamination, and (ii) the State's *parens patriae* ability to protect, conserve and manage the State's natural resources.

444. Each Defendant has, at times relevant to this action, caused, contributed to, maintained, and/or participated in the creation of such public nuisance. Among other things, each Defendant is a substantial contributor to such public nuisance as follows:

    a. Defendants manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce AFFF containing PFAS and/ or PFAS to be used in AFFF, including PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, when they knew, or reasonably should have known, that PFOS, PFOA, PFNA, PFHxS, and/or PFHpA would escape from those who store or use AFFF through leaks and other spills and contaminate State natural resources and property;

    b. Defendants manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce AFFF containing PFAS and/ or PFAS to be used in AFFF, including PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, that were delivered into the State (and areas affecting the State's natural resources and property), when they knew, or reasonably should have known, that PFOS, PFOA, PFNA, PFHxS, and/or PFHpA would be released readily into the environment during the normal, intended and foreseeable uses of PFAS-containing AFFF; and when released, PFOS, PFOA, PFNA, PFHxS, and/or PFHpA would persist in the environment and not break down, contaminate State natural resources and property, including soils, sediments, groundwater, surface waters, wildlife, and drinking water supplies, and, ultimately, be difficult and costly to remove; and

    c. Defendants manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce AFFF containing PFAS and/ or PFAS to be used in AFFF, including PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, that were delivered into the State (and areas affecting the State's natural resources and property), when they knew, or reasonably should have known, that PFOS, PFOA, PFNA, PFHxS, and/or PFHpA posed substantial risks to human health.

445. Despite their knowledge that contamination and injury of the State's natural resources and property with AFFF-related PFOS, PFOA, PFNA, PFHxS, and/or PFHpA was the inevitable consequence of their conduct, Defendants failed to provide adequate warnings or special instructions, failed to take any other reasonable precautionary measures to prevent or mitigate such contamination and injury, and/or affirmatively misrepresented the hazards of PFOS, PFOA, PFNA, PFHxS, and/or PFHpA in their product information and/or instructions for use.

446.  Defendants knew, or in the exercise of reasonable care should have known, that the introduction and use of AFFF containing PFAS and/ or PFAS to be used in AFFF, including PFOS, PFOA, PFNA, PFHxS, and/or PFHpA, would and has unreasonably and seriously endangered, injured, and interfered with the ordinary comfort, use, and enjoyment of natural resources and property relied upon by the State and its citizens.

447.  Defendants have caused, contributed to, maintained, and/or participated in a public nuisance that has caused substantial injury to the State's natural resources and property, in which the public has interests represented by and protected by the State in its trustee and *parens patriae* capacities.  Defendants' conduct also threatens to cause substantial additional injury to the State's natural resources and property.  The public nuisance has caused and/or threatens to cause substantial injury to property directly owned by the State.

448.  The contamination and injury of the State's natural resources and property with AFFF-related PFOS, PFOA, PFNA, PFHxS, and/or PFHpA is ongoing.  PFOS, PFOA, PFNA, PFHxS, and/or PFHpA continue to threaten, migrate into, and enter the State's natural resources and property, and cause new contamination in new locations.

449.  As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with AFFF-related PFOS, PFOA, PFNA, PFHxS, and/or PFHpA.  The State has incurred, is incurring, and will incur, investigation, remediation, cleanup, restoration, removal, treatment, monitoring and other costs and expenses related to contamination and injury of the State's natural resources and property, for which Defendants are jointly and severally liable.

450.  As a further direct and proximate result of Defendants' acts and omissions, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are jointly and severally liable.

451.  Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

## XVII.    SEVENTH CAUSE OF ACTION

### Private Nuisance
### (All Defendants)

452.  The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

453.  The State's property and public trust resources have been contaminated by AFFF-related PFOS, PFOA, PFNA, PFHxS, and/or PFHpA as a direct and proximate result of the intentional and unreasonable, negligent and reckless conduct of Defendants, all as alleged in this Amended Complaint.  These property and resources include state parks, beds and banks of surface water bodies, water wells, and resources held in trust by the State, such as groundwater.

454.  As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, the State has suffered injuries from contamination of State-owned property and public trust resources  Defendants' acts and omissions have substantially, intentionally, and unreasonably interfered with, obstructed, violated, and/or threatened, among other things, the State's interests in its property and public trust resources.  This harm far outweighs any utility or benefit derived from this intentional conduct.

455.  As a direct and proximate result of Defendants' acts and omissions, the State's property and public trust resources were and are contaminated with AFFF-related PFOS, PFOA, PFNA, PFHxS, and/or PFHpA.  The State has incurred, is incurring, and will incur, investigation,

remediation, cleanup, restoration, removal, treatment, monitoring and/or other costs and expenses related to contamination of the State's property and public trust resources, for which Defendants are jointly and severally liable.

456.  As a further direct and proximate result of Defendants' acts and omissions, the State has sustained and will sustain other expenses and damages, including damages for loss of use and enjoyment, for which Defendants are jointly and severally liable.

457.  Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's public trust resources and property that are indivisible.

## XVIII.    EIGHTH CAUSE OF ACTION

### Trespass
### (All Defendants)

458.  The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

459.  The State has significant property interests in the natural resources of the State.  These property rights and interests include, but are not limited to, the State's public trust and *parens patriae* interests and authority in protecting such natural resources from contamination and injury.

460.  A trustee by definition is authorized to take action to protect trust property as if the trustee were the owner of the property.

461.  The State also brings this action in its *parens patriae* capacity on behalf of its citizens to protect quasi-sovereign interests, including the integrity of the State's natural resources.  The State in its *parens patriae* capacity seeks relief for the invasion of its citizens' possessory interests by AFFF-related PFOS, PFOA, PFNA, PFHxS, and/or PFHpA.

462. The State never authorized Defendant's invasion of its natural resources and property with AFFF-related PFOS, PFOA, PFNA, PFHxS, and/or PFHpA.

463. The State owns in fee certain property within the State, including lands and water wells.

464. Defendants knew, or in the exercise of reasonable care should have known, that PFOS, PFOA, PFNA, PFHxS, and/or PFHpA are hazardous to natural resources and property, including groundwater, surface water, and public water systems, and including the property and interests of the State.

465. Defendants' acts and omissions directly and proximately caused and continue to cause AFFF-related PFAS to intrude onto and contaminate State natural resources and property, including water systems, surface water, groundwater systems, and zones of influence of the areas that supply production wells within the State.

466. At the time of Defendants' acts and omissions, Defendants knew with substantial certainty that AFFF-related PFOS, PFOA, PFNA, PFHxS, and/or PFHpA would reach onto and contaminate State natural resources and property, including water systems, surface water, groundwater systems, and zones of influence of the areas that supply production wells within the State. Defendants' knowledge was based on their knowledge of the properties of PFOS, PFOA, PFNA, PFHxS, and/or PFHpA and other conduct alleged in this Amended Complaint. Despite this knowledge, Defendants manufactured, marketed, distributed, promoted, and/or sold AFFF containing PFAS and/or PFAS for use in AFFF, including PFOA, PFNA, PFHxS, and/or PFHpA, with a profit motive in a way that has harmed the State.

467. As a direct and proximate result of the trespass, the State has been damaged and is entitled to compensatory damages for the costs of investigation, remediation, and treatment, damages for loss of use and enjoyment of the State natural resources and property, cost of

restoring State natural resources and property to their original conditions as if the trespass had

not occurred, and/or other relief the State may elect at trial.

468.  As a direct and proximate result of Defendants' acts and omissions, the State's natural

resources and property are contaminated with AFFF-related PFOS, PFOA, PFNA, PFHxS,

and/or PFHpA.  The State has incurred, is incurring, and will incur, investigation, remediation,

cleanup, restoration, removal, treatment, monitoring and other costs and expenses related to

contamination of the State's natural resources and property, for which Defendants are jointly and

severally liable.

469.  As a further direct and proximate result of Defendants' acts and omissions, the State has

sustained and will sustain other substantial expenses and damages, including damages for loss of

use and enjoyment, for which Defendants are jointly and severally liable.

470.  Defendants' acts and omissions have caused and/or threatened to cause injuries to the

State's natural resources and property that are indivisible.

### XIX.   NINTH CAUSE OF ACTION

**Actual Fraudulent Transfer Related to the
Chemours Separation and Spin Transaction,
Pursuant to 9 V.S.A. §§ 2288(a)(1) & 2291(a) as in effect on July 1, 2015,
and/or such other applicable state law
(Against Historical DuPont, The Chemours Company, DowDuPont, and Corteva)**

471.  The State realleges and reaffirms each and every allegation set forth in all proceeding

paragraphs as if fully restated in this section.

472.  The State seeks relief pursuant to 9 V.S.A. §§ 2288(a)(1) & 2291(a) as in effect on July

1, 2015 (the Vermont Uniform Fraudulent Transfers Act (VT UFTA)), against Historical

DuPont, The Chemours Company, DowDuPont, and Corteva.

473. As a result of the transfer of assets and liabilities related to the Chemours Separation and Spin Transaction described in this Amended Complaint, Historical DuPont limited the availability of assets to cover judgements for all of the liability for damages and injuries arising from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS and PFAS-containing products.

474. Historical DuPont has acted with actual intent to hinder, delay, and defraud creditors of Historical DuPont, and what would become Chemours, by (i) transferring the Dividend to Historical DuPont, and (ii) causing the incurrence of obligations in connection with the Chemours Separation and Spin Transaction.

475. Historical DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties, such as Vermont, that have been damaged as a result of Historical DuPont's actions described in this Amended Complaint.

476. Historical DuPont manufactured, marketed, distributed, sold, and promoted PFAS and PFAS-containing products despite knowing of the health and environmental risks of PFAS for decades before Chemours existed as an independent company.

477. At the time of the Chemours Separation and Spin Transaction, Historical DuPont and the business line that Chemours would come to own had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Historical DuPont's liability for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS and PFAS-containing products, including those damages and injuries caused by the business line that Chemours would come to own.

478. The State was a creditor of Historical DuPont and the business line that Chemours would come to own at the time of the Chemours Separation and Spin Transaction.

479. A number of the statutorily enumerated badges of fraud are present with respect to the Chemours Separation and Spin Transaction and evidence Defendants' fraudulent intent. *See* VT UFTA § 2288(b).

480. **The transfer of the Dividend to Historical DuPont was a transfer to an insider of Chemours, and the incurrence of obligations by Chemours to Historical DuPont, were to an insider of Chemours, Historical DuPont**. *See* VT UFTA §2288(b)(1). That obligation was the assumption of the Chemours liabilities which include the Chemours Assumed Environmental Liabilities (as each are defined in the Chemours Separation Agreement), as well as the indemnification obligations under Section 6.3 of the Chemours Separation Agreement. The transfer of these obligations to Chemours from Historical DuPont occurred at a time that Historical DuPont owned the requisite shares of Chemours, and through the DuPont Board's members, Historical DuPont employees (i.e., Nigel Pond and other DuPont Employee Board Members), and Historical DuPont agents (i.e., Historical DuPont's outside counsel), to control Chemours. Historical DuPont was an insider of Chemours when the Chemours Spin Transaction was approved and consummated. *See* VT UFTA § 2285(1)(b), (e).

481. **The Chemours Separation and Spin Transaction concealed the liabilities actually assumed by Chemours. *See* VT UFTA § 2288(b)(3).** The true scope of the obligations that were to be assumed by Chemours in the Chemours Separation and Spin Transaction were kept from Chemours management designees (and later when they were actually functioning in those roles). Additionally, the schedules to the Chemours Separation Agreement that correspond with the subsections of the definition of "Chemours Assumed Environmental Liabilities" were not publicly filed and the Info Statement dramatically understated the amount of those liabilities.

482. **The Chemours Separation and Spin Transaction occurred at a time when Historical DuPont and/or the business line that Chemours would come to own had been sued or threatened with suit related to environmental liabilities.** *See* VT UFTA § 2288(b)(4). The business line that Chemours would come to own and Historical DuPont were subject to a substantial amount of litigation at the time that the Chemours Separation and Spin Transaction was approved and when it occurred, including numerous environmental suits and remediation actions.

483. **The value of the consideration received by Chemours in respect of the Chemours Separation and Spin Transaction for the transfer of the Dividend to Historical DuPont, and the incurrence of obligations by Chemours to Historical DuPont in respect of the Chemours Separation and Spin Transaction, was not for reasonably equivalent value in respect of the value of the obligation incurred and the transfers made.** *See* VT UFTA § 2288(b)(8). The Chemours Separation and Spin Transaction was predicated upon Historical DuPont's "High End (Maximum) Realistic Exposure" estimates for liabilities, which were valued based on accounting principles and have proven in several instances to be drastically below the actual liability amounts.

484. **Chemours was insolvent or became insolvent shortly after the Chemours Separation and Spin Transaction.** *See* **VT UFTA § 2288(b)(9).** The VT UFTA recognizes "[i]nsolvency" where the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation, or when a debtor is generally not paying debts as they become due. *See* VT UFTA § 2286(a), (b). Chemours was balance-sheet insolvent at the time of the Chemours Separation and Spin Transaction. Additionally, the trading prices for Chemours's debt reflect insolvency as of the date the Chemours Separation and Spin Transaction closed and spiraled downhill in the

immediate aftermath of the Chemours Separation and Spin Transaction.  Further, as a result of

the Chemours Separation and Spin Transaction, Chemours could not pay its debts as they

became due.

485.  Lastly, the existence of Houlihan's solvency opinion does not support Chemours's

solvency because, among other things, Houlihan used Historical DuPont's contingent liability

figures that Historical DuPont engineered to massively understate the real potential maximum

exposure in preparing Houlihan's solvency opinion.

486.  **Finally, the Chemours Separation and Spin Transaction occurred shortly before or**

**shortly after a substantial debt was incurred**.  *See* VT UFTA § 2288(b)(10).  The Chemours

Separation and Spin Transaction occurred after the indebtedness under the Credit Agreement and

indentures was incurred.  As part of the Chemours Separation and Spin Transaction, Chemours

incurred significant obligations, namely the assumption of the Chemours Liabilities which

include the Chemours Assumed Environmental Liabilities (as each are defined in the Chemours

Separation Agreement), as well as the indemnification obligations under Section 6.3 of the

Chemours Separation Agreement.  Additionally, Chemours paid the Dividend to Historical

DuPont.

487.  Pursuant to VT UFTA § 2291(a), the State seeks, to the extent necessary to satisfy the

State's claims in this Amended Complaint, the attachment or other provisional remedy

(including levy) against the assets transferred to Historical DuPont and the incurrence of

obligations to Historical DuPont in the Chemours Separation and Spin Transaction, or the

proceeds of such assets now held by DowDuPont, New Dow, and Corteva, or other property of

Historical DuPont, DowDuPont, New Dow, and Corteva, and/or to hold Historical DuPont, The

Chemours Company, DowDuPont, and Corteva liable for any damages or other remedies that may be awarded through this lawsuit.

488.  DowDuPont and Corteva are not good-faith transferees of the assets initially transferred, including the Dividend, to Historical DuPont in the Chemours Separation and Spin Transaction, and later to DowDuPont and Corteva because each of Historical DuPont, DowDuPont, and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Separation and Spin Transaction; and/or (iii) Chemours's insolvency.

489.  The State further reserves such other rights and remedies that may be available to it under VT UFTA as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Amended Complaint.

## XX.    TENTH CAUSE OF ACTION

### Constructive Fraudulent Transfer Related to the Chemours Separation and Spin Transaction, Pursuant to 9 V.S.A. §§ 2289(a) & 2291(a) as in effect on July 1, 2015, and/or such other applicable state law (Against Historical DuPont, The Chemours Company, DowDuPont, and Corteva)

490.  The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

491.  The State seeks relief pursuant to the VT UFTA section 2289(a), against Historical DuPont, The Chemours Company, DowDuPont, and Corteva.

492.  The State was a creditor of Historical DuPont and Chemours at the time of the Chemours Separation and Spin Transaction.

493. Chemours did not receive reasonably equivalent value in return for the assumption and/or incurrence of Chemours Separation and Spin Transaction related obligations, including the transfer of the Dividend.

494. Chemours was insolvent as a result of the Chemours Separation and Spin Transaction. Chemours was balance-sheet insolvent at the time of the Chemours Separation and Spin Transaction. Additionally, the debt trading prices of the Notes reflect insolvency as of the date the Chemours Separation and Spin Transaction closed and spiraled downhill in the immediate aftermath of the Chemours Separation and Spin Transaction. Further, as a result of the Chemours Separation and Spin Transaction, Chemours could not pay its debts as they became due. Lastly, the existence of Houlihan's solvency opinion does not support Chemours's solvency.

495. Pursuant to VT UFTA section 2291(a), the State seeks, to the extent necessary to satisfy the State's claims in this Amended Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Historical DuPont and the incurrence of obligations to Historical DuPont in the Chemours Separation and Spin Transaction, or the proceeds of such assets now held by DowDuPont and Corteva, or other property of Historical DuPont, DowDuPont and Corteva, and/or to hold Historical DuPont, The Chemours Company, DowDuPont, and Corteva liable for any damages or other remedies that may be awarded through this lawsuit.

496. DowDuPont and Corteva are not good-faith transferees of the assets initially transferred, including the Dividend, to Historical DuPont in the Chemours Separation and Spin Transaction, and later to DowDuPont and Corteva because each of Historical DuPont, DowDuPont, and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the

fraudulent intent underlying the Chemours Separation and Spin Transaction; and/or (iii)

Chemours's insolvency.

497.  The State further reserves such other rights and remedies that may be available to it under

VT UFTA as may be necessary to fully compensate the State for the damages and injuries it has

suffered as alleged in this Amended Complaint.

## XXI.   ELEVENTH CAUSE OF ACTION

### Constructive Fraudulent Transfer Related to the Chemours Separation and Spin Transaction, Pursuant to 9 V.S.A. §§ 2288(a)(2) & 2291(a) as in effect on July 1, 2015, and/or such other applicable state law (Against Historical DuPont, The Chemours Company, DowDuPont, and Corteva)

498.  The State realleges and reaffirms each and every allegation set forth in all preceding

paragraphs as if fully restated in this section.

499.  The State seeks relief pursuant to VT UFTA section 2288(a)(2), against Historical

DuPont, The Chemours Company, DowDuPont, and Corteva.

500.  Chemours did not receive reasonably equivalent value in return for the assumption and/or

incurrence of certain Chemours Separation and Spin Transaction related obligations, including

the transfer of the Dividend.  Historical DuPont and Chemours acted without receiving a

reasonably equivalent value in exchange for the transfer or obligation, and Historical DuPont

believed or reasonably should have believed that it would incur debts beyond Chemours's ability

to pay as they became due.

501.  At the time of the Chemours Separation and Spin Transaction, Chemours (i) was engaged

or was about to engage in a business for which its remaining assets were unreasonably small in

relation to Chemours' business, and/or (ii) intended to incur or believed or reasonably should

have believed that it would incur debts beyond its ability to pay as they became due.

502. At the time of the Chemours Separation and Spin Transaction, Historical DuPont and the business line that Chemours would come to own had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Historical DuPont's liability for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS and PFAS-containing products, including those damages and injuries caused by the business line that Chemours would come to own.

503. At the time of the Chemours Separation and Spin Transaction, and at all times relevant to this action, Chemours has been insolvent.

504. Pursuant to VT UFTA section 2291(a), the State seeks, to the extent necessary to satisfy the State's claims in this Second Amended Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Historical DuPont and the incurrence of obligations to Historical DuPont in the Chemours Separation and Spin Transaction, or the proceeds of such assets now held by DowDuPont and Corteva, or other property of Historical DuPont, DowDuPont, and Corteva, and/or to hold Historical DuPont, The Chemours Company, DowDuPont, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

505. DowDuPont and Corteva are not good-faith transferees of the assets initially transferred, including the Dividend, to Historical DuPont in the Chemours Separation and Spin Transaction, and later to DowDuPont and Corteva because each of Historical DuPont, DowDuPont, and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Separation and Spin Transaction; and/or (iii) Chemours's insolvency.

506. The State further reserves such other rights and remedies that may be available to it under VT UFTA as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Second Amended Complaint

## XXII.  TWELFTH CAUSE OF ACTION

### Actual Fraudulent Transfer Related to the Merger, the Subsequent Restructuring Transactions and Assets Transfers, the DowDuPont Separation Agreement, the Dow Spin Transaction, and the Corteva Spin Transaction, Pursuant to 9 V.S.A. §§ 2288(a)(1) & 2291(a) as in effect starting on July 1, 2017, and/or 6 Del. C. §§ 1304(a)(1), & 1307 and/or such other applicable state law (Against Historical DuPont, DowDuPont, and Corteva)

507. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

508. The State seeks relief pursuant to 9 V.S.A. §§ 2288(a)(1) as in effect starting on July 1, 2017 (the Vermont Uniform Voidable Transactions Act (VT UVTA)) and/or 6 Del. C. §§ 1304(a)(1) against Historical DuPont, DowDuPont, and Corteva.

509. The State is and was a creditor of Historical DuPont and DowDuPont at all relevant times.

510. Through its participation in the Merger, the subsequent restructuring transactions and assets transfers, the DowDuPont Separation, the Dow Spin Transaction, and the Corteva Spin Transaction, Historical DuPont and DowDuPont transferred valuable assets and business to DowDuPont and Corteva (the Separation Transfers).

511. The Separation Transfers were made for the benefit of DowDuPont and Corteva.

512. At the time that the Separation Transfers were made, DowDuPont was in a position to control, and did control, DowDuPont and Corteva.

513. DowDuPont, Historical DuPont, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors of Historical DuPont and DowDuPont.

514. The State has been harmed as a result of the Separation Transfers.

515. DowDuPont, Historical DuPont, and Corteva engaged in acts in furtherance of a scheme to transfer assets out of the reach of parties, such as Vermont, that have been harmed as a result of Historical DuPont's and DowDuPont's actions described in this Amended Complaint.

516. As a result of the transfer of assets and liabilities related to the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin Transaction, and the Corteva Spin Transaction described in this Amended Complaint, DowDuPont and Corteva sought to limit the availability of assets to cover judgements for all of the liability for damages and injuries arising from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS and PFAS-containing products.

517. Historical DuPont manufactured, marketed, distributed, sold, and promoted PFAS and PFAS-containing products despite knowing of the health and environmental risks of PFAS for decades before Chemours existed as an independent company.

518. At the time of the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin Transaction, and the Corteva Spin Transaction, Historical DuPont and/or DowDuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding liability of Historical DuPont and DowDuPont, for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS and PFAS-containing products.

519. The State was a creditor of Historical DuPont and DowDuPont at the time of the Merger, the subsequent restructuring transactions and assets transfers, the DowDuPont Separation, the Dow Spin Transaction, and the Corteva Spin Transaction.

520. Historical DuPont and/or DowDuPont acted without receiving reasonably equivalent value in exchange for the transfers and/or obligations comprising the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin Transaction, and the Corteva Spin Transaction. Historical DuPont and/or DowDuPont believed or reasonably should have believed that DowDuPont would incur debts beyond its ability to pay as they became due.

521. At the time of the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin Transaction, and the Corteva Spin Transaction, and at all times relevant to this action, Historical DuPont and DowDuPont had been insolvent because each of their debts were greater than the fair saleable value of each of their assets.

522. A number of the statutorily enumerated badges of fraud are present with respect to the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin Transaction, and the Corteva Spin Transaction, and evidence Defendants' fraudulent intent. *See* VT UVTA § 2288(b); 6 Del. C. § 1304(b).

523. **In connection with the DowDuPont Separation, DowDuPont divided up its assets and obligations among entities it controlled, namely DowDuPont and Corteva**. *See* VT UVTA § 2288(b)(1); 6 Del. C. § 1304(b)(1). Certain obligations were assumed by DowDuPont and Corteva, but not New Dow, including Historical DuPont's liabilities, as well as the indemnification obligations under Article VIII of the DowDuPont Separation Agreement. The transfer of these obligations from Historical DuPont to DowDuPont, then from DowDuPont to DowDuPont and Corteva, occurred at a time that DowDuPont controlled DowDuPont and

Corteva through DowDuPont's Board's members, DowDuPont employees, and DowDuPont agents. DowDuPont was an insider of DowDuPont and Corteva, when the DowDuPont Separation was approved and consummated. *See* VT UVTA § 2285(1)(b), (e); 6 Del. C. § 1301(1)(b), (e).

524. **The DowDuPont Separation concealed the liabilities actually assumed by DowDuPont and Corteva**. *See* VT UVTA § 2288(b)(3); 6 Del. C. § 1304(b)(3). The true scope of the obligations that were to be assumed by DowDuPont and Corteva in the DowDuPont Separation Agreement were concealed. Additionally, the schedules to the DowDuPont Separation Agreement were not publicly filed.

525. **The DowDuPont Separation occurred at a time when Historical DuPont and DowDuPont had been sued or threatened with suit related to environmental liabilities**. *See* VT UVTA § 2288(b)(4); 6 Del. C. § 1304(b)(4). Historical DuPont and DowDuPont were subject to a substantial amount of litigation at the time that the DowDuPont Separation was approved and when it occurred, including numerous environmental suits and remediation actions.

526. **The value of the consideration received by DowDuPont and Corteva in respect of the DowDuPont Separation was not reasonably equivalent to the value of the obligation incurred by DowDuPont and Corteva in the DowDuPont Separation**. *See* VT UVTA § 2288(b)(8); 6 Del. C. § 1304(b)(8).

527. **DowDuPont was insolvent or became insolvent shortly after the DowDuPont Separation, the Dow Spin Transaction, and the Corteva Spin Transaction**. *See* VT UVTA § 2288(b)(9); 6 Del. C. § 1304(b)(9). The VT UVTA recognizes "[i]nsolvency" where the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation. *See* VT UVTA

§ 2286(a), (b); 6 Del. C. § 1302(a), (b).  DowDuPont was balance sheet insolvent at the time of the DowDuPont Separation and the Corteva Spin Transaction.

528.  **Finally, the DowDuPont Separation and the Corteva Spin Transaction occurred shortly before or shortly after a substantial debt was incurred**.  *See* VT UVTA § 2288(b)(10); 6 Del. C. § 1304(b)(10).  The DowDuPont Separation and the Corteva Spin Transaction occurred either shortly before or shortly after DowDuPont's incurrence of $4 billion in indebtedness to Corteva.  As part of the DowDuPont Separation and the Corteva Spin Transaction, DowDuPont incurred significant obligations, namely the assumption of the liabilities and indemnification obligations, each under the DowDuPont Separation Agreement.

529.  Pursuant to VT UVTA § 2291(a) and/or 6 Del. C. § 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Amended Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Corteva and New Dow and the incurrence of obligations to Corteva pursuant to the Corteva Spin Transaction and the Dow Spin Transaction, respectively, or the proceeds of such assets now held by DowDuPont and Corteva, or other property of Historical DuPont, DowDuPont, and Corteva, and/or to hold Historical DuPont, DowDuPont, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

530.  DowDuPont and Corteva are not good-faith transferees of the assets initially transferred to Historical DuPont in the Merger, the Subsequent Restructuring Transactions and Asset Transfers, the DowDuPont Separation Agreement, the Dow Spin Transaction, and the Corteva Spin Transaction, and later to DowDuPont and Corteva because DowDuPont and Corteva knew or should have known of (i) the fraudulent intent underlying the Merger, the Subsequent Restructuring Transaction and Assets Transfers, the DowDuPont Separation Agreement, the

Dow Spin Transaction, and the Corteva Spin Transaction Dividend; and/or (ii) the insolvency of DowDuPont.

531.  The State further reserves such other rights and remedies that may be available to it under VT UVTA as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Amended Complaint.

## XXIII. THIRTEENTH CAUSE OF ACTION

**Constructive Fraudulent Transfer Related to the
Merger, the Subsequent Restructuring Transactions and
Assets Transfers, the DowDuPont Separation Agreement,
the Dow Spin Transaction, and the Corteva Spin Transaction,
Pursuant to 9 V.S.A. §§ 2289(a) & 2291(a) as in effect starting on July 1, 2017,
and/or 6 Del. C. § 1305(a) & 1307
(Against Historical DuPont, DowDuPont, and Corteva)**

532.  The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

533.  The State seeks relief pursuant to VT UVTA § 2289(a) and/or 6 Del. C. § 1305(a) against Historical DuPont, DowDuPont, and Corteva.

534.  The State was a creditor of Historical DuPont and DowDuPont at the time of the DowDuPont Separation.

535.  DowDuPont and Corteva did not receive reasonably equivalent value in return for the assumption and/or incurrence of DowDuPont Separation related obligations.

536.  DowDuPont was insolvent as a result of the DowDuPont Separation.  DowDuPont was balance-sheet insolvent at the time of the DowDuPont Separation.

537.  Pursuant to VT UVTA § 2291(a) and/or 6 Del. C. § 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Amended Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to DowDuPont and Corteva

and the incurrence of obligations to Corteva in the DowDuPont Separation, or the proceeds of such assets now held by DowDuPont and Corteva, or other property of Historical DuPont, DowDuPont, and Corteva, and/or to hold Historical DuPont, DowDuPont, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

538. DowDuPont and Corteva are not good-faith transferees of the assets initially transferred to Historical DuPont in the Merger, the Subsequent Restructuring Transactions and Asset Transfers, the DowDuPont Separation Agreement, the Dow Spin Transaction, and the Corteva Spin Transaction, and later to DowDuPont and Corteva because DowDuPont and Corteva knew or should have known of (i) the fraudulent intent underlying the Merger, the Subsequent Restructuring Transaction and Assets Transfers, the DowDuPont Separation Agreement, the Dow Spin Transaction, and the Corteva Spin Transaction Dividend; and/or (ii) the insolvency of DowDuPont.

539. The State further reserves such other rights and remedies that may be available to it under VT UVTA as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Amended Complaint.

## XXIV. FOURTEENTH CAUSE OF ACTION

**Constructive Fraudulent Transfer Related to the
Merger, the Subsequent Restructuring Transactions and
Assets Transfers, the DowDuPont Separation Agreement,
the Dow Spin Transaction, and the Corteva Spin Transaction,
Pursuant to 9 V.S.A. §§ 2288(a)(2) & 2291(a) as in effect starting on July 1, 2017,
and/or 6 Del. C. § 1304(a)(2) & 1307
(Against Historical DuPont, DowDuPont, and Corteva)**

540. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

541.  The State seeks relief pursuant to VT UVTA § 2288(a)(2) and/or 6 Del. C. § 1304(a)(2) against Historical DuPont, DowDuPont, and Corteva.

542.  Historical DuPont and DowDuPont did not receive reasonably equivalent value in return for the assumption and/or incurrence of certain DowDuPont Separation related obligations. DowDuPont acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and DowDuPont believed or reasonably should have believed that DowDuPont would incur debts beyond its ability to pay as they became due.

543.  At the time of the DowDuPont Separation, DowDuPont was engaged or was about to engage in a business for which its remaining assets were unreasonably small in relation to the business or intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

544.  At the time of the DowDuPont Separation, DowDuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Historical DuPont's and DowDuPont's liability for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS and PFAS-containing products.

545.  At the time of the DowDuPont Separation, and at all times relevant to this action, DowDuPont has been insolvent because its debts were greater than the fair saleable value of its assets.

546.  Pursuant to VT UVTA § 2291(a) and/or 6 Del. C. § 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Amended Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to DowDuPont and the incurrence of obligations to Corteva in the DowDuPont Separation, or the proceeds of such

assets now held by DowDuPont and Corteva, or other property of Historical DuPont, DowDuPont, and Corteva, and/or to hold Historical DuPont, DowDuPont, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

547.    DowDuPont and Corteva are not good-faith transferees of the assets initially transferred to Historical DuPont in the Merger, the Subsequent Restructuring Transactions and Assets Transfers, the DowDuPont Separation Agreement, the Dow Spin Transaction, and the Corteva Spin Transaction, and later to DowDuPont and Corteva because DowDuPont and Corteva knew or should have known of (i) the fraudulent intent underlying the Merger, the Subsequent Restructuring Transaction and Assets Transfers, the DowDuPont Separation Agreement, the Dow Spin Transaction, and the Corteva Spin Transaction Dividend; and/or (ii) the insolvency of DowDuPont.

548.    The State further reserves such other rights and remedies that may be available to it under VT UVTA as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Amended Complaint.

## XXV.   PUNITIVE DAMAGES

### (All Defendants)

549.    Defendants' reprehensible conduct in manufacturing, marketing, distributing, promoting, and/or selling AFFF containing PFAS and/or PFAS for use in AFFF was undertaken with conscious, willful, and wanton disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon the State of Vermont.  Defendants' conduct was outrageously reprehensible and malicious.  Defendants acted and/or failed to act with conscious and deliberate disregard for a known, substantial, and intolerable risk of harm, with the knowledge that their acts or omissions were substantially certain to result in the threatened harm, and/or as a matter of

free and intentional business choices. Therefore, the State requests an award of punitive

damages to the maximum extent permitted by law in an amount reasonable, appropriate, and

sufficient to punish Defendants and deter them from committing the same or similar tortious acts

in the future.

## **PRAYER FOR RELIEF**

The State of Vermont seeks judgment against all Defendants for:

A.    Compensatory damages arising from AFFF-related PFAS contamination and injury of

State natural resources and property, including groundwater, surface waters, drinking

water supplies, biota, wildlife, and their associated soils, sediments, and uses, and

other State natural resources and property, according to proof, including, but not

limited to:

(i)    natural resource damages;

(ii)    loss-of use damages;

(iii)    costs of investigation;

(iv)    costs of testing and monitoring;

(v)    costs of providing water from an alternate source;

(vi)    costs of installing and maintaining wellhead treatment;

(vii)    costs of installing and maintaining a wellhead protection program;

(viii)    costs of installing and maintaining an early warning system to detect

AFFF-related PFAS before it reaches wells;

(ix)    costs of remediating AFFF-related PFAS from natural resources including

groundwater, surface waters, soils, sediments, and other natural resources;

(x)    costs of remediating PFAS contamination at release sites;

    (xi)    any other costs or other expenditures incurred to address AFFF-related PFAS contamination and injury; and

    (xii)    interest on the damages according to law;

B.    An order to compel Defendants to abate PFAS contamination by removing AFFF-related PFAS from State natural resources and property and/or by paying the State's costs to abate the contamination;

C.    Pursuant to (i) VT UFTA §§ 2288(a), 2289(a), and 2291(a), (ii) VT UVTA §§ 2288(a), 2289(a), and 2291(a), 6 Del. C. §§ 1304(a), 1305, and 1307, as applicable, and/or such other applicable state law, all remedies including an attachment or other provisional remedy (including levy) against the assets transferred to, and the incurrence of obligations to, Historical DuPont, DowDuPont, and/or Corteva, or other property of Historical DuPont, DowDuPont, and Corteva, and/or to hold Historical DuPont, The Chemours Company, DowDuPont, and Corteva liable for any damages that may be awarded under this Second Amended Complaint;

D.    Ordering that the State is entitled to avoid the transfer of Historical DuPont's liabilities to The Chemours Company and put the State in the position it would have been had the transfer not occurred;

E.    Punitive damages;

F.    Costs (including reasonable attorney fees, court costs, and other expenses of litigation);

G.    Prejudgment interest; and

H.    Any other and further relief as the Court deems just, proper, and equitable.

## JURY TRIAL DEMANDED

The State demands a trial by jury.

**Dated:**    September 4, 2024

STATE OF VERMONT

CHARITY R. CLARK
ATTORNEY GENERAL

/s/ Laura B. Murphy
Laura B. Murphy
Assistant Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-3186
Email: laura.murphy@vermont.gov

Matthew F. Pawa
Benjamin A. Krass
SEEGER WEISS LLP
1280 Centre Street, Suite 230
Newton Centre, MA  02459
(617) 641-9550
Email: MPawa@seegerweiss.com
          BKrass@seegerweiss.com

Kyle J. McGee
Viola Vetter
Jason H. Wilson
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
(302) 622-7000
Email: kmcgee@gelaw.com
          vveter@gelaw.com
          jwilson@gelaw.com